**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Timothy C. Moore #M-39367, ) | |
| ) | Case No. 19-cv-3892 |
| Plaintiff, ) | Judge Sara L. Ellis |
| v. ) | |
| ) | |
| Walter Nicholson et al., ) | |
| ) | |
| Defendant(s). ) | |
| ) | |

## FIRST AMENDED COMPLAINT

Timothy C. Moore (IDOC No. M-39367), by and through his attorneys,

Bartlit Beck LLP, brings this action against Defendants Walter Nicholson, Nathan Shepherd,

Cynthia Harris, Anna McBee, Susan Lyday, Dr. Christian Okezie, Dr. Marlene Henze, LaTanya

Williams, Dawn Cetta, Lidia Lewandowska, and Wexford Health Sources, Inc.

### INTRODUCTION

1.      In June 2018, Timothy Moore's cell in the D-Unit at Stateville Correctional

Center was littered with cockroaches.  In response to a memo from Stateville's warden that

inmates could request exterminator services if they have cockroaches inside their cell,

Mr. Moore immediately asked a Stateville correctional officer to send an exterminator to his cell.

2.      A few weeks later, after Mr. Moore's request to the correctional officer went

unheeded, Mr. Moore wrote to the warden directly to request that his cell be exterminated.

Getting no response, Mr. Moore again asked the same correctional officer to ensure his cell was

exterminated.  All of his requests were ignored.

3.      On July 18, 2018, while Mr. Moore slept, a cockroach crawled inside his right ear and burrowed itself into his ear canal.  Two days later, a Wexford Health Sources employee flushed the cockroach from Mr. Moore's ear.  Mr. Moore was not provided with any medication at this time.  Instead, he was told to obtain earplugs to ward off future cockroaches, and sent on his way.

4.      Over the next several months, Mr. Moore suffered from ear pain, blurred and double vision, dizziness, and progressive hearing loss.  He complained to Stateville's medical personnel time and again about these conditions.  But just as Mr. Moore's requests to have his cell exterminated were ignored, so too were his pleas for medical care.  It was not until February 2019 that Mr. Moore received a hearing test, and despite the alarming results indicating near complete hearing loss, he was forced to wait another four months before he saw a hearing specialist.

5.      As a result of the Illinois Department of Corrections Defendants' failure to provide constitutionally adequate living conditions, and the Wexford Health Sources Defendants' failure to provide constitutionally adequate and Illinois state law compliant medical care, Mr. Moore has endured pain and suffering, emotional trauma, and near-total hearing loss.

## JURISDICTION AND VENUE

6.      Mr. Moore brings his federal civil rights claims pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.  This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).  This Court has subject-matter jurisdiction over Mr. Moore's state law claims under 28 U.S.C. § 1367.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2).  A substantial portion of the events giving rise to Mr. Moore's claims occurred in this district, and on information and belief, one or more of the Defendants are residents of this district.

**PARTIES**

8.      Plaintiff Timothy C. Moore is in the custody of the Illinois Department of Corrections ("IDOC"), and at all times relevant to the facts and claims alleged in this First Amended Complaint, Mr. Moore was incarcerated at Stateville Correctional Center ("Stateville").

9.      Defendant Walter Nicholson ("Warden Nicholson") was at all times relevant to the facts and claims alleged in this First Amended Complaint applicable to Mr. Nicholson the warden at Stateville.  As warden, Mr. Nicholson was responsible for the health and safety of the inmates in his custody at Stateville.  Warden Nicholson is sued in his individual capacity.

10.      Defendant Nathan Shepherd ("CO Shepherd") was at all times relevant to the facts and claims alleged in this First Amended Complaint a correctional officer at Stateville. Because Mr. Moore personally solicited CO Shepherd's assistance in remedying the cockroach infestation in his cell, CO Shepherd was responsible for the dangerous condition of Mr. Moore's cell.  CO Shepherd is sued in his individual capacity.

11.      Defendant Anna McBee ("Grievance Officer McBee") was at all times relevant to the facts and claims alleged in this First Amended Complaint a grievance officer at Stateville. Because Grievance Officer McBee personally evaluated multiple of Mr. Moore's grievances regarding his unsanitary living conditions and inadequate medical care and had the opportunity and authority to intervene to ameliorate either or both, Grievance Officer McBee was responsible

3

for the injuries Mr. Moore suffered as a result of her inaction. Grievance Officer McBee is sued in her individual capacity.

12.     Defendant Susan Lyday ("Grievance Officer Lyday") was at all times relevant to the facts and claims alleged in this First Amended Complaint a grievance officer at Stateville. Because Grievance Officer Lyday personally evaluated multiple of Mr. Moore's grievances regarding his unsanitary living conditions and inadequate medical care and had the opportunity and authority to intervene to ameliorate either or both, Grievance Officer Lyday was responsible for the injuries Mr. Moore suffered as a result of her inaction. Grievance Officer Lyday is sued in her individual capacity.

13.     Defendant Cynthia Harris ("Counselor Harris") was at all times relevant to the facts and claims alleged in this First Amended Complaint a correctional counselor at Stateville. Because Counselor Harris personally evaluated multiple of Mr. Moore's grievances regarding his unsanitary living conditions and inadequate medical care and had the opportunity and authority to intervene to ameliorate either or both, Counselor Harris was responsible for the injuries Mr. Moore suffered as a result of her inaction. Counselor Harris is sued in her individual capacity.

14.     Defendant Wexford Health Sources, Inc. ("Wexford") is a corporation formed under the laws of the state of Florida with its principal place of business in Pittsburgh, Pennsylvania. At all times relevant to the facts and claims alleged in this First Amended Complaint, Wexford had a contractual relationship with the IDOC pursuant to which Wexford was responsible for providing healthcare services to inmates at IDOC facilities. As an IDOC agent exercising delegated governmental functions, Wexford is a state actor under 42 U.S.C. § 1983.

4

15.     Defendant Nurse Dawn Cetta ("Nurse Cetta") is a nurse employed by Wexford. At all times relevant to the facts and claims alleged in this First Amended Complaint, Nurse Cetta served as a nurse at Stateville.  Because of Mr. Moore's status as an inmate at Stateville, Nurse Cetta was responsible for Mr. Moore's medical care.  Nurse Cetta is sued in her individual capacity.

16.     Defendant Nurse Lidia Lewandowska ("Nurse Lewandowska") is a nurse employed by Wexford.  At all times relevant to the facts and claims alleged in this First Amended Complaint, Nurse Lewandowska served as a nurse at Stateville.  Because of Mr. Moore's status as an inmate at Stateville, Nurse Lewandowska was responsible for Mr. Moore's medical care.  Nurse Lewandowska is sued in her individual capacity.

17.     Defendant Physician Assistant LaTanya Williams ("PA Williams") is a physician assistant employed by Wexford.  At all times relevant to the facts and claims alleged in this First Amended Complaint, PA Williams served as a physician assistant at Stateville.  Because of Mr. Moore's status as an inmate at Stateville, PA Williams was responsible for Mr. Moore's medical care.  PA Williams is sued in her individual capacity.

18.     Dr. Christian Okezie is a doctor employed by Wexford.  At all times relevant to the facts and claims alleged in this First Amended Complaint, Dr. Okezie served as the acting Medical Director at Stateville.  Because of Mr. Moore's status as an inmate at Stateville, Dr. Okezie was responsible for Mr. Moore's medical care.  Dr. Okezie is sued in his individual capacity.

19.     Dr. Marlene Henze is a doctor employed by Wexford.  At all times relevant to the facts and claims alleged in this First Amended Complaint, Dr. Henze served as a doctor at

Stateville. Because of Mr. Moore's status as an inmate at Stateville, Dr. Henze was responsible

for Mr. Moore's medical care. Dr. Henze is sued in her individual capacity.

## FACTUAL ALLEGATIONS

### A Cockroach Crawls Into Mr. Moore's Ear

20.     Ever since Mr. Moore moved to Cell 538 in Stateville's Delta Unit (or "D-

House") on May 18, 2017, he has spotted cockroaches in his cell. Mr. Moore would often find

cockroaches crawling underneath, alongside, and in his bed.

21.     The infestation was so pervasive that Mr. Moore always felt as if something was

crawling on him. He struggled to fall asleep at night, kept awake by the fear that cockroaches

would crawl over him in his sleep. Disgusted by the pests—and hearing reports from fellow

inmates of cockroaches crawling inside mouths, nostrils, and ears—Mr. Moore asked CO

Shepherd to request extermination services for Mr. Moore's cell. CO Shepherd told Mr. Moore

that he would put in a work order to have Mr. Moore's cell exterminated.

22.     A few weeks passed and no exterminator appeared. Thus, on July 4, 2018,

Mr. Moore wrote Warden Nicholson to reiterate his plea for an exterminator. Not content to wait

on a response from the warden, Mr. Moore also renewed his request to CO Shepherd several

more times in July alone. CO Shepherd informed Mr. Moore that he had put in the work order to

have Mr. Moore's cell exterminated.

23.     Mr. Moore was far from the first inmate at Stateville besieged by cockroaches.

The prison's infestation has spurred myriad lawsuits:

> a.  *Davis v. Williams*, 216 F. Supp. 3d 900, 904 (N.D. Ill. 2016) (Stateville
>     inmate alleging that two cockroaches had to be flushed from his ear)
>
> b.  *Curry v. Pfister*, No. 17 C 2052, 2019 WL 3801722, at *2 (N.D. Ill. Aug. 12,
>     2019) (Stateville inmate had cockroach flushed from his ear)

    c. *Gray v. Hardy*, 826 F.3d 1000, 1003–04 (7th Cir. 2016) ("[Stateville inmate] sees cockroaches at least every other day, and sometimes as often as every few minutes.")

    d. *Boclair v. Godinez*, No. 13 C 08630, 2017 WL 1427069, at *2 (N.D. Ill. Apr. 21, 2017 (a "massive cockroach infestation in his [Stateville] F-House cell.")

    e. *Scott v. Pinas*, No. 14 C 6547, 2017 WL 3979101, at *2 (N.D. Ill. Sept. 11, 2017) (Stateville inmate alleging that cockroach crawled inside his ear while he slept)

24.    Independent inspections corroborate these prisoner complaints. For example, in *Lippert v. Baldwin*, a panel of medical experts was appointed by the court to assess whether the IDOC was "providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy." Ex. 1, Report of the 2nd Court Appointed Expert, *Lippert v. Baldwin*, No. 1:10-cv-04603 (N.D. Ill. Nov. 14, 2018), ECF No. 767 ("2018 *Lippert* Report"), at 2. In the experts' visit to Stateville, they found cockroaches throughout the infirmary. *Id.* at 34-35, 87.

25.    Other Stateville inspections have also noted a widespread infestation. A 2013 report by the John Howard Association of Illinois noted that "inmates reported cockroaches were impossible to get rid of and swarmed their cells at night, even getting in their ears and wound dressings." Ex. 2, John Howard Association of Illinois, Monitoring Visit to Stateville Correctional Center 2013, at 12.[1] The report found these complaints "common and credible." *Id.*

26.    Yet despite Mr. Moore's multiple requests for his cell to be exterminated, no exterminator ever visited Mr. Moore's cell—not after his first request to CO Shepherd in early

---

[1] This report is attached hereto as Ex. 2, and is available online at https://static1.squarespace.com/static/5beab48285ede1f7e8102102/t/5d03e28f1e07180001daf79f/1560535695351/Stateville+Correctional+Center+Report+2013.pdf

June 2018, not after his letter to Warden Nicholson on July 4, 2018, and not after his further requests to CO Shepherd that same month. Indeed, to date, no exterminator has sprayed the inside of Mr. Moore's cell.

27. Sometime between the night of July 18, 2018 and the morning of July 19, 2018, a cockroach crawled into Mr. Moore's right ear and burrowed itself in his ear canal.

28. Mr. Moore requested medical care on July 19, 2018, and on July 20, Nurse Cetta flushed the cockroach from his ear. Nurse Cetta instructed Mr. Moore to obtain ear plugs; she did not provide any further treatment or schedule Mr. Moore for follow-up care with a physician assistant or medical doctor.

### Defendants Ignore Mr. Moore's Pleas for Help

29. On July 21, 2018, Mr. Moore filed a grievance requesting to have his cell exterminated. Rather than ensure that Mr. Moore's cell was exterminated—even after it was confirmed a cockroach was flushed from his ear—Counselor Harris noted only that "[p]er the Unit Security Staff, the units are exterminated monthly."

30. Counselor Harris's response ignored Mr. Moore's actual complaint. Mr. Moore needed his *cell* to be exterminated, not just his Unit (D-House). On information and belief, the regular exterminator visits at Stateville do not include the spraying of individual cells; an exterminator does not enter individual cells unless personally escorted by a Stateville correctional officer.

31. Mr. Moore was told by IDOC personnel that in order to have his actual cell exterminated, he needed to request such extermination from a correctional officer. The correctional officer would then relay the request through the proper channels. That is why

Mr. Moore had repeatedly asked CO Shepherd and Warden Nicholson to ensure his cell received particular attention.

32.     In the last week of July 2018, Mr. Moore began experiencing ear pain and noticed that he was having trouble hearing out of his right ear.

33.     On August 2, 2018, Mr. Moore put his name on the D-House sick-call list, but was told the following morning (by a Stateville correctional officer not named in this action) that Nurse Lewandowska had removed him from the list.  So began a pattern that persisted throughout the fall of 2018: Wexford employees either refusing to treat Mr. Moore at all, or providing him with woefully inadequate care.

34.     On August 3, 2018, Mr. Moore filed two separate grievances requesting medical treatment (Nos. 5574 and 5498).  He documented that his "right ear has been bothering me for about a week now," and specifically noted "an irritating pain and hearing loss in my right ear," the same ear from which a cockroach was removed two weeks prior.  On August 14, 2018, Grievance Officer McBee denied the grievances as moot because Mr. Moore "appear[ed] to be receiving medical care at this time."  She reasoned that she lacked the "medical expertise or authority to contradict the doctor's/DON's/RN's recommendation/diagnosis."  But one need not be a medical expert to understand that cancelling the appointment of someone in acute, infection-like pain at the site of a recent injury constitutes a failure to provide proper medical care. Further, Mr. Moore's complaint was not simply that Wexford medical personnel were refusing to treat him; it was that they were not addressing his ear pain and hearing loss, which was growing more severe by the day.

**Wexford Defendants Fail to Properly Diagnose and Treat Mr. Moore's Condition**

35.     Mr. Moore was seen by an unidentified nurse (not named in this complaint) on August 11, 2018.  He reported that he was suffering throbbing and crushing headaches, blurry and double vision, and ear pain in his right ear.  The nurse scheduled a follow-up visit.

36.     On August 15, 2018, Mr. Moore was seen by PA Williams; he told her that he was experiencing sharp headaches, that his right ear hearing was muffled, and that his ear ringed off and on.  Despite having a cockroach removed from his ear just weeks earlier, PA Williams treated Mr. Moore only for allergies and sinus congestion.

37.     Mr. Moore's ear pain, muffled hearing, and headaches persisted.  So Mr. Moore again signed up for medical care, which was refused "due to no provider."  When Mr. Moore was finally seen again on September 24, 2018, he told PA Williams that he was still suffering from a "muffled sensation" in his right ear.  PA Williams concluded that the problem was allergic rhinitis or sinusitis and prescribed Mr. Moore the antibiotic amoxicillin.

38.     Convinced that Wexford staff was failing to take seriously his complaints of pain and hearing loss, Mr. Moore on October 8, 2018 filed another grievance (No. 6553).  He explained that ever since the cockroach was flushed from his ear on July 20, he had been "having difficulties hearing, coupled with pain in my right ear.  I've been complaining to Stateville's medical staff over and over again, however to no avail.  I'm in 'dire' pain!"  For "relief requested," Mr. Moore wrote: "For Stateville's Health Care Unit to give me the proper medical treatment i.e., hearing test and a MRI and or send this grievant to the proper health care unit that can tender to me grievant immediate medical attention."  Although the IDOC received this grievance on October 12, 2018, it inexplicably did not review that grievance until January 6, 2020—15 months after Mr. Moore reiterated his complaint that Wexford medical personnel were

10

not treating his ear pain and hearing loss.  Grievance Officer Lyday denied the grievance as moot

because Mr. Moore had by then received a hearing aid for his left ear.  By that point, however,

Mr. Moore had gone completely deaf in his right ear, due in part to the IDOC's and Grievance

Officer Lyday's inexcusable 15-month delay in responding to Mr. Moore's grievance.

39.     On October 10, 2018, Mr. Moore inquired when he would next see PA Williams,

and he was assured his appointment was set for October 24.  But on October 24, Mr. Moore was

denied treatment "due to time constraints."

40.     When PA Williams actually saw Mr. Moore again on October 31, 2018, she

reported that Mr. Moore's sinuses had improved but that his right ear hearing was still muffled.

Nonetheless, her sinusitis treatment protocol continued.

41.     On November 26, 2018, Mr. Moore complained again of his continued hearing

loss to PA Williams, who noted that Mr. Moore "still can't hear out of right ear."  Finally, PA

Williams referred Mr. Moore to Stateville's medical director to discuss his hearing loss.

42.     At various times during his visits with Wexford medical personnel in the fall of

2018, Mr. Moore reminded his treaters that his ear pain, hearing loss, and associated symptoms

began after the cockroach was removed from his ear in July 2018.  He was nevertheless treated

as if these symptoms stemmed only from ordinary sinus or allergy complications.

43.     It was not until December 19, 2018 that Mr. Moore was evaluated by a doctor.

On that date, Stateville's Medical Director documented Mr. Moore's severe hearing loss and

authorized an audioscope "once available."  The identity of the Medical Director is not apparent

from Mr. Moore's medical records, but on information and belief, Mr. Moore believes it was

Dr. Okezie, Dr. Marlene Henze, or an unidentified Wexford physician.

44.     On February 8, 2019—sixth months after Mr. Moore complained of ear pain and losing his hearing—he received his first hearing test.  The results were grim:  Mr. Moore registered no hearing in his right ear at two of the three frequencies tested.

45.     On February 18, 2019, an unidentified Wexford physician ordered a collegial review to consider whether Mr. Moore should be authorized for an off-site audiogram.  A collegial review is a process that Wexford requires before it will schedule an inmate for medical treatment outside the prison facility.  If, as here, a medical provider believes that a consult with an outside specialist may be necessary, the provider will submit a request to Wexford.  Typically, Wexford will assign one of its out-of-state physicians or staff to review the request in conjunction with the provider.  On February 26, the collegial review approved Mr. Moore to receive an off-site audiology evaluation.

46.     Despite this already delayed authorization, Mr. Moore had to wait another four months to get an off-site audiology evaluation.  When Mr. Moore asked why it was taking so long to receive the off-site care, he was told only that there was a significant backlog.  His hearing loss progressed in the interim, and his other symptoms—ear pain, vision problems, and nausea—persisted.

47.     On June 10, 2019, Mr. Moore was finally transferred to Ortiz Eye Associates & Ortiz Hearing in Morris, IL.  There, Hearing Instrument Specialist Matt Walk determined that Mr. Moore's right ear was "dead/unaidable" and his left ear had "severe loss."

48.     Mr. Walk explained to Mr. Moore that his hearing loss could have been prevented had Mr. Moore received proper treatment to kill the bacteria left by the cockroach after it was flushed from his ear.  Mr. Walk further explained that that the lack of proper medical treatment is what encouraged the development of the resistant bacteria that eventually damaged the hair cells

located in Mr. Moore's inner ear, or cochlea. Once damaged, the hair cells do not vibrate in the appropriate way, causing the impulses to the brain to be dampened or garbled, which in turn makes hearing comprehension difficult or impossible. Mr. Walk told Mr. Moore that this damage was irreparable.

49. On information and belief, Mr. Moore appeared to suffer from one of two debilitating conditions: Sudden Hearing Loss (or "SHL") or Meniere's disease. SHL typically begins with gradual loss of hearing in one ear and is often accompanied by tinnitus (ringing in the ears), dizziness, vertigo, or both. Mr. Moore was experiencing all these symptoms in August 2018, weeks after the cockroach was flushed from his ear. Similar symptoms indicate Meniere's disease, although symptoms tend to occur episodically, i.e. symptoms come and go, and hearing loss tends to be more gradual than with SHL.

50. When patients present with these symptoms, the standard treatment protocol is exactly what Mr. Moore (an inmate with zero medical training) requested in his October 8, 2018 grievance: a hearing test and MRI.[2] But Mr. Moore did not even receive a hearing test until February 2019 or see a hearing specialist until June 2019, by which point Mr. Moore was almost completely deaf.

51. To summarize, Mr. Moore began complaining of headaches, blurred vision, right ear pain, ringing, and hearing loss almost immediately after a cockroach was flushed from that same ear on July 20, 2018. Yet, not once over the next several months did any Wexford medical

---

[2] Dr. Lawrence Lusting of the Columbia University Medical Center has written about Sudden Hearing Loss symptoms and treatment in the Merck Manual, available at https://www.merckmanuals.com/professional/ear,-nose,-and-throat-disorders/hearing-loss/sudden-hearing-loss#v944520. Of particular note here: "Patients should have an audiogram, and unless the diagnosis is clearly an acute infection or drug toxicity, most clinicians do gadolinium-enhanced MRI to diagnose inapparent causes, particularly for unilateral losses. Patients with an acute traumatic cause also should have MRI."

provider connect those symptoms to a bacteria-laden cockroach having burrowed into his ear canal. That failure continued even after his symptoms persisted through treatment protocols for allergies and sinusitis. It was not until November 2018 that PA Williams determined Mr. Moore ought to see a doctor, and it was not until February 2019 that Mr. Moore's hearing was tested. And when he finally did see a hearing specialist in June 2019, he was deaf in one ear and nearly deaf in the other.

**Wexford's Cost-Driven Care Policies and Procedures**

52.      Under its contract with the State of Illinois, Wexford must ensure that all medical services are provided to IDOC inmates in accordance with medically accepted American Correctional Association standards of care. On information and belief, and contrary to medically accepted standards of care, Wexford has adopted policies or procedures that result in reduced and delayed access to care and/or inadequate care. These policies and procedures cause substantial delays in referring, approving, scheduling, and providing off-site medical treatment.

53.      Wexford has a clear financial incentive to maintain policies and procedures that inhibit inmate access to essential off-site medical care. Wexford's contract with the state of Illinois includes a provision, 3.1.2, which results in a reduction in Wexford's compensation "by an amount equal to what the State pays out for Hospital Service once Billed Charges exceed the Annual Hospital Utilization Threshold." *See* Ex. 3 at 27. Should Wexford provide more care for inmates than its "Utilization Threshold" allows, the state of Illinois reduces the amount it pays Wexford. Wexford thus has a clear financial incentive to minimize the amount of off-site medical care (like the hearing examination Mr. Moore received) that it provides to inmates to avoid exceeding the Utilization Threshold.

54.    Wexford's policies and procedures interfere with its treating providers'
independent and clinical judgment in diagnosing and treating their patients.  On information and
belief, Wexford physicians lack the decisionmaking authority to order medically indicated tests
and procedures, and/or have little incentive or ability to ensure their patients' treatment needs are
met once their cases have been referred to Wexford's Utilization Management team.

55.    These policies and procedures, as set forth above and as further shown below,
manifest in Wexford employees recommending off-site treatment only as a last resort and only
after the collegial review process involving multiple providers yields approval, even where it is
obvious Wexford lacks the medical expertise or equipment necessary to further treat the patient,
as was true for Mr. Moore.

56.    Wexford has adhered to these policies and procedures notwithstanding its
knowledge that they encourage Wexford employees to provide substandard care.  In 2014, a
team of experts appointed by the U.S. District Court for the Northern District of Illinois in
*Lippert v. Baldwin* investigated the adequacy of healthcare services at various IDOC facilities.
They reported that the process in place for identifying a need for, approving, and providing
specialty care suffered "breakdowns in almost every area," including substantial delays in
actually providing that specialty care in the first instance.  Ex. 4 at 29.  The October 2018 *Lippert*
Report by a second court-appointed team of experts echoed the 2014 findings and declared
Wexford's process for approving specialty care through the collegial review process a "patient
safety hazard" that should be abandoned.  Ex. 1 at 10.

57.    In addition, Wexford maintains policies and procedures that cause inadequate
staffing at IDOC facilities, including Stateville, both in terms of the number of medical personnel
Wexford staffs at any given time that are capable of providing medical services to inmates and in

terms of the qualifications and expertise of that personnel. As to the quantity of staffing, on information and belief, Wexford maintains a bare minimum of staffing at IDOC facilities, including Stateville. According to the 2018 *Lippert* report, "[s]taffing is deficient, even if [budgeted] vacancies were filled." *Id.* at 12. The report continued that, in particular, "[p]hysician staffing . . . is very poor," noting that Wexford "could not remember the last time there was a full physician staff." *Id.* at 26. As to the quality of Wexford staff, one of the 2018 *Lippert* Report's "key findings" was that Wexford "fails to hire properly credentialed and privileged physicians," which "significantly increases risk of harm to patients within the IDOC." *Id.* at 10.

58.     These policies and procedures, as set forth above and as further shown below, manifest in inmates being denied care "due to time constraints" and "due to no provider," despite inmates having previously scheduled appointments. Mr. Moore was told this multiple times in 2018 alone, resulting in long gaps in care during times of critical medical need. On information and belief, these policies and procedures also can be seen in the number of times inmates are seen by nurses and physician assistants, rather than medical doctors, even after the former fail to succeed in treating an inmate's medical condition, including Plaintiff's.

59.     Last, Wexford has failed to adopt and maintain policies and procedures that ensure adequate supervision of its treating medical providers. The October 2018 expert report cited above put it bluntly: "Since there is inadequate oversight by the IDOC over physicians, the supervision of Wexford Regional Medical Directors is the only oversight of physicians. Wexford is thereby evaluating its own performance and does this extremely poorly." Ex. 1 at 19. On information and belief, the Wexford Regional Medical Directors are responsible for ensuring that direct patient care is consistent with medically accepted standards. But according to the

2018 *Lippert* report, they do very little actual supervision: "Although the Wexford Regional Medical Directors have a clinical supervisory role over their physicians, based on their job descriptions we could not verify that they perform this adequately, as they perform no peer review, mortality review, or formal written review of clinical work." *Id.* at 19. The same report later found "no evidence . . . that verifies their oversight of physicians except their statements that they review the work of the physicians." *Id.* That same lack of supervision cascades throughout Wexford's treaters. With respect to nurses, the report concluded that "[t]here is no meaningful monitoring of nurse quality of care. If care is provided it is presumed to be adequate, when it fact it may not be adequate." *Id.* at 10.

60. These policies and procedures, as set forth above and as further shown below, manifest in the presumption of both the IDOC and Wexford employees that an inmate's medical needs have been adequately addressed so long as the inmate has received treatment. These policies and procedures are further illustrated in the unwillingness or inability of Wexford treating providers to alter their diagnoses or treatment plans even after inmates fail to positively respond to said diagnoses or treatment plans.

**Mr. Moore's Hearing Loss and Other Ongoing Damages**

61. The IDOC approved Mr. Moore for a hearing aid for his left ear, and Mr. Moore received his hearing aid from Mr. Walk on July 30, 2019. Mr. Moore can hear out of his left ear only with the use of this hearing aid. His hearing, however, remains deeply impacted.

62. Even with the help of the hearing aid, Mr. Moore routinely slept through the call announcing breakfast. It took the IDOC months to approve Mr. Moore's request for a watch alarm that could wake him up so as not to miss a meal. To date, Mr. Moore has still not received the watch.

63.     Unable to hear when another inmate or correctional officer may be approaching him, Mr. Moore now feels less capable of protecting himself in Stateville's already dangerous environment.  While the hearing aid helps provide a modicum of personal security, it also causes Mr. Moore to feel shame—he is embarrassed to be wearing the obvious device at such a young age amidst his fellow inmates.

64.     Those feelings of shame snowballed into anxiety and depression, for which Mr. Moore began receiving treatment in the fall of 2019.  In addition to the embarrassment Mr. Moore feels around other inmates, Mr. Moore has trouble falling asleep for fear of another cockroach crawling in his ear and suffers anxiety over the prospect of losing his hearing completely.  To treat his anxiety and depression, Mr. Moore has been prescribed and is currently taking the antidepressants Paxil and Zoloft.

65.     Mr. Moore also suffers additional and ongoing physical injuries beyond the hearing loss.  He has continued to experience dizziness, nausea, and ear pain and often feels lightheaded; these symptoms are consistent with vertigo, a condition often caused by inner-ear injury or infection.  Mr. Moore has repeatedly sought care for these ailments, and he has been prescribed and often takes Meclizine.

66.     Mr. Moore's injuries were caused by the IDOC Defendants' failure to maintain sanitary living conditions and the Wexford Defendants' failure to properly diagnose and treat his medical conditions.  Defendants' unjustifiable actions (or inaction) have needlessly left Mr. Moore almost totally deaf and forced him to endure physical and emotional pain and suffering.

18

### COUNT I: 42 U.S.C. § 1983
### Deliberate Indifference – Unsanitary Living Conditions
### (Against Warden Nicholson, CO Shepherd, and Counselor Harris)

67.     Plaintiff restates and realleges paragraphs 1-66 as though fully set forth herein.

68.     At all relevant times, Plaintiff was an inmate in the care, custody, and control of the IDOC.

69.     At all relevant times, Warden Nicholson, CO Shepherd, and Counselor Harris were employed by the IDOC and acting under color of state law.

70.     As set forth above, Warden Nicholson, CO Shepherd, and Counselor Harris were aware of Plaintiff's unsanitary living conditions—specifically, a cell plagued by a cockroach infestation—but refused to take steps to remedy those living conditions.  Their failure to do so constitutes deliberate indifference to Plaintiff's right to sanitary and constitutionally adequate conditions of confinement in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S. § 1983.

71.     As a direct and proximate result of the deliberate indifference of Warden Nicholson, CO Shepherd, and Counselor Harris, Plaintiff endured a cockroach burrowing itself in his ear, which ultimately lead to his near-total hearing loss, pain, suffering, and emotional distress.

### COUNT II: 42 U.S.C. § 1983
### Deliberate Indifference – Serious Medical Need
### (Against Grievance Officer McBee and Grievance Officer Lyday)

72.     Plaintiff restates and realleges paragraphs 1-71 as though fully set forth herein.

73.     At all relevant times, Plaintiff was an inmate in the care, custody, and control of the IDOC.

74.     At all relevant times, Grievance Officer McBee and Grievance Officer Lyday were employed by the IDOC and acting under color of state law.

75.     As set forth above, Grievance Officer McBee and Grievance Officer Lyday were aware of Plaintiff's serious medical need for treatment of his ear pain, blurred vision, dizziness, and progressive (and now permanent) hearing loss but failed to intervene to ensure Plaintiff received adequate care.  Grievance Officer McBee's and Grievance Officer Lyday's refusal to take action despite their opportunity and authority to do so constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eight and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

76.     As a direct and proximate result of Grievance Officer McBee's and Grievance Officer Lyday's deliberate indifference to Plaintiff's serious medical needs, Plaintiff was denied appropriate treatment for months, aggravating the extent of his permanent hearing loss and needlessly prolonging his pain, suffering, and emotional distress.

**COUNT III: 42 U.S.C. § 1983**
**Deliberate Indifference – Serious Medical Need**
**(Against Nurse Cetta, Nurse Lewandowska, PA Williams,**
**Dr. Okezie, Dr. Henze, and Does 1-10)**

77.     Plaintiff restates and realleges paragraphs 1-76 as though fully set forth herein.

78.     At all relevant times, Plaintiff was an inmate in the care, custody, and control of the IDOC.

79.     At all relevant times, the State of Illinois contracted with Defendant Wexford to provide healthcare to IDOC inmates, including Plaintiff.

80.     At all relevant times, Nurse Cetta, Nurse Lewandowska, PA Williams, Dr. Okezie, Dr. Henze, and Does 1-10 were employed by Wexford and, pursuant to Wexford's contract with the State of Illinois, were acting under color of state law.

81.     Does 1-10 signify all those individuals employed by Wexford who provided medical care to Plaintiff, related to Plaintiff's ear- and hearing-related injuries that Plaintiff has heretofore been unable to identify.[3]

82.     As set forth above, Nurse Cetta, Nurse Lewandowska, PA Williams, Dr. Okezie, Dr. Henze, and Does 1-10 were aware of Plaintiff's serious medical need for treatment of his ear pain, blurred vision, dizziness, and progressive (and now permanent) hearing loss but failed to take steps to provide Plaintiff adequate medical care.  Their failure to provide Plaintiff adequate medical care despite their responsibility to do so constitutes deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

83.     As a direct and proximate result of their deliberate indifference to Plaintiff's serious medical needs, Plaintiff's hearing needlessly (and permanently) deteriorated and Plaintiff was forced to endure pain, suffering, and emotional distress.

### COUNT IV: 42 U.S.C. § 1983
### Deliberate Indifference – Serious Medical Need – *Monell* Claim
### (Against Wexford Health Sources, Inc.)

84.     Plaintiff restates and realleges paragraphs 1-83 as though fully set forth herein.

85.     At all relevant times, Wexford contracted with the State of Illinois to provide healthcare to IDOC inmates, including Plaintiff.

---

[3] Plaintiff's medical records do not provide this information in every instance.  At times, the signature of the treating provider is simply illegible.  At other times, it appears that a nurse may sign a record on behalf or in lieu of the physician assistant or medical doctor who also treated Plaintiff during a given visit.  Plaintiff has repeatedly requested that Defendant Wexford identify all individuals who participated in Mr. Moore's medical care from the July 2018 cockroach incident through the present, but Wexford has failed to provide that information.

86.     At all relevant times, Wexford employed Nurse Cetta, Nurse Lewandowska, PA Williams, Dr. Okezie, Dr. Henze, and various other unidentified individuals who participated in Plaintiff's medical care, all of whom were acting under color of state law.

87.     At all relevant times, Wexford was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by Wexford and IDOC employees who participated in the provision of medical care to inmates incarcerated at Stateville, including Plaintiff.

88.     Wexford adopted and maintained policies and procedures that discouraged specialty care generally and off-site treatment specifically.  Wexford additionally adopted and maintained policies and procedures that forced its employees to deny an inmate care altogether, or to require an inmate to see a nurse or physician assistant in lieu of a medical doctor.  Finally, Wexford adopted and maintained policies and procedures that caused its employees to adhere to misdiagnoses and failed treatment protocols rather than consult with colleagues or seek outside assistance.

89.     Nurse Cetta, Nurse Lewandowska, PA Williams, Dr. Okezie, Dr. Henze, and various other unidentified individuals who participated in Plaintiff's medical care acted pursuant to these policies and procedures when they repeatedly failed to refer Plaintiff to an outside specialist equipped to properly treat his ear pain, hearing loss, and vision problems; when they repeatedly refused Plaintiff any care due to "time constraints" or "no provider available"; when they allowed Plaintiff to consult only with a nurse or physician assistant rather than a medical doctor; and when they failed to revise their care of Plaintiff despite the months-long inefficacy of the allergy- and sinusitis-based treatment.

90.     Wexford's policies and procedures constitute deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

91.     As a direct and proximate result of Wexford's deliberately indifferent policies and procedures, Plaintiff was rendered almost totally and irreparably deaf and was forced to endure pain, suffering, and emotional distress.

### COUNT V: Illinois Law Medical Malpractice
### (Against Nurse Cetta, Nurse Lewandowska, PA Williams, Dr. Okezie, Dr. Henze, and Does 1-10)

92.     Plaintiff restates and realleges paragraphs 1-91 as though fully set forth herein.

93.     At all relevant times, the State of Illinois contracted with Defendant Wexford to provide healthcare to IDOC inmates, including Plaintiff.

94.     At all relevant times, Nurse Cetta, Nurse Lewandowska, PA Williams, Dr. Okezie, Dr. Henze, and Does 1-10 were employed by Wexford and provided medical care to inmates at Stateville, including Plaintiff.

95.     At all relevant times, it was the duty of Nurse Cetta, Nurse Lewandowska, PA Williams, Dr. Okezie, Dr. Henze, and Does 1-10 to exercise due care and caution in the treatment of their patients, including Plaintiff.

96.     Does 1-10 signify all those individuals employed by Wexford who provided medical care to Plaintiff related to Plaintiff's ear- and hearing-related injuries that Plaintiff has heretofore been unable to identify.

97.     Despite this duty, the Wexford Defendants failed to exercise the care that a reasonably careful provider would have used under the circumstances, and they were therefore negligent in their treatment of Plaintiff.

98.     As set forth above, Nurse Cetta was the first nurse to treat Plaintiff following the cockroach burrowing into his ear canal.  Although Nurse Cetta flushed the cockroach from Plaintiff's ear, she knew or should have known that Plaintiff needed urgent and intensive additional care to protect against future ear pain, hearing loss, headaches, and vision problems. A reasonably careful nurse under the circumstances would have ensured Plaintiff received further care and, if she was unable to provide that care herself, would have at the very least referred plaintiff to see a physician assistant or medical doctor who could provide such treatment.

99.     As set forth above, Nurse Lewandowska struck Plaintiff's name from the sick-call list in early August, when it was most critical that he receive urgent and adequate medical care for his ear injury.  Nurse Lewandowska also participated in Mr. Moore's care throughout the fall of 2018, during which time Mr. Moore's ear pain, headaches, and visions problems persisted, and his hearing loss progressed.  Nurse Lewandowska knew or should have known that Mr. Moore had only recently had a cockroach removed from his ear, and yet she failed to connect Plaintiff's clear and consistent symptoms of ear pain, hearing loss, and vision problems to that event, either in her own treatment of Plaintiff or in her assistance of PA Williams and other Wexford employees involved in Plaintiff's treatment.  A reasonably careful nurse under the circumstances would have ensured Plaintiff receive more urgent care and that such care took into account the cockroach incident that clearly precipitated Plaintiff's injuries.

100.     As set forth above, PA Williams treated Plaintiff multiple times in August, September, October, and November of 2018.  PA Williams knew or should have known that Plaintiff had had a cockroach removed from his ear in July 2018, and yet she failed to connect Plaintiff's clear and consistent symptoms of ear pain, hearing loss, and vision problems to that

event.  Instead, PA Williams ascribed Plaintiff's symptoms—which Plaintiff had never suffered

before July 18, 2018—to an allergic reaction or sinusitis.  And despite her resultant treatment

protocols proving ineffective as the weeks passed by, PA Williams adhered to her original and

mistaken assessment.  A reasonably careful physician assistant under the circumstances would

have recognized the causal connection between the cockroach crawling in Mr. Moore's ear and

his immediately resulting ear pain, hearing loss, and vision problems, and would have tailored

her treatment accordingly.  In addition, a reasonably careful physician assistant would have,

regardless of the reasonableness of her initial misdiagnosis, adjusted treatment after recognizing

that Plaintiff's symptoms were unresponsive to that treatment, or at the very least consulted

another medical professional for assistance in treating Plaintiff.

101.    As set forth above, either Dr. Okezie, Dr. Henze, or a Wexford Doe (physician)

treated Mr. Moore on at least one occasion in December 2018.  Dr. Okezie, Dr. Henze, or

Wexford Doe knew or should have known that Plaintiff had already suffered extensive hearing

loss and further should have known that the treatment protocol advised by PA Williams in the

fall of 2018 was not adequately addressing Plaintiff's symptoms.  Dr. Okezie, Dr. Henze, or

Wexford Doe knew or should have known that Plaintiff's hearing loss was progressive and

potentially permanent, and that he needed urgent and appropriate medical care to stem the

advancing loss.  A reasonably careful physician would have done far more than simply order that

Plaintiff receive an audioscope "once available."

102.    With respect to Defendant Does 1-10, any reasonably careful medical

professional who participated in Mr. Moore's treatment would have understood that the onset of

Plaintiff's ear pain, hearing loss, and vision problems was caused by the cockroach burrowing

into Plaintiff's ear canal only days earlier and seen to it that Plaintiff received urgent and adequate medical care that was responsive to the readily apparent facts.

103.     As a direct and proximate result of the Wexford Defendants' negligent acts and omissions, Plaintiff was rendered almost totally and irreparably deaf and was forced to endure pain, suffering, and emotional distress.

## COUNT VI: Illinois Law Medical Malpractice
### (Against Wexford Health Sources, Inc., via Respondeat Superior)

104.     Plaintiff restates and realleges paragraphs 1-103 as though fully set forth herein.

105.     Wexford, through its agents, apparent agents, and/or employees, accepted Plaintiff as a patient.  At all relevant times, these agents, apparent agents, and/or employees were acting within the scope of their employment with Wexford and had a duty to exercise due care and caution in the treatment of patients, including Plaintiff.

106.     At all relevant times, Wexford, through its agents, apparent agents, and/or employees acting within the scope of their employment or agency relationship, failed to exercise due care and caution in its diagnosis and treatment of Plaintiff's injuries.  Wexford's agents and employees received clear and consistent signs that Plaintiff's hearing loss was serious and progressive, that it was tethered to the cockroach that burrowed in his ear in July 2018, and that further and immediate testing was necessary to properly treat Plaintiff.  Despite this knowledge, Wexford's agents and employees failed to take the steps that a reasonably careful medical provider would have taken to address Plaintiff's conditions.

107.     As a direct and proximate result of the negligent acts and omissions of Wexford's agents and employees, Plaintiff was rendered almost totally and irreparably deaf and was forced to endure pain, suffering, and emotional distress.

108.     Wexford is vicariously liable for the negligent acts and omissions of its agents, apparent agents, and/or employees (including but not limited to Nurse Cetta, Nurse Lewandowska, PA Williams, Dr. Okezie, and Dr. Henze) in their failure to exercise due care and caution in their diagnosis and treatment of Plaintiff's ear pain, hearing loss, and vision problems.

### COUNT VII: Illinois Law Medical Malpractice
### (Against Wexford Health Sources, Inc., for Institutional Negligence)

109.     Plaintiff restates and realleges paragraphs 1-108 as though fully set forth herein.

110.     At all relevant times, Wexford, as a healthcare provider, owed a duty to maintain adequate treatment policies and a duty to review and supervise the care of its patients, including Plaintiff.

111.     Despite this duty, Wexford failed to exercise the care that a reasonably careful healthcare institution would have used under the circumstances, and it was therefore negligent in its care of Plaintiff.  Wexford knew or should have known that its policies and procedures for approving specialty care and/or off-site consultations and scheduling of the same constituted barriers to timely and essential care and threatened patient health and safety, including Plaintiff's.  Wexford knew or should have known that its policies and procedures were likely to, and in fact did, cause delays in the approval and scheduling of Plaintiff's hearing test, referral and transfer to an off-site hearing specialist, and appropriate and timely care for his fast-progressing hearing loss.  But Wexford adopted and maintained such policies and procedures and mandated that its employees comply therewith.

112.     In addition, Wexford failed to adopt and adhere to policies and procedures to select, staff, and supervise employees, including nurses, physician assistants, and physicians, that a reasonably careful healthcare services provider would have adopted and maintained under the circumstances, and it was therefore negligent in its care of Plaintiff.  Wexford knew or should

have known that its policies and procedures for selecting, staffing, and supervising employees would likely result in, and in fact did result in, delays or negligent oversight in the diagnosis and treatment of IDOC inmates in its care, including Plaintiff.

113. Wexford knew or should have known that its policy and procedure of maintaining inadequate staffing levels (and supervision thereof) would cause inmates to be denied care altogether, even when they had a previously scheduled appointment; would cause inmates to be seen only by nurses or a physician assistant; and would cause inmates to receive inadequate treatment that was never remedied, even after being proven ineffective. A reasonably careful healthcare services provider would have adopted and maintained policies and procedures that ensured inmates received medical services in a reasonably prompt fashion, and that they were treated by an adequately trained medical doctor for particularly serious or intractable medical conditions.

114. As a direct and proximate result of Wexford's negligent acts and omissions, Plaintiff was rendered almost totally and irreparably deaf and was forced to endure pain, suffering, and emotional distress.

### PRAYER FOR RELIEF

115. Mr. Moore requests that the Court enter judgment in his favor against each Defendant, and an Order granting the following relief:

    A. Compensatory and punitive damages in amounts to be determined at trial;

    B. Expenses and attorney's fees under 42 U.S.C. §§ 1983 and 1988; and

    C. Any such other or further relief as the Court may find proper.

### JURY DEMAND

Mr. Moore hereby demands a jury trial on all issues so triable. *See* Fed. R. Civ. P. 38(b).

Dated: July 17, 2020                          Respectfully submitted,

*/s/ Brian C. Swanson*
Brian C. Swanson
Daniel R. McElroy
Luke C. Beasley
BARTLIT BECK LLP
54 W. Hubbard Street, Suite 300
Chicago, IL 60654
Phone: 312-494-4400
brian.swanson@bartlitbeck.com
dan.mcelroy@bartlitbeck.com
luke.beasley@bartlitbeck.com

*Attorneys for Plaintiff Timothy C. Moore*

## CERTIFICATE OF SERVICE

I, Brian C. Swanson, hereby certify that on July 17, 2020, a true and exact copy of the foregoing was electronically served by transmission of Notice of Electronic Filing generated by CM/ECF to all counsel of record as of issuance of filing.

/s/ *Brian C. Swanson*
Brian C. Swanson