CHARLES Z. WEINGARTEN, M.D.
August 19, 2022

```
         IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

TIMOTHY C. MOORE, M39367,        )
                                 )
               Plaintiff,        )
                                 )
    vs.                          )  No. 19-cv-3892
                                 )
WALTER NICKOLSON, NATHAN         )
SHEPHERD, CYNTHIA HARRIS,        )
ANNA McBEE, SUSAN LYDAY,         )     EXHIBIT
DR. CHRISTIAN OKEZIE,            )        N
DR. MARLENE HENZE, LATANYA       )
WILLIAMS, DAWN CETTA, LIDIA      )
LEWANDOWSKA, and WEXFORD         )
HEALTH SOURCES, INC.,            )
                                 )
               Defendants.       )
```

          The supplemental discovery deposition of CHARLES Z. WEINGARTEN, M.D., appearing remotely from Northbrook, Illinois, taken in the above-entitled cause, before Tracy L. Abbott, Certified Shorthand Reporter, on the 19th day of August, 2022, at the hour of 9:00 a.m., pursuant to notice, via Zoom videoconference.

REPORTED BY:
Tracy L. Abbott, CSR
License No. 084-003182
APPEARING REMOTELY FROM WINNEBAGO COUNTY, ILLINOIS

CHARLES Z. WEINGARTEN, M.D.
August 19, 2022

```
                                     Page 2
 1   REMOTE APPEARANCES:
 2
 3          BARTLIT BECK LLP
            BY:  MR. LUKE BEASLEY
 4          54 West Hubbard Street
            Chicago, Illinois  60654
 5          (312) 494-4453
            Luke.beasley@bartlitbeck.com
 6          Juliana.thewis@bartlitbeck.com
 7              On behalf of the Plaintiff;
 8
            HEYL, ROYSTER, VOELKER & ALLEN, P.C.
 9          BY:  MR. JORDAN EMMERT
             and MR. MICHAEL J. ORSI
10          120 West State Street, 2nd Floor
            Rockford, Illinois  61105-1288
11          jemmert@heylroyster.com
            morsi@heylroyster.com
12          (815) 963-4454
13              On behalf of Dr. Christian Okezie,
                Dr. Marlene Henze, La Tanya
14              Williams, Dawn Cetta, Lidia
                Lewandoska, and Wexford Health
15              Sources, Defendants.
16
17
18
19
20
21
22
23
24
```

```
                                     Page 3
 1                  I N D E X
 2   WITNESS                              PAGE
 3     CHARLES Z. WEINGARTEN, M.D.
 4       Examination by Mr. Emmert           4
 5
 6
 7
 8
 9
10                  EXHIBITS
11   NUMBER    DESCRIPTIONS        MARKED FOR ID
12   1     Supplemental report             5
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                     Page 4
 1            (Witness sworn remotely.)
 2            CHARLES Z. WEINGARTEN, M.D.,
 3   called as a witness herein, having been first duly
 4   sworn, was examined and testified as follows:
 5                 EXAMINATION
 6   BY MR. EMMERT:
 7      Q.   Can you state your name and spell it
 8   for the record, Doctor?
 9      A.   Charles Weingarten, W-e-i-n-g-a-r-
10   t-e-n.
11           MR. EMMERT:  Let the record reflect
12   that this is the supplemental deposition of Dr.
13   Charles Weingarten taken pursuant to notice and by
14   agreement of the parties.  It's subject to the
15   Federal Rules of Evidence and Federal Rules of
16   Civil Procedure where they apply.
17   BY MR. EMMERT:
18      Q.   Good morning, Doctor.
19      A.   Good morning.
20      Q.   To begin with, Doctor, I'm going to
21   just go ahead and share my screen with you here.
22   And let me know, can you see what's on my screen
23   there?
24      A.   I can.
```

```
                                     Page 5
 1      Q.   And do you have a copy of your
 2   supplemental report in front of you?
 3      A.   I do.
 4      Q.   Okay.  Feel free to go ahead and look
 5   at that while I'm asking you some questions about
 6   it today.  I will just move my screen around here.
 7   All right.  Doctor, this supplemental report that
 8   I'm showing you, and for the record, I'm going to
 9   go ahead and mark this as Exhibit 1 to today's
10   deposition.
11           (Weingarten Deposition Exhibit
12            No. 1 was marked for
13            identification.)
14   BY MR. EMMERT:
15      Q.   Doctor, it's a three-page report,
16   correct?
17      A.   It's a cover page and two-page report,
18   well, yeah.
19      Q.   And who wrote this report, Doctor?
20      A.   I did.
21      Q.   You did?
22      A.   I did.
23      Q.   Okay.  And is it an accurate and
24   complete representation of your opinions that you
```

CHARLES Z. WEINGARTEN, M.D.
August 19, 2022

Page 6

1 hold in this case?
2  A.  Yes.
3  Q.  Okay.  And just from reading the
4 report, it appears that you reviewed Dr. Robert
5 Kern's deposition in preparation for preparing
6 your report, and it also appears that you reviewed
7 some medical records from the University of
8 Illinois-Chicago which we have Bates stamped in
9 this case HRVA 1345 through 1432; is that correct?
10 I'm sorry, I may have missed your response.  Is
11 that right?
12  A.  Yes, that's correct.
13  Q.  And did you also review the exhibits
14 from Dr. Kern's deposition?
15  A.  Which exhibits?
16  Q.  Any or all of them.
17  A.  Huh?
18  Q.  Any or all of them.
19  A.  I think the pertinent ones I did, yes.
20  Q.  Okay.  Do you remember what those were?
21  A.  No, I do not.
22  Q.  Okay.  Now, did you base your report
23 based upon the information that you learned in
24 reviewing the deposition of Dr. Kern, as well as

Page 7

1 the medical records HRVA 1345 through 1432?
2  A.  I based my opinions on what I read in
3 his deposition and the information you referenced,
4 yes.
5  Q.  Okay.  Do you know Dr. Kern?
6  A.  I do, good man.
7  Q.  How do you know him?
8  A.  Professionally, he was chairman of the
9 department at Feinberg when I was active there,
10 and I have seen him occasionally traveling or at
11 meetings.
12  Q.  He was chairman of the department --
13 are you talking about Northwestern University?
14  A.  Yes, he is now chairman, yes.
15  Q.  And you were at one time at
16 Northwestern University?
17  A.  I was there for 50 years on the
18 faculty.  I'm retired now.
19  Q.  Okay.  So he was department chair at
20 some -- during some period of time when you were
21 at Northwestern, as well?
22  A.  That's correct.
23  Q.  Now, this supplemental report that you
24 have in front of you, Doctor, does that contain

Page 8

1 all of the opinions that you have about Dr. Kern's
2 testimony and the medical records identified as
3 HRVA 1345 through 1432?
4  A.  Yes.
5  Q.  Okay.  Doctor, I want to ask you a
6 couple of questions here about your opinions in
7 this report.  And, again, feel free to look at the
8 one in front of you, but I have it up on the
9 screen for you, as well as everybody else.  You
10 mention here in Section 2 of your report, it's
11 titled response to Dr. Kern, that -- let's see,
12 second paragraph here, "While respecting Dr.
13 Kern's opinions, I think the issue of," quote
14 "'possible malingering,'" end quote, "was
15 addressed by the audiologist Nichole Suss, as well
16 as Dr. Weinreich."  Do you see that?
17  A.  I do.
18  Q.  What do you mean by you think the issue
19 of possible malingering was addressed by those two
20 people?  What do you mean by putting that in your
21 report?
22  A.  Just what I said.  If you read the
23 pages, they have comments that further testing is
24 recommended.  They express their opinion.

Page 9

1  Q.  Okay.  And then you go on to say that
2 the Stenger test which is designed to detect
3 malingering was inconclusive.  So you're putting
4 forward in this report that the Stenger test was,
5 in fact, inconclusive, is that correct?
6  A.  According to the records, yes.
7  Q.  And by inconclusive, that means the
8 test can't show one way or the other whether or
9 not Mr. Moore was malingering, is that right?
10  A.  That is what the audiologist stated,
11 yes.
12  Q.  Now, with respect to these two tests
13 that you talk about that Mr. Moore underwent, the
14 OAE and acoustic reflex --
15  A.  Excuse me, one second.  I'm going to
16 close the door here.
17  Q.  Sure.
18  A.  Sorry.
19  Q.  No, you're fine.  All right.  These two
20 tests that Mr. Moore underwent at UIC in July of
21 2021, the OAE and the acoustic reflex tests, both
22 of those are objective tests, is that correct?
23  A.  They are objective tests, yes.  They
24 depend on patient cooperation, but they are

CHARLES Z. WEINGARTEN, M.D.
August 19, 2022

Page 10

1  objective.
2      Q.   Now, when you say they're dependent
3  upon patient cooperation, what do you mean by
4  that?
5      A.   Still and allow placement of external
6  ear canal probes.  [Reporter clarification.]  Yes,
7  the patient has to cooperate and allow placement
8  of the ear canal probes, and they have to hold
9  still.
10     Q.   Okay.  But the tests do not require the
11 patient to communicate to the person who is
12 administering the tests whether or not they have
13 heard something, correct?
14     A.   According to -- yeah, according to the
15 standard definition of the test, that is correct.
16     Q.   Okay.  Now, both of these tests are
17 used to determine if an ear is functioning
18 properly as you would see with someone who can
19 hear, is that right?
20     A.   That's not an accurate statement.
21 These tests are used to diagnose ear function in
22 different parts of the ear.  They don't say -- it
23 doesn't determine normally.  It is a way of
24 assessing internal and inner ear and auditory

Page 11

1  reflex arc function.
2      Q.   Okay.  So the tests are used to
3  determine whether or not an ear is functioning
4  properly?
5      A.   You could say that, yes.
6      Q.   Okay.  And the tests could also show if
7  an ear is not functioning properly, is that
8  correct?
9      A.   Correct.
10     Q.   Did you say that is correct?
11     A.   That is correct.
12     Q.   Okay.  I'm sorry.  Sometimes your
13 answer is cutting out --
14     A.   Function, I guess it depends how you
15 determine function.  Does it mean normal,
16 dysfunction?
17     Q.   Okay.  Understood.  Now, you mention in
18 your report here, and I'm just trying to find it
19 real quick.  Still in that second paragraph there,
20 "The OAE and acoustic reflex tests are not a
21 measure of auditory thresholds per se."  Do you
22 see that sentence?
23     A.   Yes, I do.
24     Q.   What do you mean by they're not a

Page 12

1  measure of auditory thresholds per se?
2      A.   The measure of auditory threshold is a
3  subjective test.  That's the audiogram.  These are
4  indirect measures of auditory thresholds, but
5  they're not -- that's not their primary purpose.
6  They are either a reflexive response or
7  measurement of audio acoustic emission, which is
8  some cochlear spontaneous activity.
9      Q.   What do you mean by -- I'm sorry, go
10 ahead.
11     A.   They do not directly correlate with
12 auditory thresholds.
13     Q.   Okay.  And what do you mean by auditory
14 thresholds?
15     A.   That's the diagnostic audiogram.
16     Q.   I suppose would a layman's definition
17 of an auditory threshold be the decibel level at
18 which someone can or cannot hear?
19     A.   Decibel level at which they respond to
20 specific frequencies.
21     Q.   Okay.  So it's fair to say that these
22 two tests, the OAE and the acoustic reflex tests,
23 do not quantify the degree of hearing loss someone
24 may be experiencing; is that right?

Page 13

1      A.   To a certain extent, they can quantify.
2      Q.   Okay.
3      A.   As stated on my report.
4      Q.   Okay.  Buy they're -- I suppose what do
5  you mean "to a certain extent, they can quantify"?
6      A.   The responses elicited by the acoustic
7  reflex and the OAE correlate to some extent with
8  auditory thresholds indirectly.
9      Q.   But they're not a measure of the full
10 extent of auditory thresholds that someone with
11 normal hearing would respond to, is that correct?
12     A.   They're not -- that's not their primary
13 purpose.  Their primary purpose is not to
14 determine auditory thresholds, correct.
15     Q.   Moving on in that second paragraph, you
16 say, "The asymmetrical response noted by the
17 audiologist indicates an asymmetrical hearing loss
18 which is greater in the right ear given the lack
19 of response in lower frequencies."  Do you see
20 that sentence?
21     A.   I do.
22     Q.   What do you mean by asymmetrical
23 response?
24     A.   One ear is not the same as the other

CHARLES Z. WEINGARTEN, M.D.
August 19, 2022

Page 14

1  ear. Based on this I think the hearing loss on
2  the right -- it would imply there might be
3  additional hearing loss on the right compared to
4  the left.
5     Q.  Then I will go ahead and move on to the
6  last page of your report here. You conclude,
7  "Thus Mr. Moore does not, in fact, have normal
8  hearing in both ears." Do you see that sentence?
9     A.  I do.
10    Q.  Okay. What do you mean by "does not
11 have normal hearing"?
12    A.  Well, based on the asymmetrical
13 response and suggestion that one ear -- the right
14 ear does not have normal thresholds, it would
15 infer that his auditory thresholds are not the
16 same and not normal.
17    Q.  So in a normal ear, the auditory
18 thresholds would be the same?
19    A.  Auditory thresholds are the ones that
20 -- an audiogram, that's a subjective test. These
21 tests correlate indirectly and somewhat directly
22 with the auditory thresholds; but one of them
23 requires a very loud stimulus, and the other one
24 measures cochlear function passively with a

Page 15

1  correlation that's within 30 -- 15, 20, 30
2  decibels. So it's not a direct correlation.
3     Q.  Then in the next sentence you say, "In
4  addition, his acoustic reflexes are not normal as
5  contralateral reflex is absent for the left ear
6  and partially present for the right ear." What do
7  you mean by "contralateral reflex"?
8     A.  It's very complicated. Acoustic reflex
9  measures the neural arc from the cochlea to the
10 cochlear nerve, the superior olive and then
11 connects indirectly to the muscles in the ear and
12 next to the facial nerves. So you click on one
13 ear and you measure. You can measure it on the
14 same ear. You can measure it on the contralateral
15 ear and ipsi ear. There's whole courses given on
16 the analysis of the acoustic reflex, but his was
17 not normal.
18    Q.  Okay. Is Mr. Moore completely deaf in
19 his right ear?
20    A.  I don't know.
21    Q.  Okay. Now, with respect to the results
22 of the OAE test and the acoustic reflex test,
23 would you agree that the results of those tests
24 show that Mr. Moore is able to hear at some level

Page 16

1  out of both his right and left ear?
2     A.  Some level, yes.
3     Q.  Okay. But as we talked about earlier,
4  the tests don't quantify the extent to which
5  Mr. Moore may have some level of hearing loss in
6  either one of his ears, correct?
7     A.  They quantify to some extent. I said
8  not directly.
9     Q.  Okay. Do you know --
10    A.  Tests are not designed to determine
11 auditory thresholds. [Reporter clarification.]
12 These tests are not designed to -- their primary
13 purpose is not designed to detect auditory
14 thresholds.
15    Q.  Do you know if Mr. Moore has any
16 hearing loss in either ear?
17    A.  Based on the diagnostic audiogram, he
18 does.
19    Q.  Okay. The subjective test, correct?
20    A.  Correct.
21    Q.  Okay. So as you sit here today, you
22 aren't able to quantify how much hearing loss
23 Mr. Moore has in either his right or his left ear,
24 correct?

Page 17

1     A.  Of course not. I didn't test him. The
2  audiologist and the tests quantify his hearing
3  loss.
4     Q.  Now, ultimately the records indicated
5  that further testing was appropriate, and I think
6  you agreed with that in a supplemental report.
7  What further testing on Mr. Moore do you believe
8  is appropriate?
9     A.  Audiologist's recommendation and Dr.
10 Weinreich's recommendation for at least an ABR or
11 auditory brainstem response, as well as an MRI.
12    Q.  I'm going to go back up to the first
13 page of your report here. Beginning of the second
14 paragraph, you say, "While respecting Dr. Kern's
15 opinion," and we already addressed the second part
16 of that sentence. What do you mean by "respecting
17 Dr. Kern's opinion"?
18    A.  Just what I said. I respect Dr. Kern's
19 opinion.
20    Q.  Okay.
21    A.  Pretty straightforward. I respect Dr.
22 Kern.
23    Q.  Why is that?
24    A.  I respect Dr. Kern.

CHARLES Z. WEINGARTEN, M.D.
August 19, 2022

Page 18

1  Q. Why is that?
2  A. Why is that? Because I know him, and
3  he deserves my respect.
4  Q. Is he a good doctor?
5  A. He is a doctor, yes.
6  Q. Do you think he's a good doctor?
7  A. As far as I know he is, yes.
8  Q. Okay.
9  A. He's a good man.
10     MR. EMMERT: All right. Luke, I think
11 that's about all I have, but if you could give me
12 five minutes to look at my notes?
13     MR. BEASLEY: Yeah, no problem.
14     MR. EMMERT: Come back at 9:25, and
15 we'll go from there.
16     MR. BEASLEY: Sounds good.
17     (A brief recess was taken.)
18 BY MR. EMMERT:
19  Q. All right. Back on the record.
20 Doctor, I just had a brief follow-up for you. I
21 asked you a question earlier about whether or not
22 you were able to quantify the amount of hearing
23 loss that Mr. Moore has in either one of his ears,
24 his right or his left ear; and you indicated that

Page 19

1  the tests quantify the degree of hearing loss, and
2  I believe you referred to the audiogram. Do you
3  remember that line of questioning generally?
4  A. I do.
5  Q. Okay. As you sit here today, do you
6  have an opinion as to the degree of hearing loss
7  that Mr. Moore has in either one of his ears based
8  upon that audiogram?
9  A. Based upon the audiogram and other
10 responses and the observation of the audiologist,
11 I think additional tests are warranted to get an
12 accurate determination of his hearing loss.
13  Q. So you can't give me a percentage, 10
14 percent, 20 percent, 30 percent, how much hearing
15 loss he has in either ear?
16  A. If I would, based on the audiogram
17 alone, he has a profound loss on the right -- I
18 don't have it exactly in front of me -- and a mild
19 loss on the contralateral ear, the other ear.
20  Q. Okay.
21  A. Again, that's not my opinion. That is
22 based on the audiogram.
23  Q. Okay. What's a profound hearing loss?
24  A. Say again?

Page 20

1  Q. What is a profound hearing loss?
2  A. Oh, depends on the definition, 80, 70,
3  70-plus decibels, 80-plus decibels as an overall
4  threshold, or a speech reception threshold of 70,
5  80.
6  Q. But as you sit here today, you can't
7  give me a percentage as far as the amount of
8  hearing loss he has in his right or his left ear?
9     MR. BEASLEY: Objection to form. Asked
10 and answered. Go ahead.
11  A. That would require a formula based on a
12 disability which is, I think, approved by the
13 government. I don't have the formula in front of
14 me. I can calculate it for you. That's not based
15 on my opinion. That is a formal calculation based
16 on specific auditory threshold frequencies.
17     MR. EMMERT: Okay. That is all I have
18 for you.
19     MR. BEASLEY: No questions for me.
20     THE COURT REPORTER: Signature?
21     MR. BEASLEY: Yeah, we'll reserve
22 signature.
23     THE COURT REPORTER: Would you like to
24 order the transcript?

Page 21

1     MR. EMMERT: Yep, we will order the
2  transcript. And since we have summary judgment
3  briefing coming up here soon, if we could get it
4  as soon as possible, that would be great.
5     THE COURT REPORTER: Sure. Would you
6  like a copy of the transcript?
7     MR. BEASLEY: Yes, regular delivery.
8     FURTHER DEPONENT SAITH NOT AT 9:29 A.M.

Page 22

```
 1         IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3   TIMOTHY C. MOORE, M39367,     )
                                   )
 4              Plaintiff,         )
                                   )
 5       vs.                       ) No. 19-cv-3892
                                   )
 6   WALTER NICKOLSON, et al.,     )
                                   )
 7              Defendants.        )
 8
 9        This is to certify that I have read the
10   transcript of my deposition taken in the above-
11   entitled cause by Tracy L. Abbott, Certified
12   Shorthand Reporter, on August 19, 2022, and that
13   the foregoing transcript consisting of Pages 1
14   through 23 accurately state the questions asked of
15   me and the answers given by me as they now appear.
16
17
18                        _____
                          Charles Z. Weingarten, MD
19
     No errata sheets submitted (Please initial)___.
20   Number of errata sheets submitted _____(pgs.)
21   Subscribed and sworn to
     before me this _____ day
22   of _____, A.D. 2022.
23
     _____
24      Notary Public
```

Page 23

```
 1   STATE OF ILLINOIS   )
                         ) SS.
 2   COUNTY OF WINNEBAGO )
 3        I, Tracy L. Abbott, Certified Shorthand
 4   Reporter, within and for the State of Illinois, do
 5   hereby certify:
 6        That prior to being examined, the
 7   witness in the foregoing proceedings was by me
 8   duly sworn to testify to the truth, the whole
 9   truth, and nothing but the truth;
10        That said proceedings were taken
11   remotely before me at the time and places therein
12   set forth and were taken down by me in shorthand
13   and thereafter transcribed into typewriting under
14   my direction and supervision;
15        I further certify that I am neither
16   counsel for, nor related to, any party to said
17   proceedings, not in anywise interested in the
18   outcome thereof.
19        In witness whereof, I have hereunto
20   subscribed my name.
21        Dated:  August 19, 2022.
22
23
                    _____
24                  Tracy L. Abbott, C.S.R.
                    License Number 084-003182
```