IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Timothy C. Moore #M-39367, | ) |
| | ) |
| Plaintiff, | ) Case No. 19-cv-3892 |
| | ) |
| v. | ) Judge Sara L. Ellis |
| | ) |
| Walter Nicholson et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF TIMOTHY C. MOORE'S OPPOSITION TO
<u>WEXFORD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ii

INDEX OF EXHIBITS ..........................................................................................................vi

INTRODUCTION ..................................................................................................................1

BACKGROUND ....................................................................................................................3

LEGAL STANDARD .............................................................................................................3

ARGUMENT ........................................................................................................................4

I.      Count III: The Individual Defendants were Deliberately Indifferent to Mr. Moore's
        Serious Medical Needs ..............................................................................................4

A.      PA Williams was deliberately indifferent to Mr. Moore's serious medical needs,
        causing him various injuries .......................................................................................6

        1.      August 15, 2018 Visit ......................................................................................7

        2.      September 24, 2018 Visit ...............................................................................17

        3.      October 31, 2018 Visit ...................................................................................21

        4.      November 26, 2018 Visit.................................................................................22

B.      Dr. Henze was deliberately indifferent to Mr. Moore's serious medical needs, causing
        him various injuries ...................................................................................................26

II.     Count IV: Wexford's "Collegial Review" Policy was the Moving Force Behind
        Mr. Moore's Constitutional Injuries .........................................................................35

III.    Counts V-VII: PA Williams, Dr. Henze, and Wexford Provided Negligent Care to
        Mr. Moore, Causing Him Injury ...............................................................................42

CONCLUSION....................................................................................................................46

## TABLE OF AUTHORITIES

**Cases**

*Akers v. Wexford Health Sources, Inc.*,
  No. 14-cv-00997-JPG-DGW, 2015 WL 4574754 (S.D. Ill. July 29, 2015).....................41

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................................3

*Apex Digit., Inc. v. Sears, Roebuck & Co.*,
  735 F.3d 962 (7th Cir. 2013)............................................................................................3

*Arnett v. Webster*,
  658 F.3d 742 (7th Cir. 2011)............................................................................................5

*Berry v. Peterman*,
  604 F.3d 435 (7th Cir. 2010)...............................................................................29, 35

*Broaddus v. Wexford Health Sources, Inc.*,
  No. 15-cv-1339-SCW, 2018 WL 1565603 (S.D. Ill. Mar. 30, 2018) ................................41

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................................3

*Connick v. Thompson*,
  563 U.S. 51 (2011)............................................................................................................41

*Davis v. Kayira*,
  938 F.3d 910 (7th Cir. 2019).....................................................................................18, 26

*Dean v. Wexford Health Sources, Inc.*,
  18 F.4th 214 (7th Cir. 2021) .............................................................................31, 36, 39

*Doll v. Brown*,
  75 F.3d 1200 (7th Cir. 1996)..........................................................................................25

*Est. of Simpson v. Gorbett*,
  863 F.3d 740 (7th Cir. 2017)............................................................................................3

*Estelle v. Gamble*,
  429 U.S. 97 (1976).............................................................................................................4

*Farmer v. Brennan*,
  511 U.S. 825 (1994)....................................................................................................5, 12

*Freeman v. Crays*,
  2018 IL App (2d) 170169................................................................................................44

*Garvin v. Armstrong,*
236 F.3d 896 (7th Cir. 2001) ................................................................................4

*Gayton v. McCoy,*
593 F.3d 610 (7th Cir. 2010) ..............................................................4, 15, 16, 31

*Genova v. Kellogg,*
No. 12 C 3105, WL 3930351 (N.D. Ill. June 25, 2015) ....................................10

*Glisson v. Indiana Department of Corrections,*
849 F.3d 372 (7th Cir. 2017) (en banc) ..........................................................39, 40

*Gray v. Hardy,*
826 F.3d 1000 (7th Cir. 2016) ............................................................................4

*Greeno v. Daley,*
414 F.3d 645 (7th Cir. 2005) ......................................................................*passim*

*Grievson v. Anderson,*
538 F.3d 763 (7th Cir. 2008) ...........................................................................16

*Guerra v. Advanced Pain Centers S.C.,*
2018 IL App (1st) 171857 .................................................................................43

*Hammer v. Residential Credit Solutions, Inc.,*
No. 13 C 6397, 2015 WL 7776807 (N.D. Ill. Dec. 3, 2015) ...............................9

*Hayes v. Snyder,*
546 F.3d 516 (7th Cir. 2008) ..............................................................................4

*Hemminger v. LeMay,*
2014 IL App (3d) 120392 ...................................................................................45

*Holton v. Mem'l Hosp.,*
176 Ill. 2d 95 (1997) ..........................................................................................46

*Howell v. Wexford Health Sources, Inc.,*
987 F.3d 647 (7th Cir. 2021) ..............................................................................40

*Jackson v. Pollion,*
733 F.3d 786 (7th Cir. 2013) ............................................................................15

*Johnson v. Advoc. Health & Hosps. Corp.,*
892 F.3d 887 (7th Cir. 2018) ............................................................................23

*Johnson v. Ingalls Memorial Hospital,*
402 Ill. App. 3d 830 (1st Dist. 2010) ................................................................44

*Klein v. Wexford Health Sources, Inc.,*
No. 16 C 8818, 2019 WL 2435850 (N.D. Ill. June 11, 2019) .........................................19

*Mathison v. United States,*
619 F. App'x 691 (10th Cir. 2015) .........................................................................31

*Mayes v. United States,*
No. 15 Civ. 7155 (KPF), 2018 WL 1274029 (S.D.N.Y. Mar. 5, 2018) .........................28

*McGee v. Adams,*
721 F.3d 474 (7th Cir. 2013)...............................................................................19

*McGill v. Duckworth,*
944 F.2d 344 (7th Cir. 1991)...............................................................................12

*Monell v. Dep't of Soc. Servs.,*
436 U.S. 658 (1978).......................................................................................*passim*

*Morgan v. SVT, LLC,*
724 F.3d 990 (7th Cir. 2013)...............................................................................10

*Parker v. Ritz,*
No. 18-cv-1895-RJD, 2021 WL 1758259 (S.D. Ill. May 4, 2021) ...........................33, 40

*Paz v. Wauconda Healthcare & Rehab. Ctr., LLC,*
464 F.3d 659 (7th Cir. 2006)...............................................................................26

*Petties v. Carter,*
836 F.3d 722, 728 (7th Cir. 2016) (en banc)......................................................*passim*

*Pyles v. Fahim,*
771 F.3d 403 (7th Cir. 2014).................................................................................4

*Ruffin-Thompkins v. Experian Info. Sols., Inc.,*
422 F.3d 603 (7th Cir. 2005).................................................................................3

*Sain v. Wood,*
512 F.3d 886 (7th Cir. 2008).........................................................................13, 33

*Sharif v. Carter,*
No. 12 C 5685, 2017 WL 3421554 (N.D. Ill. Aug. 8, 2017) ...............................7, 21, 22

*Sherrod v. Lingle,*
223 F.3d 605 (7th Cir. 2000).................................................................................6

*Southard v. Wexford Medical,*
No. 17-cv-839-JPG-RJD, 2019 WL 3330237 (S.D. Ill. June 6, 2019),
*report and recommendation adopted in part, rejected in part,*
No. 3:17-cv-00839-JPG-RJD, 2019 WL 3322364 (S.D. Ill. July 24, 2019).....................40

*Sterling v. Wexford Health Sources, Inc.*,
   No. 16 C 6280, 2021 WL 5906067 (N.D. Ill. Dec. 13, 2021) ............................................35

*Thomas v. Cook Cnty. Sheriff's Dep't*,
   604 F.3d 293 (7th Cir. 2010) ....................................................................................40

*Thomas v. Illinois*,
   697 F.3d at 615 ..........................................................................................17, 25, 31

*Townsend v. University of Chicago Hospitals*,
   318 Ill. App. 3d 406 (1st Dist. 2000) ..........................................................................44

*Vilayhong v. Santos*,
   No. 3:19-CV-00748-MAB, 2022 WL 4355844 (S.D. Ill. Sept. 20, 2022) ..............................34

*Von Ryburn v. Obaisi*,
   No. 14 CV 4308, 2022 WL 1444309 (N.D. Ill. May 6, 2022) ............................................40

*Walker v. Benjamin*,
   293 F.3d 1030 (7th Cir. 2002) ............................................................................29, 34

*Walker v. Peters*,
   233 F.3d 494 (7th Cir. 2000) .......................................................................................7

*Williams v. City of Chicago*,
   733 F.3d 749 (7th Cir. 2013) ................................................................................3, 10

*Woodward v. Corr. Med. Servs. of Ill., Inc.*,
   368 F.3d 917 (7th Cir. 2004) ...............................................................................35, 38

*Zaya v. Sood*,
   836 F.3d 800 (7th Cir. 2016) ..................................................................................8, 13

**Rules**

Fed. R. Civ. P. 56 .......................................................................................................3

# INDEX OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| A | 08/03/18 Offender's Grievance, IDOC_000057-58 |
| B | 11/26/18 Offender Outpatient Progress Notes, IDOC 000369 |
| C | 06/07/22 Deposition Transcript of Dr. Robert Kern |
| D | 06/24/21 Deposition Transcript of La Tanya Williams |
| E | 03/10/22 Deposition Transcript of Dr. Charles Weingarten |
| F | 10/31/18 Offender Outpatient Progress Notes, IDOC 000368 |
| G | 01/20/21 Deposition Transcript of Timothy Moore |
| H | 08/28/18 Mental Health Progress Note, HRVA 000592-593 |
| I | 08/01/19 Moore Letter, IDOC 000465 |
| J | 11/05/19 Psychotropic Medication Consent, IDOC 000467 |
| K | 10/08/18 Offender's Grievance, IDOC_000059-60 |
| L | 03/30/21 Deposition Transcript of Dr. Marlene Henze |
| M | 05/09/11 Dr. Henze Dep Ex. 2, IDOC & Wexford Contract (EXCERPTS) |
| N | 10/2018   Dr. Henze Dep Ex. 1, Lippert v. Godinez Report (EXCERPTS) |
| O | 03/30/21 Dr. Henze Dep Ex. 4, Printout of Wexford Health webpage |

# **INTRODUCTION**

Can Wexford obtain summary judgment on Timothy Moore's medical malpractice and deliberate indifference claims when substantial evidence shows that Wexford's providers either did not believe that Mr. Moore was suffering from the condition he claimed or, if they did, simply made no effort to timely address it? The answer is unequivocally no, and this case should be set for trial.

Beginning in August 2018, Mr. Moore suffered sudden onset hearing loss. For four straight months, Mr. Moore complained that he had trouble hearing out of his right ear. For four straight months, not a single Wexford employee tested his hearing, referred Mr. Moore to have his hearing tested, or even contemplated sending Mr. Moore to an ENT. None of that is disputed. And it is a genuinely disputed fact whether anyone even took the time to examine Mr. Moore's ear during the first three months that he reported his hearing loss.

It was not until *six* months after Mr. Moore began complaining of hearing loss (a concern he reiterated at every single medical visit during that time) that Mr. Moore received even the most rudimentary hearing screening—one which corroborated Mr. Moore's complaints and showed very advanced hearing loss in his right ear. The formal audiogram that followed about a year after his complaints began was even more ominous—Mr. Moore's right ear was by then almost entirely dead.

The two individual defendants have offered incomprehensible explanations for their failures. The first—physician's assistant LaTanya Williams ("PA Williams"), who saw Mr. Moore four straight times in the fall of 2018 after Mr. Moore first began suffering hearing loss—insists she appropriately treated Mr. Moore for allergies and a sinus infection. But the actual evidence shows that a simple hearing test at *any time* in the fall of 2018 would have confirmed that the extent of Mr. Moore's hearing loss was *totally* inconsistent with a mere sinus infection, a fact on which *both* sides' expert witnesses agree. A jury must therefore decide whether PA Williams' "treatment" rose above the constitutional and state-law floors.

The second—Dr. Marlene Henze, who began treating Mr. Moore in December 2018—claims that she, too, responded appropriately to Mr. Moore's complaints of hearing loss. But when pressed to justify why she did not take certain actions that a reasonable medical provider would take (*e.g.*, expediting a hearing test and referring to an ENT), Dr. Henze revealed she really does not believe Mr. Moore is suffering from any hearing loss at all. A medical professional cannot justify her actions as a reasonable response to a genuine condition, while simultaneously claiming she need not have taken certain actions because she never believed the patient had that condition to begin with. In a move as shocking as it is revealing, Dr. Henze *never* sent Mr. Moore to be evaluated by an ENT until after her deposition—and even then instructed the specialists to "check for malingering" rather than simply assess Mr. Moore's condition. Dr. Henze's gambit failed; the additional testing yet again confirmed Mr. Moore has suffered hearing loss in his right ear, leaving the only question for the jury to be one of extent. Dr. Henze must be held accountable.

PA Williams' and Dr. Henze's employer, Wexford, must also answer for its constitutional violations. Wexford put in place and maintained policies at Stateville, where Mr. Moore was incarcerated, that Wexford should have known would (and in fact did) lead to inmates receiving constitutionally deficient care. Most importantly, Wexford's "collegial review" policy created a barrier to inmates, like Mr. Moore, from receiving appropriate specialty care; the evidence will show that policy restricts who can refer inmates to receive necessary medical treatment and disincentivizes those who can from actually doing so.

Lacking any sound justification for the actions of PA Williams or Dr. Henze, and the policies it sanctioned, Wexford turns to causation arguments that depend on a defendant-friendly reading of the record—one the summary judgment rules preclude—and a misapprehension of what federal and state law require to advance to trial. Because many fact issues on crucial elements of Mr. Moore's claims require a jury to resolve, Wexford's motion should be denied.

## BACKGROUND

Plaintiff directs the Court to the parties' Joint Statement of Undisputed Material Facts (Dkt. 155-2, hereinafter "JSUMF") for a recitation of the record in this matter. Throughout the brief, Plaintiff may cite additional evidence and testimony not included in the JSUMF. Plaintiff did not deliberately omit any such evidence from the JSUMF, but rather found supplementation of certain portions of the record necessary after reviewing Wexford's arguments in support of summary judgment. Many of the additional record citations are to deposition testimony that could not be included in their entirety in the JSUMF.

## LEGAL STANDARD

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the burden of showing the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. To avoid summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (cleaned up). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (cleaned up). In determining whether a genuine dispute of material fact exists, the Court must view the facts "in the light most favorable to the non-moving party," including by resolving all evidentiary conflicts and credibility questions in his favor. *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013); *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013).

# ARGUMENT

## I. Count III: The Individual Defendants were Deliberately Indifferent to Mr. Moore's Serious Medical Needs

To establish an Eighth Amendment claim for deliberate indifference to a serious medical condition, a plaintiff must identify facts from which it can be inferred that (1) he had a "serious medical need[]" and (2) that defendants were deliberately indifferent to that need. *See Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A plaintiff must then show that the deliberate indifference caused him injury. *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010). "Proximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation." *Id.*

The first element of deliberate indifference turns on an objective assessment of the plaintiff's medical condition. "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). A condition is also objectively serious if a "failure to treat [it] could result in further significant injury or the unnecessary and wanton infliction of pain." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (cleaned up). The medical condition need not be life-threatening, and there is no hard-and-fast requirement for what suffices. Rather, "[w]hen assessing an Eighth Amendment claim, we look for physical injury 'that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016) (quoting *Hayes*, 546 F.3d at 523); *see, e.g.*, *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (finding that asthma can be a qualifying serious medical condition).

The second element of deliberate indifference requires showing the defendants acted with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (cleaned up). "The officials must know of and disregard an excessive risk to inmate health." *Greeno*, 414 F.3d at 653. This does not mean a plaintiff "must establish that officials intended or desired the harm that transpired." *Id.* "Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk"—and the factfinder may reach that conclusion "from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. at 842). Recognizing that Section 1983 defendants will "[r]arely if ever" admit that they consciously disregarded a substantial risk of harm, *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc), courts have made clear that a plaintiff can prove this element in various ways. For example, a plaintiff may establish deliberate indifference by showing a provider's "persiste[nce] in a course of treatment known to be ineffective." *Greeno*, 414 F.3d at 655. Similarly, deliberate indifference can be proven where a doctor opts for an "easier and less efficacious treatment" when superior treatment options are available. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (cleaned up). A reasonable jury can also find deliberate indifference where there is an "inexplicable delay in treatment" combined with evidence that the delay "exacerbated the [plaintiff's] injury or unnecessarily prolonged [his] pain." *Petties*, 836 F.3d at 730-31 (collecting cases).

There is more than enough evidence in the record to establish that PA Williams and Dr. Henze were deliberately indifferent to Mr. Moore's serious medical needs, and that their indifference caused Mr. Moore additional injuries. After further consideration following the parties' meet and confer regarding this Motion, however, Mr. Moore does not oppose Defendants' motion with respect to his constitutional claim for deliberate indifference against Defendant Cetta, and respectfully submits that summary judgment should be entered for Nurse Cetta on that claim.

**A.** **PA Williams was deliberately indifferent to Mr. Moore's serious medical needs, causing him various injuries**

Wexford does not contest that Mr. Moore's hearing loss (and associated symptoms) constitute a serious medical condition. Instead, it contends that the treatment provided by PA Williams to Mr. Moore in the fall of 2018 obviates Mr. Moore's deliberate indifference claim because she "performed an appropriate examination and exercised her professional medical judgment" on each of her four visits with Mr. Moore. Dkt. 159, Wexford Br. at 8. The premise of Wexford's motion—that because PA Williams offered *some* treatment to Mr. Moore, she cannot be deemed deliberately indifferent—is inconsistent with well-settled Seventh Circuit law. While "neither medical malpractice nor a mere disagreement with a doctor's medical judgment amount to deliberate indifference," *Greeno*, 414 F.3d at 653, that does not mean a medical professional is entitled to summary judgment in any case where they provided *some* care and their lawyers simply invoked the treater's "medical judgment." That is why "a prisoner is not required to show that he was literally ignored" to prevail on a deliberate indifference claim. *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000).

The law is more nimble than that. For one thing, a jury is not required to credit a defendant's self-serving story for why she exercised her "medical judgment" in a particular manner. *Petties*, 836 F.3d at 733 (rejecting Wexford doctor's attempt to win summary judgment on "clearly a post-hoc rationalization"). Defendants can say they took a particular course of action to address a particular medical need, but where (as here) that claim is belied by significant other evidence, summary judgment is inappropriate. In addition, where (as here) a defendant adheres to one course of treatment despite objective indications that treatment is not working, the law says a jury should be permitted to determine whether the defendant was deliberately indifferent. *Greeno*, 414 F.3d at 654 ("We think a factfinder could infer as much from the medical defendants' obdurate refusal to alter

Greeno's course of treatment despite his repeated reports that the medication was not working and his condition was getting worse.").

In view of this law, the evidence detailed below demonstrates that Wexford's motion should be denied and the claim against PA Williams should proceed to trial.[1]

## 1. August 15, 2018 Visit

*The deliberate indifference element.* Mr. Moore had never before complained of *any* hearing loss until he did so in August 2018. JSUMF ¶ 54. He sought medical attention on August 2, 2018, for one reason and one reason only—the sudden loss of hearing and pain in his right ear. Ex. A, IDOC_000057-58 ("I've experienced an irritating pain and hearing loss in my right ear.").[2] Mr. Moore was not seen by PA Williams for these complaints until August 15, 2018. During that visit, according to PA Williams' medical record from that day, Mr. Moore told PA Williams that the hearing in his right ear was muffled—"it was bad"—and that his ear was ringing intermittently. JSUMF ¶¶ 36-37. Despite Mr. Moore having never before reported *any* degree of hearing loss, the record contains no indication that PA Williams performed a detailed examination of Mr. Moore's ear, much less actually tested the degree of the hearing loss he was experiencing.

Wexford's argument that "PA Williams utilized her professional medical judgment" by instead treating Mr. Moore for allergies and prescribing him ibuprofen is unavailing. Wexford Br. at 9. True, courts assessing deliberate indifference claims should consider whether the doctor has

---

[1] Mr. Moore analyzes PA Williams' conduct on each of her four visits with Mr. Moore in the fall of 2018, tracking Wexford's organization in its brief. However, as this Court has noted, it "must consider [a defendant]'s treatment as a whole instead of in pieces." *Sharif v. Carter*, No. 12 C 5685, 2017 WL 3421554, at *6 (N.D. Ill. Aug. 8, 2017) (citing *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) ("We examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs.")). Mr. Moore submits that viewing PA Williams' treatment as a whole only makes his deliberate indifference case stronger.

[2] Pursuant to this Court's standing order on summary judgment procedures, Mr. Moore occasionally cites to evidence not cited in or appended to the parties' Joint Statement of Undisputed Material Facts. Such supporting material will be cited and attached as separate exhibits.

exercised their professional judgment. But that "does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). If other evidence in the record belies the doctor's proffered explanation—including evidence suggesting the doctor did not honestly believe said explanation, which may come from "clues drawn from the context surrounding a treatment decision"—then "a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred." *Id.* A jury could so conclude here.

Mr. Moore sought medical treatment in the first place because he had never-before-experienced hearing loss and ringing in his right ear, *see* Ex. A, IDOC_000057—a loss that PA Williams made no effort to confirm, much less measure its extent, JSUMF ¶ 41. There remains a genuine issue of material fact as to whether PA Williams examined Mr. Moore's ears *at all* during the August 15 visit, since the medical record contains no description of his ears, ear canals, inner ear, or the condition of his tympanic membranes; indeed, the first time PA Williams documented *anything* about the condition of Mr. Moore's ear was November 26, 2018—nearly four months after Mr. Moore's hearing loss complaints began. Ex. B, IDOC 000369; JSUMF ¶ 53.

Wexford argues that PA Williams' August 15 diagnosis of "allergic rhinitis" proves "she did not ignore Mr. Moore's complaints." Wexford Br. at 9. But that a medical provider treats one condition (Mr. Moore's itchy eyes and congestion) does not mean she treated another (Mr. Moore's hearing loss). And there is *no evidence* to suggests PA Williams drew any connection between Mr. Moore's hearing loss complaints and allergies, or that her treatment of the latter was intended to address the former. If PA Williams actually believed Mr. Moore's hearing loss was explained by allergic rhinitis, then one would expect some indication of that in the contemporaneous medical records. Wexford's own expert, Dr. Robert Kern, a specialist in sinus issues, acknowledged that if hearing loss were explained by allergic rhinitis, there could be multiple objective physical findings

that show as much, including a retracted tympanic membrane and/or fluid in the ears. Ex. C, Kern Dep. 126:5-21. Yet Dr. Kern acknowledged that, beyond the acronym "HEENT" scribbled in the record for August 15, there is *absolutely no description of the condition of Mr. Moore's ears, either the left or right*, much less a single positive physical finding that would support the conclusion that Mr. Moore's hearing loss was connected to allergic rhinitis. *Id.* at 127:5-24, 131:1-132:7.

Wexford's reliance on PA Williams' testimony that she did examine Mr. Moore's ears on August 15 does not aid its argument. Wexford says: "PA Williams has testified in the most positive manner that she knows she examined Mr. Moore's ears on August 15, 2018, and she explained that she did not find anything noteworthy concerning Mr. Moore's ears." Wexford Br. at 10. But that testimony deserves no deference, since PA Williams separately admitted that she does not remember *any* visit with Mr. Moore "independent of the medical records." JSUMF ¶ 20; Ex. D, Williams Dep. 13:11-17.[3] For that same reason, Wexford's reliance on *Hammer v. Residential Credit Solutions, Inc.*, No. 13 C 6397, 2015 WL 7776807 (N.D. Ill. Dec. 3, 2015), is misplaced. Although deposition testimony from a medical provider can supplement what the relevant medical records themselves say, that is true only if the provider has some independent memory of the visit at issue, which here PA Williams admitted she does not. JSUMF ¶ 20.

Wexford complains that Mr. Moore cannot create a question of fact on this issue "with credibility arguments" about PA Williams. Wexford Br. at 11. But nor can Wexford create an *undisputed* fact from testimony that is (1) weakened (if not wholly negated) by PA Williams' admission she has no independent memory of the events at issue in this case, JSUMF ¶ 20, and

---

[3] Similarly, Wexford's argument that Mr. Moore must do more than challenge PA Williams' credibility to create a genuine issue of fact on this score falls flat. Wexford Br. at 10-11. The fact that PA Williams, during her November 2018 visit with Mr. Moore, actually documented the condition of Mr. Moore's ears—even though she found no "positive" findings indicating something was wrong with them—belies her testimony that she found nothing wrong with them on the three prior visits, too, but for some unexplained reason did not write that finding down.

(2) belied by her own explanation for why the August 15 record contains no details of such an ear exam. PA Williams said the reason why she did not document the condition of Mr. Moore's ear on August 15 (or on September 24 or October 31) is that there were no "positive findings," meaning there was nothing in her purported exams that caused PA Williams concern. Yet during Mr. Moore's November 26 visit—the first time in her four months of treating Mr. Moore she documented the condition of Mr. Moore's ears—PA Williams noted that Mr. Moore's ear canals were clear, which means *normal*, or the *opposite* of a "positive finding." Struggling to explain herself, PA Williams said she noted the clear ear canals that day because it was "a positive negative finding, if there is such a thing." JSUMF ¶ 54. A jury could just as well conclude that the reason she noted Mr. Moore's ear canals that day, unlike on her prior three visits, is because that was the first time she had ever bothered to examine them carefully. *Williams*, 733 F.3d at 752 (holding that "issues of credibility" are "issues for a jury at trial, not a court on summary judgment").

These facts easily distinguish this case from those upon which Wexford relies. In *Morgan v. SVT, LLC*, the defendant attempted to create a fact issue by highlighting a "single, minor discrepancy in the statements of someone [] peripherally involved in the contested action." 724 F.3d 990, 999 (7th Cir. 2013). But Mr. Moore does not rely on a "single, minor discrepancy" in PA Williams' testimony, and PA Williams is at the center (not the periphery) of Mr. Moore's claims. Wexford also cites *Genova v. Kellogg*, where the court held the nonmoving party "must do more than question another party's self-serving testimony." No. 12 C 3105, 2015 WL 3930351, at *6 (N.D. Ill. June 25, 2015). But Mr. Moore has done so, and in fact has done exactly what *Genova* requires—"cite facts in the record to support an assertion that a triable issue exists as to [the witness]'s knowledge." *Id.* Namely, that PA Williams herself disclaimed independent knowledge of the events in this case, and that her explanation for the absence of any description of the ear exam she claims to have

performed (no positive findings) is inconsistent with the November 26 record, where such a description is present (despite making no positive findings).

Even assuming PA Williams examined Mr. Moore's ear on August 15, it is undisputed that she did not test his hearing on that day. The "gross hearing assessment" Wexford alludes to is a red herring, for two reasons. First, the medical record from that day contains no indication of PA Williams having conducted such an assessment, and PA Williams testified she has no independent recollection of what occurred that day. Second, this purported assessment consisted of nothing more than seeing if Mr. Moore could understand her during their visit. JSUMF ¶ 55. Of course, such an "assessment" would have been worthless in Mr. Moore's situation, since at that time he could hear fine out of his left ear. The salient point is that PA Williams indisputably did not perform any structured test to identify the severity of Mr. Moore's right ear hearing loss on August 15. Added to the evidence showing that PA Williams failed even to examine Mr. Moore's ears on that day, this provides powerful evidence that PA Williams was deliberately indifferent to Mr. Moore's serious medical needs.

PA Williams' refusal to test Mr. Moore's hearing was a critical error. Wexford's own expert Dr. Kern agreed that allergic rhinitis could cause only "mild" hearing loss, and that Mr. Moore's (much-delayed) hearing tests showed a hearing loss different from that which could be caused by allergies. JSUMF ¶ 128. If PA Williams' position is that she believed she was treating Mr. Moore's hearing loss by treating his allergies—an untenable claim, for the reasons outlined above—a simple hearing test would have confirmed the folly of that belief. Plaintiff's expert Dr. Charles Weingarten, who has over 50 years of experience in otology (diseases of the ear), JSUMF ¶ 107, will explain to the jury that, had Mr. Moore received basic diagnostic testing like this when he began reporting his symptoms, he could have been referred for appropriate treatment and potentially recovered his hearing, JSUMF ¶ 110; Ex. E, Weingarten Dep. 17:15-21.

Although unclear, Wexford may be arguing that PA Williams' failure to test Mr. Moore's hearing means there is a lack of evidence that "PA Williams was actually aware that Mr. Moore was suffering from a serious medical condition that she did not treat." Wexford Br. at 9. But it is undisputed Mr. Moore relayed his complaint of right ear hearing loss to PA Williams; it is documented in the August 15 record, along with ringing in the same ear. That PA Williams did not know the severity or extent of Mr. Moore's hearing loss owed entirely to her unjustifiable refusal to promptly test as much. A medical provider cannot avoid responsibility for their deliberate indifference by claiming a lack of subjective awareness of the risk when that lack of awareness is itself owed to unreasonable actions. *See McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991) (noting that "shutting your eyes for fear of what you will learn satisfies scienter requirements" because "[g]oing out of your way to avoid acquiring unwelcome knowledge is a species of intent"), *rev'd on other grounds*, *Farmer*, 511 U.S. 825. Wexford, and its employees, cannot make like an "an ostrich" to avoid Eight Amendment liability. *Id.* PA Williams's refusal to pursue the most basic steps a medical provider should undertake when a patient complains of hearing loss—examine the ear and test hearing—cannot now insulate her from liability.

PA Williams' explanation for her refusal to test Mr. Moore's hearing only proves why the claim against her cannot be resolved on summary judgment and must go to a jury. She contends she did not perform a hearing test (or order that one be performed) because a hearing test "is not appropriate where there are positive findings such as boggy and congested nasal turbinates . . . which may be the cause of muffled hearing before a hearing assessment." Wexford Br. at 12. But PA Williams' say-so by itself cannot render her choice reasonable, especially when Wexford's own expert Dr. Kern disagrees with her, stating: "If you seriously believe that somebody has a significant hearing loss, then you would test it." JSUMF ¶ 128. That contradiction aside, PA Williams' testimony simply makes no sense: why would conducting a simple hearing test—to confirm the

existence and severity of Mr. Moore's hearing impairment on August 15—in any way preclude PA Williams for treating the "boggy and congested nasal turbinates" she found that day? It would not.

At any rate, a jury could easily reject PA Williams' argument that her treatment of allergic rhinitis was designed to remedy Mr. Moore's hearing loss—and instead find that such a story is merely a convenient post-hoc rationalization for her outright failure to address it. *See Petties*, 836 F.3d at 733 (rejecting Wexford doctor's attempt to win summary judgment on "clearly a post-hoc rationalization"); *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (noting that doctor cannot win summary judgment if plaintiff shows doctor's justification "was a sham").

Ample "clues drawn from the context surrounding [PA Williams'] treatment decision" on August 15 undermine her argument that her prescription of Claritin was intended to remedy Mr. Moore's hearing loss. *Zaya*, 836 F.3d at 805. First, there is *nothing* in the medical record from that day showing PA Williams took Mr. Moore's hearing complaint seriously: no details of the ear exam she now claims she performed, no description of the condition of Mr. Moore's ear, and no hearing test whatsoever. PA Williams acknowledged as much at her deposition. JSUMF ¶ 34. Second, PA Williams' claim now that she could not test Mr. Moore's hearing on August 15 and instead needed to treat *only* Mr. Moore's congested nasal turbinates because that "may be the cause of muffled hearing" cannot be squared with her *continued* failure to perform a hearing assessment during her October 31st visit. Wexford Br. at 12, 16. During this October 31 visit, she found Mr. Moore's sinuses had improved, documented no nasal congestion, and yet noted that Mr. Moore's right ear continued to be muffled. JSUMF ¶¶ 48-50; Ex. F, IDOC 000368. Third, as noted earlier, Wexford's own expert will testify that rhinitis can cause only *minor* hearing loss; it therefore makes no sense to assume that treating rhinitis would resolve Mr. Moore's *significant* hearing loss.

*The causation element.* Finally, Wexford argues that PA Williams' omissions on August 15—including her failure to assess Mr. Moore's hearing—could not have contributed to the advancement

and permanence of Mr. Moore's hearing loss. Wexford Br. at 12. This is more assertion than "argument," one which in any event merits little consideration. Wexford says a hearing test "does not stop hearing loss." *Id.* But no one has argued a hearing test "stops" hearing loss; it is, however, a critical step in diagnosing the existence and severity of hearing loss which, if done, would dictate immediate and more targeted treatment to stop or reverse the hearing loss. PA Williams' own boss, Dr. Henze, agreed that a patient with hearing loss needs to be tested to determine next steps. JSUMF ¶ 82. A hearing test may have shown, for example, that Mr. Moore's right ear hearing was not merely muffled but severely impaired, a finding far more consistent with sudden sensorineural hearing loss ("sudden hearing loss") than to mere rhinitis, a point on which both side's experts agree. JSUMF ¶ 128. Plaintiff's expert Dr. Weingarten will explain to the jury that timely testing would have dictated a referral to an ENT, and that treatment administered promptly could have forestalled further hearing loss and possibly also reversed the hearing loss Mr. Moore had already experienced. JSUMF ¶¶ 110-114; Ex. E, Weingarten Dep. 106:14-24 (Dr. Weingarten: "Yes, the earlier the treatment of diagnosed sudden hearing loss, theoretically the better outcomes, yes."). It therefore remains a genuinely disputed fact whether earlier and different treatment could have saved Mr. Moore's hearing in his right ear.

Wexford cites Dr. Weingarten's deposition testimony that, had Mr. Moore received appropriate testing and been referred to an ENT in August 2018, he cannot be certain what treatment Mr. Moore would have received at that time—apparently to suggest Plaintiff lacks adequate evidence of causation. Wexford Br. at 13. This line of questioning proves nothing. In response to a series of similar questions, Dr. Weingarten was making the basic point that the treatment Mr. Moore would have received "would depend on the diagnosis and findings." Ex. E, Weingarten Dep. 43:15-19. Of course, no expert could say with certainty what treatment would have been provided to a patient at a specific time when the treatment needed would depend on testing a

deliberately indifferent defendant never ordered. Regardless, Dr. Weingarten elsewhere explained that his opinion based on a review of all available evidence is that Mr. Moore in fact experienced sudden sensorineural hearing loss, JSUMF ¶ 108, that the best treatment for that would have been prompt administration of steroid therapy, Ex. E, Weingarten Dep. 101:15-102:5, that such treatment can stop or reverse hearing loss, *id.* at 30:18-21, and that such treatment is likely to be most effective if it is administered within four to six weeks, *id.* at 28:17-24; *see also* JSUMF ¶ 115 (Dr. Weingarten opining that PA Williams' and Dr. Henze's delays "precluded any possibility that Mr. Moore's hearing loss could have been ameliorated").

That is more than enough to go to a jury, even under the cases Wexford cites. Wexford quotes *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (cleaned up), for the broad proposition that Mr. Moore must show "that the delay (rather than the inmate's underlying condition) caused some degree of harm." Wexford Br. at 14. That's true. But Mr. Moore will have no trouble showing that PA Williams' delay "caused some degree of harm," since the evidence shows PA Williams ignored Mr. Moore's complaints of hearing loss at three straight visits (August through October), or exactly the period of time when treatment would have stood the *greatest* chance of improving Mr. Moore's hearing—as undisputed expert testimony will establish.

Wexford next cites *Gayton*, but that case squarely supports Mr. Moore, not Wexford. There, the Seventh Circuit reversed the district court's decision to exclude expert testimony on causation, but then noted that "even if the plaintiff could not proffer expert testimony in this case, he still would have adequate causation evidence to reach trial," because "[p]roximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer **no evidence** that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation." 593 F.3d at 624 (emphasis added). The decision continued: "But if the plaintiff offers evidence that allows the jury to infer that a delay in treatment harmed an inmate, there is enough

causation evidence to reach trial." *Id.* at 624-25. The court cited *Grievson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) for support, where the plaintiff lacked expert testimony, but the "medical records relating to his injury [] could have led a jury to infer that a delay in treatment could have unnecessarily prolonged and exacerbated his injury." *Gayton*, 593 F.3d at 625 (citing *Grievson*, 538 F.3d at 779). Here, not only would the medical records alone permit a jury to infer that the delays exacerbated Mr. Moore's hearing loss, but Mr. Moore has actual expert testimony that explains precisely how that could have happened.

That same expert testimony will also explain how PA Williams' (and later, Dr. Henze's) refusal to order an MRI could well be causing Mr. Moore additional harm, or at least risking as much. JSUMF ¶¶ 111-12. Mr. Moore to this day has not received an MRI to rule out the possibility of a retrocochlear lesion, which is the standard-of-care imaging for a patient who suffers sudden hearing loss, as even Wexford's own expert Dr. Kern agrees. JSUMF ¶ 128. Indeed, Dr. Kern recalled that in the cases where he could identify hearing loss shown by an audiogram, he ordered an MRI "shortly thereafter" and "found a tumor a couple times." Ex. C, Kern Dep. 114:3-21.

Finally, Wexford's brief does not address any of the other injuries Mr. Moore has alleged he suffered as a result of PA Williams' deliberate indifference. *See generally* Dkt. 56, First Am. Compl. The emotional distress Mr. Moore experienced while continuously pleading for and being denied appropriate treatment in the fall of 2018 is reflected by (among other things) a contemporaneous grievance he filed with prison authorities in October 2018. JSUMF ¶ 46. Mr. Moore also complained of the deep embarrassment he felt at being forced to wear a hearing aid at such a young age (in his early thirties) after his hearing loss went untreated and became permanent. Ex. G, Moore Dep. 13:10-16:12; Ex. H, HRVA 000592-593. Mr. Moore was prescribed and has been taking antidepressants since 2019. Ex. I, IDOC 000465 (Mr. Moore writing to request counseling for shame, anxiety, and self-esteem loss following hearing loss in August 2019); Ex. J, IDOC 000467

(Mr. Moore being prescribed Paxil in November 2019). Wexford must answer for these injuries, too. *Cf. Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012) (courts should not treat psychological harm differently from physical harm).

### 2. September 24, 2018 Visit

*The deliberate indifference element*. While a jury could reasonably conclude PA Williams was deliberately indifferent based on the August 15 visit alone, the treatment she provided—or more precisely, failed to provide—over subsequent visits confirms that conclusion.

When Mr. Moore presented to PA Williams on September 24, he again complained of difficulty hearing from his right ear. And again, PA Williams' medical record from that day neither documents the result of any ear exam nor reflects any hearing assessment having been conducted. JSUMF ¶ 40. Wexford's brief misleadingly cites JSUMF ¶ 40 to claim that PA Williams "visually inspected Mr. Moore's ears with and without an otoscope, found no signs of infection, [and] both ear drums were intact." Wexford Br. at 14-15. But that is simply what PA Williams *testified to* during her counsel's questioning of her, testimony undermined by the absence of any of these findings in the medical record, and PA Williams' admission that she has no independent memory of her visits with Mr. Moore apart of from the records themselves. JSUMF ¶¶ 40, 20.[4] It is undisputed that PA Williams did not test Mr. Moore's hearing during this visit. *Id.* ¶ 41.

Instead of doing those sensible things, PA Williams continued to treat Mr. Moore for allergic rhinitis, switching the antihistamine from Claritin to Zyrtec and also prescribing an antibiotic for possible sinusitis. *Id.* ¶ 43. She did so because she determined that Mr. Moore's nasal turbinates remained congested. *Id.* There is no *undisputed* evidence—her say-so is contradicted by other

---

[4] During the parties' collaboration on the JSUMF, Plaintiff's counsel was careful to note when a witness testified to having done certain things, as opposed to those things actually having been done. If the Court reads JSUMF ¶ 40, for example, it begins with "PA Williams testified that she visually inspected . . . ." That clarification is important. That a witness said something can be considered an undisputed fact; that what they said is true, *i.e.*, undisputed, is another matter.

evidence in the record—that she did so because she subjectively believed that would ameliorate Mr. Moore's hearing loss. Thus, a jury could reasonably find that PA Williams' treatment of Mr. Moore on August 15 and September 24 effectively "ignore[d] a request for medical assistance" for his hearing loss. *Petties*, 836 F.3d at 729. Or, in the alternative, a jury could find that PA Williams (1) unreasonably chose to "persist[] in a course of treatment known to be ineffective," *Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019) (cleaned up), (2) opted for an "easier and less efficacious treatment without exercising professional judgment, *Petties*, 836 F.3d at 730 (cleaned up), or (3) "inexplicabl[y] delay[ed]" treating Mr. Moore's hearing loss, *id.*—any one of which provides a sufficient basis for deliberate indifference.

Wexford argues otherwise, insisting that PA Williams' "differential diagnosis and altered treatment plan on September 24, 2018 were the opposite of persistence in a course of ineffective treatment." Wexford Br. at 16. That can perhaps be said of PA Williams' treatment for Mr. Moore's congested nasal turbinates, but Mr. Moore does not argue deliberate indifference with respect to that treatment. The issue here is whether PA Williams was deliberately indifferent to Mr. Moore's *emergent hearing loss*, and with respect to that, a genuine dispute of material fact exists. Since the evidence strongly suggests PA Williams did not take Mr. Moore's hearing complaint seriously, and it is undisputed she did not test his hearing, a jury could conclude that PA Williams' claim to have been "treating" the hearing loss by prescribing treatment for allergic rhinitis and sinusitis is mere post-hoc rationalization. *Petties*, 836 F.3d at 733.

The cases Wexford cites to suggest PA Williams' evolving treatment for Mr. Moore's congestion is the "opposite of deliberate indifference" have no application here. In *Pyles*, unlike here, there was no argument that the doctor was in essence treating the wrong condition; the prisoner was suffering from back pain, and the doctor changed the medication he prescribed in an effort to alleviate that back pain. 771 F.3d at 407. In *McGee v. Adams*, again unlike here, "[t]he record

establishe[d] that McGee's complaints were not ignored," since the particular condition he complained about had been the subject of "meaningful and ongoing assessment" that was "the antithesis of 'deliberate indifference.'" 721 F.3d 474, 481-82 (7th Cir. 2013). Here, by contrast, PA Williams' treatment through the first two visits (and later, as we will see, through the first three) shows *no* assessment—much less any "meaningful and ongoing" assessment—of Mr. Moore's hearing loss. *Id.* A jury could easily and reasonably find that a medical provider who may not have examined Mr. Moore's ears, and indisputably did not test his hearing, was deliberately indifferent to that patient's complaints of hearing loss.

This case finds a more apt analogy in *Klein v. Wexford Health Sources, Inc.*, No. 16 C 8818, 2019 WL 2435850 (N.D. Ill. June 11, 2019). In that case, the prisoner-plaintiff told the Wexford doctor (in January 2016) that he had been unable to hear out of his right ear for some two months (since November 2015), yet the doctor neither "diagnos[ed] the hearing loss [n]or consider[ed] treatment beyond pain relief"—facts which the court held sufficient to support a jury finding of deliberate indifference. *Id.* at *8.

Crucially, the *Klein* court denied summary judgment notwithstanding the doctor's argument "that he declined to consider more aggressive treatment for Klein in January 2016" because he believed more conservative treatment for blood in the plaintiff's ear would cure the plaintiff's hearing loss. *Id.* at *9. The court reasoned that a jury could "reject [the doctor's] explanation as a post hoc rationalization . . . because there is no evidence that Klein's right ear was still bleeding in January 2016." *Id.* (cleaned up). A jury could conclude just the same about PA Williams' explanation that she thought treatment for allergic rhinitis would address Mr. Moore's hearing loss, given that (1) Mr. Moore had never before reported *any* hearing loss, whether due to allergies or not, (2) that Moore's hearing loss had persisted despite treatment with an antihistamine, and, most importantly, (3) that PA Williams' records from the August and September visits contain **zero** indication she

intended her allergy treatment to address Mr. Moore's hearing loss (as opposed to his apparently congested nasal turbinates).

Other evidence from the time between Mr. Moore's September 24 and October 31 visits with PA Williams provides further support for Mr. Moore's claim—most significantly, the grievance Mr. Moore filed with Stateville officials on October 8, 2018, roughly two weeks after PA Williams saw him on September 24. JSUMF ¶ 46; Ex. K, IDOC_000059-60. In this grievance, Mr. Moore explained the hearing loss he had endured over the last two months "coupled with pain in my right ear." Ex. K, IDOC_000060. He wrote that he had "been complaining to Stateville's medical staff over and over again, however to no avail." *Id.* For "Relief Requested," Mr. Moore asked for exactly what PA Williams had been denying him: "For Stateville's Healthcare Unit to give me the proper medical treatment i.e., hearing test and a MRI." *Id.* at IDOC_000059. This grievance supports that Mr. Moore had been telling PA Williams he was seriously concerned about his hearing loss during both the August 15 and September 24 visits (what PA Williams documented as only "muffled" hearing), and that PA Williams gave no indication to Mr. Moore that her treatment for allergies and sinuses was intended to improve the hearing loss complaints.

*The causation element.* Wexford also contends that there is no evidence that, had PA Williams addressed Mr. Moore's hearing complaints by (among other things) testing his hearing, Mr. Moore could have stopped the progression of his hearing loss and potentially even recovered some of what he had already lost. Wexford Br. at 17. Here Wexford repeats all the same failed arguments it made with respect to the August 15 visit—*i.e.*, that a hearing test "does not stop hearing loss" and that PA Williams' failure to test his hearing means we cannot know with certainty what additional medical care Mr. Moore would have received. *Id.* Mr. Moore incorporates by reference the responses he's already given to these arguments. *Supra* at 14-15.

### 3. October 31, 2018 Visit

This visit marks the third straight time in less than three months that Mr. Moore told PA Williams his hearing in his right ear was impaired. JSUMF ¶¶ 47-48. Specifically, the record written by PA Williams states "Sinuses better but right ear still muffled." *Id.* ¶ 48. PA Williams acknowledged that, as of this visit, Mr. Moore had complained about hearing loss in his right ear for "almost three months in a row." *Id.* ¶ 49. And yet, for the third straight time, PA Williams made no mention of the condition of Mr. Moore's ears (though she again asserts she examined them), and for the third straight time, PA Williams administered no hearing test. *Id.* Nor did PA Williams refer Mr. Moore to an ENT or other auditory specialist, or even refer Mr. Moore to see a different provider at Stateville who might be better equipped to address his hearing complaints.

Wexford again seeks to justify these failures by PA Williams on the basis that she was actually treating Mr. Moore's hearing loss complaints by continuing to treat him for sinusitis. Wexford Br. at 18-19. That explanation is not credible, and the jury may well reject it, for the reasons recited earlier in response to the same Wexford arguments. *Supra* at 7-10. In fact, Wexford's attempted justification falls even flatter here. Although Mr. Moore's *sinuses* had improved with PA Williams' course of treatment (various antihistamines, antibiotics, and anti-inflammatories), his hearing had not. Indeed, Mr. Moore's sworn testimony is that his hearing had *worsened* over that span. JSUMF ¶ 52. So while Wexford is contending that PA Williams should be insulated from liability because she expected her treatment for sinusitis to also address Mr. Moore's hearing loss, the "factfinder could infer [deliberate indifference] from [PA Williams]'s obdurate refusal to alter [Mr. Moore]'s course of treatment despite his repeated reports that the medication was not working and his condition was getting worse." *Greeno*, 414 F.3d at 654. Contrast with another case makes that conclusion all the more clear. In *Sharif*, this Court granted summary judgment to a Wexford physician who "initially pursued a conservative treatment for a non-displaced fracture and then,

when it became clear Sharif's fracture was not healing, determined that he should refer Sharif to a specialist." 2017 WL 3421554, at *6. The facts here are far different. Even if PA Williams was actually trying to treat Mr. Moore's hearing loss in those early visits—she was not—she should have changed course and referred Mr. Moore to a specialist when her treatment proved ineffective.

In all events, it bears repeating that, having failed to conduct any sort of meaningful hearing test to determine the extent of Mr. Moore's hearing loss, PA Williams had no legitimate reason to believe that Mr. Moore's hearing loss was caused by or connected to allergies or a sinus infection. JSUMF ¶ 128. Had she performed even rudimentary testing, she could have ruled out even her own post-hoc rationalization for her decisions, since such testing (when Mr. Moore finally got it) showed his hearing loss was far worse than what could be caused by such run-of-the-mill maladies. *Id.*

*The causation element.* Because Wexford's arguments here are identical to the arguments made regarding PA Williams' first two visits with Mr. Moore, Plaintiff incorporates his responses to those arguments. *Supra* at 14-15.

#### 4. November 26, 2018 Visit

*The deliberate indifference element.* During this visit, PA Williams' notes reflect that Mr. Moore "still can't hear out of right ear." JSUMF ¶ 53. This time, however, PA Williams performed a "finger rub test," where she put her fingers a couple inches away from Mr. Moore's ear, rubbed her fingers together, and then asked him whether he heard anything. *Id.* ¶ 55. She then noted "decreased auditory acuity." *Id.* ¶ 53. In addition, PA Williams denoted what she called a "positive negative finding, if there is such a thing," specifically that Mr. Moore's ear canals were clear. *Id.* ¶ 54. Finally, PA Williams referred Mr. Moore to see Stateville Medical Director, Dr. Henze, to treat Mr. Moore's hearing loss. *Id.* ¶ 56. PA Williams did not immediately refer Mr. Moore to receive a formal hearing assessment (whether on-site or off-site) because she said she did not have the capability to do so. *Id.*

The November 26 visit occurred more than *three months* after Mr. Moore began complaining of hearing loss, and it was the *fourth time* PA Williams had seen Mr. Moore in that span. Yet that record contains: (1) the first evidence of a hearing test actually being performed, (2) the first description of the condition of Mr. Moore's ears, and (3) the first referral to a provider with the authority to order a formal hearing assessment for Mr. Moore (at least according to PA Williams' testimony). These are three things that PA Williams should have done the very first time she saw him for his hearing loss complaints, when his chance at recovery was far greater.

The presence of these three notes in the record makes the absence of such notes in the previous three records all the more conspicuous. They substantially undermine PA Williams' efforts to defend her choice to ignore Mr. Moore's hearing loss complaints over the prior three visits. *Supra* at 13, 18-19. Wexford's arguments in response to this point, Wexford Br. at 21-23, all amount to asking the Court to impermissibly draw inferences from the evidence in its favor. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (stating that all reasonable inferences must be drawn in favor of the party opposing summary judgment).

For example, to explain away the fact that on November 26, 2018 PA Williams *for the very first time* made a record regarding the condition of Mr. Moore's ears—the first time we have documentary evidence suggesting she actually performed an otoscopic examination of Mr. Moore's ears—Wexford says that is because this was the first time such findings "became pertinent." Wexford claims that on his prior visits, he had other symptoms like a congested nose. Wexford Br. at 22. The rationale is somewhat inscrutable, but for present purposes it is sufficient to note there is another, more probable explanation: it was the first time PA Williams performed an actual ear exam. For instance, PA Williams was asked why, in the August-September-October records, there is no description of the results of the ear exam she claims she performed, and her answer was that she had no "positive" findings "so there was nothing for me to note in regards to his ear exam." Ex. D,

Williams Dep. 208:21-209:9. A positive finding is one indicating something is wrong, according to PA Williams: "If I saw redness, if I saw swelling, if I saw discharge, if I saw a red eardrum, if I saw it retracted, that type of thing I would document." *Id.* at 19:1-6. And yet, the first time she documents *anything* about Mr. Moore's ears (on November 26), it is that the canals are clear, meaning normal. JSUMF ¶ 53.

But the November 26 record does more than simply shed light on PA Williams' prior inattention to Mr. Moore's complaints; it also reveals still new conduct that fell below the constitutional floor. For one, PA Williams did not immediately refer Mr. Moore for a formal hearing assessment that would trigger referral to an ENT, because (she says) she did not believe she had the authority to do so. JSUMF ¶ 56. Nor did she immediately recommend Mr. Moore's referral to an ENT, despite a patient in her care appearing to be losing (or having already lost) a significant amount of hearing. She instead showed zero urgency.

*The causation element.* Wexford makes no new arguments regarding causation here save one— that because the November 26, 2018 visit occurred nearly three months after Mr. Moore began losing his hearing, that even had PA Williams acted appropriately, it would not have made a difference for Mr. Moore's hearing. Wexford relies on deposition testimony from Plaintiff's expert Dr. Weingarten for this argument. Wexford Br. at 23 (citing JSUMF ¶¶ 112, 117). Wexford's argument has three flaws. First, it elides the Dr. Weingarten testimony it does not like. Dr. Weingarten also testified that, beyond the ideal four-to-six-week treatment window, "the likely benefit [of treatment] is miniscule but possible." JSUMF ¶ 112. That the likely efficacy of treatment decreased the farther from the onset of the hearing loss does not mean it categorically would fail.

Second, that the likely success of treatment decreased as PA Williams continued in her failed "treatment" of Mr. Moore's hearing loss has no bearing on Mr. Moore's ability to prove PA Williams' deliberate indifference proximately caused him injury. Tort law has long recognized the

24

viability of claims based on "probabilistic harm," or "loss of a chance" caused by tortious behavior. *Thomas v. Illinois*, 697 F.3d at 615 (citing discussion of concept in *Doll v. Brown*, 75 F.3d 1200, 1205-06 (7th Cir. 1996)). As *Doll* explains, this concept of "loss of a chance" is "illustrated by cases in which, as a result of a physician's negligent failure to make a correct diagnosis, his patient's cancer is not arrested, and he dies—but he probably would have died anyway." 75 F.3d at 1205. The law's answer to such a puzzle is not to dismiss the claim altogether; instead, "[t]he trier of fact will estimate the probability that the patient would have survived but for the physician's negligence—say it is 25 percent—and will award that percentage of the damages the patient would have received had it been certain that he would have survived but for the negligence." *Id.* at 1205-06. Although the Seventh Circuit did not apply that logic in *Thomas v. Illinois* itself—a Section 1983 case involving a cockroach infestation in a prison—it said it was "important to emphasize because of [its] pertinence to future cases." 697 F.3d at 615. For example, this one.

Third, even if appropriate treatment (including steroid therapy) would have been less likely to help Mr. Moore regain his hearing at this later date, that does not mean that such treatment would not have alleviated Mr. Moore's mental anguish at having been refused such treatment. It also does not mean that Mr. Moore wouldn't have earlier received an MRI, which could have identified certain possible causes of the hearing loss. And identifying the cause of his hearing loss (e.g. retrocochlear lesion, about which Plaintiff's expert will testify) might still have required different treatment than the administration of steroid therapy. JSUMF ¶¶ 108, 111.

In summary, ample evidence shows that PA Williams was deliberately indifferent to Mr. Moore's serious medical needs. Despite Mr. Moore complaining of right ear hearing loss over the course of three straight visits from August 2018 through October 2018, PA Williams not once tested Mr. Moore's right ear hearing—an *undisputed* fact that by itself should preclude summary judgment on the deliberate indifference element because it shows PA Williams effectively "ignore[d]

a request for medical assistance." *Petties*, 836 F.3d at 729. Multiple other pieces of record evidence, including PA Williams' "persistence in a course of treatment known to be ineffective," reinforce that conclusion. *Davis*, 938 F.3d at 915 (cleaned up). While Wexford has a defendant-friendly story to tell to try and minimize those failures or explain them away, that only creates questions of fact that a jury must resolve. *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 665 (7th Cir. 2006) ("The record here, replete with credibility questions and competing versions of the facts, demonstrates that this case should be sorted out by the trier of fact.").

**B.     Dr. Henze was deliberately indifferent to Mr. Moore's serious medical needs, causing him various injuries**

Wexford contends, as it did with the claim against PA Williams, that Mr. Moore lacks evidence to show either the deliberate indifference or causation elements of his constitutional claim against Dr. Henze. As the evidence detailed below shows, genuine disputes of material fact preclude summary judgment on either basis.

*The deliberate indifference element.* After PA Williams (on November 26) referred Mr. Moore to Dr. Henze, she first treated Mr. Moore on December 19, 2018. JSUMF ¶ 72. The sole reason for PA Williams' referral to Dr. Henze was to assess Mr. Moore's hearing loss. *Id.* ¶ 56. Dr. Henze's notes from the visit indicate that Mr. Moore had been experiencing hearing loss in his right ear for "many months" and that he was referred for that specific reason. *Id.* ¶ 72.

Notwithstanding that treatment for allergies and sinus issues over the prior four months had failed to stem the tide of Mr. Moore's hearing loss, Dr. Henze noted Mr. Moore's bulging ear drums and testified that she believed that "Mr. Moore had eustachian tube dysfunction which correlates with the allergic rhinitis he had been treated for and can be the last thing to go after a sinus

infection." *Id.* ¶ 73.[5] She did not personally test Mr. Moore's hearing during the visit, nor did she order that a test be promptly given to Mr. Moore. Instead, Dr. Henze's notes from the visit show that she ordered an audioscope procedure for Mr. Moore "once available." *Id.* Dr. Henze thus knew that Mr. Moore was experiencing hearing loss, that PA Williams' prior treatments had failed to resolve the hearing loss, and that Mr. Moore had not yet even had his hearing formally tested—and she proceeded to act without any urgency to get that done, thus continuing with the same indifference that PA Williams had shown.

Dr. Henze admitted that Mr. Moore *needed* a hearing test to determine the level of hearing dysfunction so that she could determine what steps to take moving forward. *Id.* That testimony was hard to square with her laissez-faire "once available" orders for Mr. Moore to be tested. The following colloquy ensued:

> Q. So it's important that you get that hearing test quickly so that you can then determine an appropriate course of action moving forward, right?
>
> A. Again, we don't have a real clear—again, the symptoms of hearing loss are much more dramatic than the findings that we—we have on exam, so.
>
> Q. So does that just come back to you somewhat suggesting that you didn't believe Mr. Moore, is that was this is, Dr. Henze? I'm trying to understand why you keep falling back to that testimony.
>
> A. And I'll say, again, he didn't have his hearing aids when he saw me yesterday and I wasn't using this loud of a voice. . . . I do have a hard time, if he was so deaf, why wasn't he using his hearing aid. If he is so deaf, why didn't he use his hearing aid yesterday?

Ex. L, Henze Dep. 339:5-340:7 (attorney objections omitted); JSUMF ¶ 97.

---

[5] Interestingly, Dr. Henze would go on to note Mr. Moore's bulging ear drums—sometimes called effusion—over at least three different visits. JSUMF ¶ 81. PA Williams never indicated such a finding from her four visits with Mr. Moore in the fall of 2018, before she referred him to Dr. Henze. In fact, PA Williams said that in 38 years as a physician assistant, she could not remember ever having diagnosed an effusion. *Id.* She said she'd rely on an ENT to do that because she does not have any specialized training in the ear. *Id.* That is still further evidence PA Williams was out of her depth, and should have immediately referred Mr. Moore to see an ENT when Mr. Moore presented with persistent complaints of hearing loss.

Setting aside the fact that Dr. Henze refused to actually answer the question posed—likely because she recognized the answer would undermine her decision *not* to expedite Mr. Moore's testing—the upshot of this exchange is that Dr. Henze gave extensive testimony that shows she simply did not believe Mr. Moore's complaints of hearing loss, or the later testing results that corroborated those complaints. Indeed, the only reason Dr. Henze ever decided to send Mr. Moore to see an ENT—which she did only after she was deposed in this case—was for the express purpose of proving Mr. Moore was malingering (or faking the extent of his hearing loss). JSUMF ¶ 121.[6]

To state the obvious, a doctor cannot claim to have responded reasonably to a patient's symptoms while simultaneously defending her refusal to provide certain treatment on the basis that she believed the patient's symptoms were not genuine. But as the above colloquy illustrates, that is *exactly* what Dr. Henze has done. A doctor could take one route or the other to defend against a deliberate indifference claim—but Dr. Henze and Wexford try to take both at the same time. Dr. Henze's inconsistent testimony regarding Mr. Moore's condition and her treatment of it alone should be enough to stave off summary judgment on whether she acted with deliberate indifference. But even taking each of Wexford' apparent arguments on the merits, they both fail.

If Wexford's argument is that Dr. Henze behaved appropriately in response to Mr. Moore's complaints because she did not believe them—a point Wexford dances around rather than making it

---

[6] Although it is nothing more than a sideshow for this motion, since the extent of Mr. Moore's hearing loss remains a fact issue for the jury, it is worth noting what Wexford does not tell the Court about Mr. Moore's visit to the ENT in the summer of 2021. Even though Dr. Henze ordered that referral for apparently a single purpose—to prove Mr. Moore was not telling the truth about his hearing—the testing proved no such thing. Instead, the audiologist and ENT who treated Mr. Moore that day said that while it was "possible" Mr. Moore was malingering, it was "unclear." JSUMF ¶ 122. And the one test they administered that was specifically designed to "catch" a patient malingering about unilateral hearing loss (the "Stenger Test") was negative, meaning Mr. Moore's hearing loss appeared genuine. *Id.* ¶ 126; *Mayes v. United States*, No. 15 Civ. 7155 (KPF), 2018 WL 1274029, at *4 n.5 (S.D.N.Y. Mar. 5, 2018) ("Dr. Weiss described the purpose of the Stenger Test as follows: Stenger testing is a test designed to 'catch' individuals who feign hearing loss.").

explicitly—that runs headlong into the law. Wexford Br. at 1, 13, 29 (citing JSUMF ¶ 97, in which Dr. Henze suggests Mr. Moore could be pretending to have lost hearing). Case after case confirms a provider cannot earn summary judgment on the basis that they believed the plaintiff was malingering, when ample evidence in the record exists to contradict that suspicion. That simply creates a fact issue on the subjective element of deliberate indifference. *See Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) ("The fact that Nurse Dunbar and Dr. Benjamin may have based their refusal to treat Walker's pain on a good-faith belief that he was malingering, that he was not in pain but was merely trying to get high with the narcotic painkiller, is an issue for the jury."); *Greeno*, 414 F.3d at 655 ("The possibility that Zunker and nurse Nordahl did not do more for Greeno because they thought he was malingering and did not really have a severe medical need is an issue for the jury."); *Berry v. Peterman*, 604 F.3d 435, 442 n.2 (7th Cir. 2010) ("This evidence might support an argument that Dr. Butler believed Berry was exaggerating his pain, but again, that argument presents at most a factual issue that must be addressed to a jury.").

If Wexford's argument is instead that Dr. Henze accepted Mr. Moore's complaints as true and behaved appropriately in response to them, that argument likewise fails. The record contains sufficient evidence for a jury to conclude that Dr. Henze "knew of a substantial risk of harm to [Mr. Moore] and disregarded the risk." *Greeno*, 414 F.3d at 653. There is no dispute that she knew Mr. Moore had experienced hearing loss for months, and that he was referred for that sole reason. And yet despite Mr. Moore's hearing not responding to treatment with antibiotics and antihistamines and anti-inflammatories—at least some of which PA Williams says were designed to help restore his hearing—Dr. Henze still failed to act with even a modicum of urgency. She thus squandered any realistic chance at stopping the progression of Mr. Moore's hearing loss and/or reversing it.

Wexford's explanation of Dr. Henze's actions does not pass muster. Wexford says it was appropriate for Dr. Henze not to expedite Mr. Moore for hearing testing *despite* Dr. Henze's agreement that testing was necessary "to determine the level of hearing dysfunction so that she could know what steps to take moving forward." JSUMF ¶ 73. Dr. Henze and Wexford simply cannot reconcile Dr. Henze's admission that testing was necessary to make an appropriate diagnosis and formulate an effective treatment plan with her failure to secure an onsite audioscope for Mr. Moore until roughly *two months* later (February 2019) and a formal audiogram offsite another *four months* after that (June 2019). *Id.* ¶ 110. That audiogram showed that Mr. Moore's right ear was dead and unaidable, and that Mr. Moore had also suffered some hearing loss in his left ear. *Id.* ¶ 83. Immediate testing—which is what Dr. Henze should have ordered, given the months-long persistence of Mr. Moore's hearing loss through courses of antibiotics and antihistamines—would have shown the severity of hearing loss in Mr. Moore's right ear. And a medical provider like Dr. Henze would know such hearing loss is not consistent with mere allergic rhinitis or sinusitis (or a particular symptom of those conditions called "eustachian tube dysfunction," which is the terminology Dr. Henze used). JSUMF ¶ 128.

*Causation.* Instead of trying to patch up Dr. Henze's story, Wexford pivots to causation. Wexford Br. at 28. Wexford again cites snippets of Dr. Weingarten's deposition to suggest nothing could have been done for Mr. Moore after September 26, 2018—or, six weeks after Mr. Moore reported the onset of his hearing loss—so Dr. Henze should be off the hook for her December 19 actions. *Id.*

As an initial matter, Dr. Weingarten's testimony applies only in the event that Mr. Moore in fact suffered from sudden sensorineural hearing loss, and that his hearing loss is not being caused by the presence of, for example, a retrocochlear lesion—which can be detected by an MRI that has never been ordered for Mr. Moore. And even with respect to sudden sensorineural hearing loss,

Dr. Weingarten offered additional testimony on the subject of treatment outside the six-week window, including that he would *still* "offer treatment to the patient," but that he would "advise them that the . . . likely benefit is miniscule but possible." Ex. E, Weingarten Dep. 105:7-18; *see also supra* at 24-25. That treatment might be less likely to succeed does not mean Dr. Henze can be excused for failing to offer any at all. *Supra* at 25; *Thomas v. Illinois*, 697 F.3d at 615 (explaining viability of "probabilistic harm" and "loss of a chance" damages theories in Section 1983 cases).

Wexford never offers an analogous case on which summary judgment was granted on such shaky causation grounds. This is unsurprising given that causation is almost always a question for the jury, save for "the rare instance that a plaintiff can proffer **no evidence** that a delay in medical treatment exacerbated an injury." *Gayton*, 593 F.3d at 624 (emphasis added). Wexford's best effort here is citing *Mathison v. United States*, 619 F. App'x 691 (10th Cir. 2015)—a case whose lone similarity to this one is that the plaintiff may have suffered from sudden hearing loss. There, the plaintiff alleged that the defendant's overly loud public address system caused *the onset* of his sudden hearing loss; not (as here) that any delay in treatment by his medical providers exacerbated hearing loss after its onset. *Mathison*, 619 F. App'x at 692. In addition to that different causation question, the plaintiff faced the added problem of lacking any expert testimony whatsoever. *Id.* at 694-695. Here by contrast, Mr. Moore's expert will explain how PA Williams' and Dr. Henze's failures could have caused his hearing loss to worsen and become permanent.

That Dr. Henze said "she has no control over outside providers' schedules" is misleading and irrelevant to this motion. Wexford Br. at 28. It's misleading because of course Dr. Henze, as the Stateville Medical Director, has the authority to send inmates under her care to receive emergency medical treatment that cannot be provided in the facility. In fact, Wexford likes to point this out in response to *Monell* claims regarding its "collegial review" practice. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 239 (7th Cir. 2021) (noting that, as of 2016, "medical directors can fast-track urgent or

emergent cases"); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). But in any event, the testimony is irrelevant because the issue was not that Dr. Henze lacked the authority to ensure Mr. Moore received emergency care for his hearing (including, for instance, the administration of steroids); the issue was that Dr. Henze concluded, by her own admission, that nothing could be done to help Mr. Moore. From her deposition:

> Q. So in a situation where a patient has—has suddenly had the onset of hearing loss and has continued losing hearing for a period of several months, do you think it's important that he receive the audiogram quickly?

> A. It's—again, it is not an emergency. He doesn't need to go to the heart cath lab or anything. Having an audiogram is not going to change whether he loses all of his hearing or some of his hearing. It's going to—having a test is not going to change the nature of his alleged disability.

> Q. Do you think that there is nothing that could have been done to prevent Mr. Moore from going totally deaf in his right ear?

> A. No, I don't.

> Q. You don't think there is any treatment that could have been done?

> A. No.

Ex. L, Henze Dep. 200:9-201:6 (attorney objections omitted).[7]

Dr. Henze was and is wrong about that, as expert testimony will explain. But for purposes of this motion, the key point is that she made a decision, without *ever having tested Mr. Moore's hearing*, that his hearing loss was not a serious issue that needed (or could even respond to) immediate treatment. A jury must be permitted to evaluate Dr. Henze's explanation—including whether she truly ever credited Mr. Moore's initial claims of hearing loss or the later audiogram results that corroborated his complaints, and whether her treatment evinced disregard for those complaints.

---

[7] Notably, immediately after this question-and-answer, Dr. Henze reverted to testifying yet again that she does not believe Mr. Moore actually lost his hearing, saying "Again, there is no believable cause and effect here." Ex. L, Henze Dep. 201:7-15. A court on summary judgment simply cannot determine as a matter of undisputed fact whether Dr. Henze ever even believed Mr. Moore had lost his hearing, and therefore cannot determine if she in fact knew of and disregarded that risk of harm.

Wexford's related argument (the same one they made with respect to PA Williams) that the delay in testing was fine because "it is a test and not a treatment or cure for hearing loss," Wexford Br. at 29, fails for the same reasons this defense of PA Williams' conduct fails, *supra* at 14-15. That a test itself doesn't stop hearing loss is beside the point. The hearing tests, by Dr. Henze's own admission, are necessary because they help diagnose the patient and identify appropriate next steps. JSUMF ¶ 82. Get the tests quickly, get the patient treated quickly—it's simple. PA Williams and Dr. Henze refused to timely start that two-step process.

Wexford next says all Mr. Moore can show here is "mere disagreement between a prisoner and his doctor," which it says is not enough for deliberate indifference. Wexford Br. at 31. But Mr. Moore has far more than that here, especially given Dr. Henze's testimony that she essentially did not believe Mr. Moore was actually suffering from the medical condition for which he is now suing. That testimony will show that Dr. Henze's other justifications for her behavior—that she did not believe Mr. Moore's hearing required urgent treatment, that she could not compel faster hearing testing, that she believed Mr. Moore's hearing may have simply been impacted by eustachian tube dysfunction, and so on—are shaky post-hoc rationalizations that a jury could freely reject. *Petties*, 836 F.3d at 733 (rejecting Wexford doctor's attempt to win summary judgment on "clearly a post-hoc rationalization"); *Sain*, 512 F.3d at 895 (noting that doctor cannot win summary judgment if plaintiff shows doctor's justification "was a sham"). Moreover, just as with PA Williams, Dr. Henze's stubborn refusal to send Mr. Moore to a specialist despite the failure of her other treatment protocols dooms Wexford's motion. A doctor who persists in a more conservative, but ultimately ineffective, treatment option cannot earn summary judgment merely by asserting a difference of medical opinion. *See, e.g.*, *Parker v. Ritz*, No. 18-cv-1895-RJD, 2021 WL 1758259, at *4 (S.D. Ill. May 4, 2021) (holding that, although deliberate indifference is not established "simply because medical professionals disagree," a doctor was not entitled to summary judgment where the patient's

pain persisted throughout doctor's conservative course of treatment); *Vilayhong v. Santos*, No. 3:19-CV-00748-MAB, 2022 WL 4355844, at *14 (S.D. Ill. Sept. 20, 2022) ("While Santos ultimately characterizes Plaintiff's position as a mere disagreement with the course of treatment, it is equally plausible that a reasonable jury could look at the record and conclude that Santos persisted in a course of treatment over a period of many months that was obviously ineffective.").

Dr. Henze's course of treatment *after* her initial December 19, 2018 visit with Mr. Moore also provides further support for Mr. Moore's deliberate indifference claim. It shows that Dr. Henze, no matter what conditions Mr. Moore presented with, was simply not going to take those conditions seriously. Mr. Moore presented with positive findings in his right ear over multiple different visits with Dr. Henze, spread over the course of several months. JSUMF ¶¶ 72, 81, 89. His right ear drum was bulging in December 2018, and again in April 2019; in June 2019 the same ear was "very sore and red, draining," suggestive of infection. *Id.* Despite course after course of antibiotics and antihistamines and even ear drops, Mr. Moore's right ear continued to plague him—and still Dr. Henze would not refer Mr. Moore to an ENT.

Then, in November 2019, Mr. Moore requested medical help for dizziness, a sensation of the room spinning, and ringing in the ears (tinnitus)—symptoms Dr. Henze agreed were consistent with vertigo, and which can be caused by an ear-related disease caused Meniere's disease. *Id.* ¶ 92. Those symptoms caused Mr. Moore to again seek medical help in February 2020. *Id.* ¶ 95. Even though Dr. Henze admitted she would rely on an ENT to diagnose Meniere's disease, she defended her decision not to refer Mr. Moore to an ENT for these persistent symptoms because, she said, he did not appear as ill as he complained of being. *Id.* ¶ 99. So back again we come to Dr. Henze and her disbelief. But whether her skepticism was in good faith or well-founded is something for the jury, and not this Court on summary judgment, to decide. *See Walker v. Benjamin*, 293 F.3d at 1040 ("The fact that Nurse Dunbar and Dr. Benjamin may have based their refusal to treat Walker's pain

on a good-faith belief that he was malingering, that he was not in pain but was merely trying to get high with the narcotic painkiller, is an issue for the jury."); *Greeno*, 414 F.3d at 655 ("The possibility that Zunker and nurse Nordahl did not do more for Greeno because they thought he was malingering and did not really have a severe medical need is an issue for the jury."); *Berry*, 604 F.3d at 442 n.2 ("This evidence might support an argument that Dr. Butler believed Berry was exaggerating his pain, but again, that argument presents at most a factual issue that must be addressed to a jury.").

## II.   Count IV: Wexford's "Collegial Review" Policy was the Moving Force Behind Mr. Moore's Constitutional Injuries

Mr. Moore agrees with Wexford's recitation of the standard he must meet to carry his *Monell* claim through trial. His burden is to show that certain Wexford policies, practices, or customs were "the direct cause or moving force behind the constitutional violation[s]" he suffered. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (cleaned up). The record contains evidence sufficient to show that Wexford's "collegial review" policy caused PA Williams and Dr. Henze to deliver constitutionally inadequate medical care to Mr. Moore.[8]

Through its contract with the State of Illinois, Wexford provides healthcare services in multiple Illinois Department of Corrections facilities. The State's contract with Wexford authorizes Wexford to send inmates for offsite specialty care when necessary, but also imposes a "[c]ompensation adjustment" when the cost of those offsite referrals exceeds a certain limit— meaning the State can effectively claw back a portion of what it pays Wexford on an annual basis. Ex. M, Henze Dep. Ex. 2, Wexford-IDOC Contract § 2.2.3.7(b); *Sterling v. Wexford Health Sources, Inc.*, No. 16 C 6280, 2021 WL 5906067, at *2 (N.D. Ill. Dec. 13, 2021). Wexford has systems in place to limit the number of such referrals. Most prominently, it maintains a "collegial review" process,

---

[8] Wexford first moves for summary judgment on Plaintiff's *Monell* claim on the basis that Mr. Moore has failed to establish the requisite underlying constitutional violation. Mr. Moore responds to this argument by incorporating by reference his arguments with respect to PA Williams and Dr. Henze. *Supra* Section I.

which is a "phone conference call attended by a utilization physician in Pittsburgh, the facility Medical Director, and the scheduling clerk from the facility. At these calls, the corporate utilization physician reviews the list of referrals from the facility over the prior week. The utilization physician either approves or denies the referral." Ex. N, Henze Dep. Ex. 1, 2018 Lippert Report, at 63.[9]

Wexford cannot seriously dispute that the collegial review process is a cost-containment mechanism designed to discourage and reduce offsite referrals. Wexford's corporate medical director for utilization management has testified that collegial review is used to "aggressively manage all offsite services for appropriate utilization and cost-effectiveness." *Dean*, 18 F.4th at 227 (cleaned up). Indeed, Wexford makes collegial review a part of its sales pitch to entities like IDOC, touting it on its web site as "a proactive, physician-led process designed to reduce offsite care costs." Ex. O, Henze Dep. Ex. 4, Wexford Webpage. Wexford brags about the predictable results of collegial review: "fewer requested offsite referrals, a reduction in the percentage of referrals denied as inappropriate, and an overall decrease in specialty consults." *Id.* Unsurprisingly, the collegial review process has been a frequent target in litigation, *see, e.g.*, *Dean*, 18 F.4th at 237, and has been harshly criticized by neutral outside observers, Ex. N, Henze Dep. Ex. 1, 2018 Lippert Report at 10, 63-69, 121.[10]

Here, Mr. Moore's claim is *not* that the collegial review process played a part in his constitutional injuries because the Wexford physician sitting in Pittsburgh outright denied Dr. Henze's request for specialty care. Instead, his claim is that the very existence of the collegial review process either outright prevented or at least discouraged PA Williams and Dr. Henze from

---

[9] Wexford maintained the collegial review process throughout Mr. Moore's treatment at Stateville, and he was approved for outside treatment through the collegial review process a few times. JSUMF ¶¶ 79, 87.

[10] The 2018 Lippert Report, along with an earlier iteration in 2014, will be admissible at trial as evidence that the individual defendants and Wexford as an entity were on notice of the problems inherent with the collegial review process.

referring him to an ENT or other specialist capable of treating his sudden hearing loss. Ample evidence in the record creates a genuine dispute of material fact on this issue.

*PA Williams.* PA Williams testified that, although she is one of the primary care providers at Stateville, she has *no* authority to initiate the collegial review process for a patient that she believes requires offsite specialty care. JSUMF ¶ 24; Ex. D, Williams Dep. 37:6-10 (regarding collegial review, "that is part of the medical director's responsibility that I'm not involved in at all"); 41:10-16 ("I don't normally do [collegial review]," but instead "refer the patient to the medical director"). PA Williams, in her almost 40 years of experience in healthcare, had never encountered a process like collegial review before Wexford and Stateville. JSUMF ¶ 24. Asked multiple times whether the process, in her professional medical judgment, was a good idea for patient care, PA Williams would not answer the question, stating instead "that's just what happens" and "that's just the way things go." *Id.*; Ex. D, Williams Dep. 49:1-24.

A jury could reasonably conclude that, by erecting a hurdle that prohibits PA Williams from personally referring patients in her care for offsite specialty care, Wexford created a policy that played a causal role in PA Williams' deliberately indifferent failure to refer Mr. Moore for immediate hearing testing onsite, to an offsite audiogram, and/or to an offsite specialist like an ENT. Wexford tries to use this same fact to its advantage, arguing that because PA Williams was "not authorized to make a recommendation that a patient receive outside specialty care," that means the collegial review policy could not have played a causal role in her refusal. Wexford Br. at 40. That makes no sense. That Wexford implemented a restrictive gatekeeping policy for patient access to offsite specialty care and then gave only one provider (Dr. Henze) the keys to that gate does not somehow mean the Wexford policy is not to blame.

*Dr. Henze.* The record contains sufficient evidence to show that Dr. Henze, as the Medical Director at Stateville responsible for carrying out collegial review with the Pittsburgh-based Wexford

doctor, was predisposed against referring patients for offsite care. Dr. Henze testified that she underwent training with the Pittsburgh-based doctor on the collegial review process in 2017, in which she said she "learned a lot of nuances with prison medicine." JSUMF ¶ 65; Ex. L, Henze Dep. 35:1-36:18. Asked to explain what those "nuances" were, Dr. Henze offered only one: that inmate patients might be lying about their symptoms, because there is secondary gain in being permitted to leave the facility. JSUMF ¶ 65; Ex. L, Henze Dep. 35:1-36:18.[11] Dr. Henze admitted point-blank that training had an impact on her: "It influenced how I assessed the patient." Ex. L, Henze Dep. 39:16-20.

This testimony dovetails with Dr. Henze's testimony about Mr. Moore, specifically her statements at various times that indicate she simply did not believe Mr. Moore's hearing loss was genuine. Dr. Henze's admission that her collegial review experience caused her to be more skeptical of her inmate patient's medical needs, coupled with her testimony that she essentially did not believe Mr. Moore, is strong evidence that Wexford's policies were "the direct cause or moving force behind the constitutional violation[s]" Mr. Moore suffered. *Woodward*, 368 F.3d at 927 (cleaned up). Added to the fact that Dr. Henze refused to refer Mr. Moore to an ENT or other specialist even after (1) none of PA Williams' or Dr. Henze's treatments proved effective against Mr. Moore's hearing loss, and (2) Dr. Henze later proved unable to treat Mr. Moore's nausea, dizziness, and tinnitus (all possible symptoms of vertigo, if not Meniere's disease, both ear-related conditions), a reasonable jury could certainly conclude Wexford's collegial review policy caused Dr. Henze not to refer Mr. Moore for offsite treatment.[12]

---

[11] Technically, Dr. Henze offered a second "nuance": "I learned what lotion is used for." Ex. L, Henze Dep. 40:11-18.

[12] Until, of course, she did— in 2021, after Mr. Moore suffered for nearly three years, after her deposition in this case, and only then for the express purpose of malingering, ostensibly in hopes of winning this lawsuit. JSUMF ¶ 121. Mr. Moore "passed" the one test specifically designed to "catch" a patient malingering about

Wexford's various arguments to defeat Mr. Moore's *Monell* claim are all unpersuasive. First, Wexford says "there is no evidence in the record that Wexford has express written policies" that discourage referring patients for offsite specialty care. Wexford Br. at 33. But Mr. Moore submits that Wexford's own description of collegial review provides exactly that. Dr. Ritz's testimony acknowledges collegial review's cost-cutting function—and the obvious way in which it cuts those costs is by reducing the number of referrals for offsite care. *Dean*, 18 F.4th at 227. Again, Wexford explicitly acknowledges that the *goal* of collegial review is to "reduce offsite care costs" and says the *results* of collegial review are "fewer requested offsite referrals . . . and an overall decrease in specialty consults." Ex. O, Henze Dep. Ex. 4, Wexford Webpage. The Seventh Circuit has, for good reason, had no trouble concluding that collegial review is an express written policy subject to a *Monell* challenge. "In Dean's case, collegial review is an explicit, official policy followed by Wexford; everyone, including my colleagues, readily recognizes this fact. No one denies that Dean was attacking Wexford's own policy and actions." *Dean*, 18 F.4th at 247 (Wood, J., dissenting, but describing a point on which the panel agreed).

Nor is Wexford correct that Mr. Moore's *Monell* claim cannot survive summary judgment without evidence "of a pattern of other inmates experiencing these purported policies and procedures." Wexford Br. at 33. Binding precedent says otherwise. In *Glisson v. Indiana Department of Corrections*, the Seventh Circuit expressly rejected the argument that a plaintiff challenging an official policy can prevail only "if the record reflected numerous examples of the constitutional violation in question." 849 F.3d 372, 381 (7th Cir. 2017) (en banc). Rather, "[t]he key is whether there is a conscious decision not to take action," which "can be proven in a number of ways, including *but not limited to* repeated actions." *Id.* (emphasis added); *see also Von Ryburn v. Obaisi*, No. 14 CV 4308, 2022

---

unilateral hearing loss (the "Stenger Test"); the result was negative, meaning Mr. Moore's hearing loss appeared genuine. *Id.* ¶ 126.

WL 1444309, at *6 (N.D. Ill. May 6, 2022) (discussing *Glisson*, "the Court concludes that the failure by a plaintiff seeking to impose *Monell* liability based on a facially lawful policy to introduce evidence that the policy has caused constitutional deprivations for others is not, standing alone, fatal to the *Monell* claim"). Here, Mr. Moore can argue with supporting evidence that PA Williams made a conscious decision not to refer him for specialty care because the collegial review process denied her even the ability to do so. Whereas Dr. Henze made a conscious decision not to refer Mr. Moore for specialty care because the collegial review process (and her training on it) led her to discount and disregard inmate patient complaints as illegitimate or exaggerated.

In addition, even if the Court concludes Mr. Moore needs evidence that the collegial review process harmed others just as it did him, there are no "bright-line rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021). Rather, plaintiffs must only "provide evidence from which a jury could reasonably infer that a 'series of violations' occurred, not 'isolated acts of misconduct.'" *Parker*, 2021 WL 1758259, at *5 (quoting *Howell*, 987 F.3d at 654). If a plaintiff demonstrates that "there is a policy at issue rather than a random event," that is enough. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Here, the evidence regarding the purpose and design of the collegial review process provides strong support for that inference. So do the law reporters, which are rife with cases showing prisoners harmed in various ways by Wexford's collegial review process. A far from exhaustive survey:

- In *Southard v. Wexford Medical*, No. 17-cv-839-JPG-RJD, 2019 WL 3330237, at *2 (S.D. Ill. June 6, 2019), *report and recommendation adopted in part, rejected in part*, No. 3:17-cv-00839-JPG-RJD, 2019 WL 3322364 (S.D. Ill. July 24, 2019), Magistrate Judge Daly permitted a *Monell* claim to proceed past summary judgment where the plaintiff argued Wexford's collegial review process caused him to not be timely seen by an ENT (even though there was no indication in the decision that the plaintiff had identified any similar injuries to other similarly situated plaintiffs).

- In *Broaddus v. Wexford Health Sources, Inc.*, No. 15-cv-1339-SCW, 2018 WL 1565603, at *6 (S.D. Ill. Mar. 30, 2018), the court denied summary judgment where the evidence showed plaintiff "was subjected to the same conservative treatment in the face of recurring and worsening problems for at least three years" and yet was denied more aggressive treatment at collegial review).

- In *Akers v. Wexford Health Sources, Inc.*, No. 14-cv-00997-JPG-DGW, 2015 WL 4574754, at *8 (S.D. Ill. July 29, 2015), the Court granted in part a motion for preliminary injunction and ordered an immediate referral to a specialist.

Finally, Wexford says nothing at all of the additional way Mr. Moore can establish his *Monell* claim—by proving to the jury that the risk of the collegial review causing dangerous delays (or outright denials) in providing medical care was "patently obvious," such that no "proof of a pre-existing pattern of violations" is needed. *Connick v. Thompson*, 563 U.S. 51, 64 (2011). A policy with the *express purpose* of cutting costs by reducing the number referrals for offsite specialty care quite obviously poses a risk of under-referring patients, like Mr. Moore, who have legitimate medical needs that cannot be treated satisfactorily within the prison facility. *See* Ex. O, Henze Dep. Ex. 4, Wexford Webpage. Wexford should know that the medical providers who work for it are mindful of their employer's predisposition against referrals to outside providers. And Wexford did more than tout the cost-savings of collegial review in its marketing; it tied itself to the mast by signing a contract with the State that says its monthly payments "will be reduced by an amount equal to what the State pays out for Hospital Services once Billed Charges exceed the Annual Hospital Utilization Threshold." Ex. M, Wexford-IDOC Contract § 3.1.2 ("Hospital Utilization Adjustment"). This means that for every cent spent for treatment at an outside provider for an inmate's care over a predetermined threshold, there was a cent taken out of Wexford's ultimate compensation from the State. That creates an obvious incentive for providers like Dr. Henze and PA Williams, both Wexford employees, to avoid referring patients for outside specialty care. Mr. Moore should have the opportunity to prove as much to a jury.

**III.    Counts V-VII: PA Williams, Dr. Henze, and Wexford Provided Negligent Care to Mr. Moore, Causing Him Injury[13]**

Mr. Moore agrees with Wexford's basic recitation of Illinois medical malpractice law. Wexford Br. at 42. It's in applying the law that Wexford's motion runs off-course.

Wexford contends that Mr. Moore cannot establish the proximate cause element of any of his malpractice claims. *Id.* at 42-47.[14] Wexford's principal argument appears to be that, (1) because Dr. Weingarten testified that there may be "two possible causes" of Mr. Moore's hearing loss, and (2) because those different causes would have different treatments, and (3) because Dr. Weingarten cannot say for certain which of these two causes is to blame, that Dr. Weingarten cannot "provid[e] an opinion to a reasonable degree of medical certainty explaining what treatment an ENT would have provided had such a specialist treated Mr. Moore." *Id.* at 44.

This argument is confounding, given that the parties' Joint Statement of Undisputed Material Facts states: "Based on the documents he reviewed, it is Dr. Weingarten's opinion to a reasonable degree of medical certainty that Plaintiff has sudden hearing loss syndrome." JSUMF ¶ 108. That is Dr. Weingarten's expert opinion. That Dr. Weingarten allowed for the possibility that Mr. Moore is suffering from a retrocochlear lesion—as any otolaryngologist worth his or her salt would have to admit, given that Mr. Moore *still* has not received an MRI to rule that possibility out—does not mean he does not hold his opinion regarding Mr. Moore's sudden hearing loss to a reasonable degree of medical certainty. Wexford identifies nothing in the law or in logic that dictates that an

---

[13] After further consideration following the parties' meet-and-confer, and in view of Wexford's well-made arguments with respect to Nurse Cetta, Mr. Moore does not oppose summary judgment and respectfully submits that summary judgment should be entered for Nurse Cetta on this claim. Likewise, Mr. Moore does not oppose Wexford's motion for summary judgment with respect to Count VII for institutional negligence.

[14] Mr. Moore's responses to Wexford's various causation attacks on the deliberate indifference claims suffice to answer the same (or similar) ones here, but for ease of the Court's analysis, Mr. Moore responds to them anew in this section.

expert witness who admits the possibility of other diagnoses has therefore forfeited his ability to provide competent expert testimony on what he thinks is the *most likely* one.

Wexford's distortion of the record does not end there. It cites Dr. Weingarten's testimony that he does not know for certain what therapy any ENT would have used in the four-to-six-week period after August 15, 2018. Wexford tried this same trick when arguing causation on the deliberate indifference claims, and Mr. Moore refers the Court to his answer to it there. *Supra* at 14-15. Again, Dr. Weingarten was making the basic point that the treatment Mr. Moore would have received—*had he actually been sent to an ENT when he should have*— "would depend on the diagnosis and findings." Ex. E, Weingarten Dep. 43:15-19. He elsewhere explained that his opinion, based on review of all available evidence, is that Mr. Moore in fact experienced sudden sensorineural hearing loss, JSUMF ¶ 108, that the best treatment for that would have been prompt administration of steroid therapy, Ex. E, Weingarten Dep. 101:15-102:5, that such treatment can stop or reverse hearing loss, *id.* at 30:18-21, and that such treatment is likely to be most effective if it is administered within four to six weeks, *id.* at 28:17-24; *see also* JSUMF ¶ 115 (Dr. Weingarten opining that PA Williams' and Dr. Henze's delays "precluded any possibility that Mr. Moore's hearing loss could have been ameliorated"). Dr. Weingarten has *never* said that, had Mr. Moore received the appropriate testing and referral and been diagnosed with what he believes Mr. Moore experienced (sudden sensorineural hearing loss), he would have no idea what treatment should be pursued.

The cases Wexford cites are easily distinguished from this one. Wexford Br. at 45. The plaintiff in *Guerra v. Advanced Pain Centers S.C.*, 2018 IL App (1st) 171857, lacked sufficient evidence of proximate causation because no medical expert testified that, had the patient's treatment been appropriate, the patient would not have committed suicide. *Id.* ¶ 40. In other words, *Guerra* concerned a total absence of expert testimony attempting to connect the negligent behavior to the plaintiff's injury—a far cry from what we have here.

In *Freeman v. Crays*, 2018 IL App (2d) 170169, the expert was not a cardiologist and yet was attempting to opine on the sorts of treatments a cardiologist might offer. He was not even able to "testify to a reasonable degree of medical certainty as to *how* a cardiologist would have *effectively* treated [the plaintiff]," and thus was found to "lack[] the necessary foundation to offer an opinion that defendant's negligence was the proximate cause of" the plaintiff's death. 2018 IL App (2d) 170169, ¶¶ 33, 36. Similarly, in another of Wexford's cases, *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 414 (1st Dist. 2000), three experts for the plaintiff—none of whom was a radiologist or urologist—said a radiologist or urologist could have provided treatment, but provided no testimony on what they could have done to address plaintiff's particular injury. Here, by contrast, Dr. Weingarten is an otolaryngologist, with a specialty in otology—the only expert in the case who can claim to have specialized in diseases in the ear—and he has described exactly what treatment would be appropriate for a patient with sudden sensorineural hearing loss, which is what he has concluded Mr. Moore is most likely suffering from. JSUMF ¶¶ 107-112.

Lastly, Wexford oversimplifies the analysis in *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830 (1st Dist. 2010). The problem with causation there was that, although plaintiff's expert had identified a cesarean section as one surgical intervention the plaintiff could have received had she been referred to an obstetrician, he also acknowledged that, based on the medical evidence he reviewed, the standard of care would not have required a cesarean section. 402 Ill. App. 3d at 845. That meant there was "no evidence that the alleged deviations from the standard of care increased her risk of harm." *Id.* (cleaned up). Here, by contrast, Dr. Weingarten has identified the particular treatment that would have been required had Mr. Moore's sudden sensorineural hearing loss been timely diagnosed.

Wexford's next argument is that Dr. Weingarten's use of the words "may have" to at one point address causation means his opinion is insufficient to create a fact issue on proximate cause.

Wexford Br. at 45. It says these words render his opinion "pure speculation insufficient to satisfy the proximate cause element of a medical malpractice claim." *Id.* Wexford is incorrect. Its only support for this argument is quoting a case's use of the words "contingent, speculative, or merely possible"—but it never then explains what renders those labels applicable. *Id.* at 46 (cleaned up). In any event, Wexford's position is unsupportable under Illinois law. Where, as here, a plaintiff's theory is that defendants' unreasonable delay reduced his chance of an improved medical outcome, a plaintiff need not sponsor expert testimony that the delayed or denied treatment definitively would have proved effective. *Hemminger v. LeMay*, 2014 IL App (3d) 12039, ¶ 23 ("In other words, Hemminger only needed to show that Dr. LeMay's negligence deprived Tina of the opportunity to undergo treatment that *could* have been more effective if given earlier, not that such treatment *would* have been effective.").

Finally, Wexford again argues that PA Williams and Dr. Henze are absolved of any responsibility for any conduct that occurred after September 26, 2018, given that Dr. Weingarten testified that treatment for sudden sensorineural hearing loss is shown to be most effective within that six-week time frame. Wexford Br. at 46. As explained above, Wexford mischaracterizes Dr. Weingarten's testimony because it omits the fact that Dr. Weingarten said he would recommend treatment outside that six-week window, but would simply advise a patient that the probability of success is lower. JSUMF ¶ 112; *supra* at 24, 31. Wexford's argument also conflicts with Illinois law, which does not allow medical providers to escape responsibility for their negligent acts by saying bad things would have happened to their patients anyway. As the Supreme Court of Illinois has said:

> Disallowing tort recovery in medical malpractice actions on the theory that a
> patient was already too ill to survive or recover may operate as a disincentive on
> the part of health care providers to administer quality medical care to critically ill
> or injured patients. Moreover, it has been noted that it is impossible to divine
> who would fall into one category [survivor] or the other [nonsurvivor]. Not
> allowing such a case to be decided by a jury means that statistical proof of a less
> than 50% chance would be dispositive, even though no expert in the world could

45

> prospectively state who would survive and who would die. That is why doctors treat all patients, not just those with better than even odds.

*Holton v. Mem'l Hosp.*, 176 Ill. 2d 95, 119-20 (1997) (cleaned up).

The record thus contains evidence sufficient to show that PA Williams' and Dr. Henze's negligent treatment of Mr. Moore proximately caused his injury. Because the claims against them in their personal capacity survive (Count V), so too must Mr. Moore's claim against Wexford under a *respondeat superior* theory of liability (Count VI). *See* Wexford Br. at 47 (providing no other basis to dismiss Count VI).

## <u>CONCLUSION</u>

For these reasons, Wexford's motion should be substantially denied.[15] In the event that Wexford raises any argument or authority in reply not addressed herein, Mr. Moore respectfully requests the opportunity to provide further briefing or address such points at oral argument.

---

[15] As stated within this opposition. Plaintiff does not oppose Wexford's motion regarding the deliberate indifference claim against Nurse Cetta (part of Count III), the state-law malpractice claim against Nurse Cetta (part of Count V), and the state-law malpractice claim for institutional negligence against Wexford (Count VII).

Dated: October 28, 2022                    Respectfully submitted,

*/s/ Luke C. Beasley*
Brian C. Swanson
Daniel R. McElroy
Luke C. Beasley
BARTLIT BECK LLP
54 W. Hubbard Street, Suite 300
Chicago, IL 60654
Phone: 312-494-4400
brian.swanson@bartlitbeck.com
dan.mcelroy@bartlitbeck.com
luke.beasley@bartlitbeck.com

*Attorneys for Plaintiff Timothy C. Moore*

## CERTIFICATE OF SERVICE

I, Luke C. Beasley, hereby certify that on October 28, 2022, a true and exact copy of the foregoing was electronically served by transmission of Notice of Electronic Filing generated by CM/ECF to all counsel of record as of issuance of filing.


<u>/s/ Luke C. Beasley</u>
Luke C. Beasley