# Exhibit G

**DEPOSITION TRANSCRIPT**
**TIMOTHY C. MOORE**
**PLAINTIFF**
**JANUARY 20, 2021**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TIMOTHY C. MOORE, M39367, Plaintiff, vs. WALTER NICKOLSON, NATHAN SHEPHERD, CYNTHIA HARRIS, ANNA McBEE, SUSAN LYDAY, DR. CHRISTIAN OKEZIE, DR. MARLENE HENZE, LATANYA WILLIAMS, DAWN CETTA, LIDIA LEWANDOWSKA, and WEXFORD HEALTH SOURCES, INC., Defendants. | No. 19-cv-3892<br>WEBEX VIDEOCONFERENCE DEPOSITION OF TIMOTHY MOORE<br>1-20-21 |

Deposition of TIMOTHY MOORE, a witness of lawful age, taken on behalf of the defendants, Dr. Marlene Henze, Dr. Christian Okezie, Latanya Williams, PA, Nurse Dawn Cetta, Lydia Lewandoska, RN, Wexford Health Sources, Inc. in the above-entitled cause, wherein Timothy Moore is the plaintiff and Walter Nickolson, et al. are the defendants, pending in the District Court of the United States for the Northern District of Illinois, Eastern Division, before Angela D. Oldenburg and Deb Fisher, Notaries Public in and for Winnebago County, Illinois, via Webex videoconference on the 20th day of January, 2021, commencing at 9:30 a.m., as reported and transcribed by Angela D. Oldenburg and Deb Fisher, Certified Shorthand Reporters in and for the State of Illinois.

APPEARANCES:

ATTORNEY LUKE BEASLEY
ATTORNEY RYAN MCELROY
ATTORNEY BRIAN CHARLES SWANSON
Bartlit Beck LLP
54 West Hubbard Street
Chicago, Illinois
Appeared via Webex videoconference on behalf of the plaintiff.

ATTORNEY ELIZABETH JORDANE MALLORY
Illinois Attorney General's Office
100 West Randolph Street
13th Floor
Chicago, Illinois
Appeared via Webex videoconference on behalf of the defendants, Walter Nickolson, Nathan Shepherd, Cynthia Moore, Susan Lyday, Anna McBee, Cynthia Harris and Marlene Henzie.

ATTORNEY JORDAN W. EMMERT
Heyl, Royster, Voelker & Allen
120 West State Street
2nd Floor
Rockford, Illinois
Appeared via Webex videoconference on behalf of the defendants, Dr. Marlene Henze, Dr. Christian Okezie, Latanya Williams, PA, Nurse Dawn Cetta, Lydia Lewandoska, RN, and Wexford Health Sources, Inc.





INDEX

| WITNESS | | EXAMINATION |
|---|---|---|
| Timothy Moore | (Mr. Emmert) | 4 |
| | (Ms. Mallory) | 108 |
| | (Mr. Beasley) | 137 |
| | (Mr. Emmert) | 144 |

EXHIBITS

Moore Deposition Exhibits No. 1 and 2

(Not Attached)

Certificate of Shorthand Reporter....... 149





TIMOTHY MOORE,

called as a witness on behalf of the defendants, Dr. Marlene Henze, Dr. Christian Okezie, Latanya Williams, P.A., Nurse Dawn Cetta, Lydia Lewandoska, R.N., and Wexford Health Sources, Inc., being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. EMMERT:

Q. Mr. Moore, can you state your name and spell it for the record, please?
A. Timothy Moore, T-i-m-o-t-h-y M-o-o-r-e.

MR. EMMERT: Let the record reflect this is the discovery deposition of Timothy Moore taken pursuant to notice and by agreement of the parties and is subject to the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

Q. Mr. Moore, I'm going to go over a couple of ground rules with you prior to the deposition starting just so we're all on the same page. Have you ever been deposed before?
A. No, sir.
Q. Okay. So we have a court reporter here who is taking down everything that we're saying. And





as you can see, we're also remote and doing this online. So it's going to be really important that we only have one person talking at a time today. So I'll ask you a question, and then you can wait until I'm done asking the question, and then you respond to it. Does that make sense to you?
A. Yes, sir.
Q. Okay. And then, similarly, given that everything is being taken down, I'm going to ask that you give verbal responses to my questions. You know, shakes of the head or uh-huh or uh-uh is really hard for the court reporter to transcribe on the transcript. Does that make sense?
A. Yes, sir.
Q. Okay. And if at any point you don't understand any of my questions, just go ahead and let me know. Ask me to rephrase it. That's totally fine. Or if you just don't understand what I'm asking you, just go ahead and let me know, and I will do my best to remedy the situation. Does that make sense?
A. Yes, sir.
Q. Okay. And if at any point today you want a

break, need to go to the bathroom or you just want to stand up and move around, that is perfectly fine, too. Just let me know. The only thing that I'll ask of you is if I have a question pending, I'm going to ask that you go ahead and answer that question prior to taking the break. Is that okay?
A. Yes, sir.
Q. And as I mentioned, I'm going to be asking you some questions today and so are other counsel. And I would just ask that, you know, if you don't know the answer to something, go ahead and tell me you don't know. I don't want you to guess. Does that make sense?
A. Yes, sir.
Q. All right. So are you currently taking any medications that would impair your ability to understand my questions or give responses today?
A. No, sir.
Q. Okay. And do you have any medical conditions that would interfere with your ability to understand my questions or give responses today?
A. I'm hard of hearing, sir, so I might have to --





I might ask you to repeat some things if I can't -- if I don't hear you.
Q. Okay. And that makes perfect sense. I do understand that you're hard of hearing. And if at any point you can't hear me, you didn't understand something, please let me know, and I will state the question again. Okay?
A. Yes, sir.
Q. All right. So your inmate number is M39367; is that correct?
A. Yes, sir.
Q. Okay. What's your highest level of education --
A. (Interrupting) I have a GED, sir --
Q. -- high school diploma?
A. Yes, sir.
Q. Have you taken any college classes, anything like that?
A. No, sir.
Q. Okay. Do you have any type of medical training?
A. No, sir.
Q. Okay. So you're not a doctor?
A. No, sir.
Q. You're not a nurse; is that correct?
A. No, I'm not a nurse, sir.





Q. You're not a nurse practitioner; is that correct?
A. No, I'm not a nurse practitioner, sir.
Q. And you are also not a physician's assistant; is that correct?
A. That's correct, sir.
Q. Okay. Other than this lawsuit we're going to talk about today, have you ever filed any other lawsuits?
A. No, sir.
Q. So the way I understand it, this particular lawsuit that we're speaking about today revolves around your allegations that a cockroach crawled in your ear on July 18, 2018; is that correct?
A. Yes, sir. If I remember right, yes, sir, it was around that time.
Q. Okay. On or about that date? Is that fair to say?
A. Yes, sir. Yes, sir.
Q. Okay. And it's also my understanding that you were referred out to Ortiz Hearing on or about June 10 of 2019; is that correct?
A. Yes. Approximately, yes, sir.
Q. Okay. So that time period between the cockroach





crawling into your ear and your referral to Ortiz Hearing, that's the time period that is the subject of this lawsuit; is that correct?
A. You asking me is that the subject of the lawsuit? I don't -- I don't know. Can you help me understand the question? Is that the subject of the lawsuit?
Q. So that time period between July 18 of 2018 when the cockroach crawled into your ear to approximately June 10 of 2019, that time period is the subject of your lawsuit; is that correct?
A. I wouldn't -- I wouldn't be able to tell you what the subject of the lawsuit is. I would -- that would have to be something my attorneys would be able to speak on.
Q. Okay. Perhaps I should ask this a different way. Are you making any allegations against any of the medical defendants in this case that relate to any care and treatment they provided to you after June of 2019?
A. Repeat it one more time, sir.
Q. Sure. So are you making any allegations against any of the medical defendants in this case that relate to a time period after June of 2019?

A. After June of 2019? The allegations I'm making are dealing with from the time when the incident happened to now. The time 2018 until now.
Q. Okay. So are you claiming that with respect to the medical defendants in this case, that you are still not receiving proper medical treatment as it relates to your ears?
A. No. What I'm saying is that the allegations that I'm claiming, sir, is dealing with the defendants, the medical defendants, from the start of the incident until now.
Q. Okay. I'll ask it again. Are you claiming that the medical defendants are currently failing to provide you treatment with respect to your ears?
A. Well, they've given me -- they have given me the hearing aid. I still haven't received any antibiotics for my ears, but I have been given hearing aids and things of that nature.
Q. Okay. So that's really the subject of my question. After you received the hearing aids -- because it seems to me, based upon reading your Complaint, that you're making allegations from the time that the cockroach crawled into your ear up until the point you were referred out to





the hearing specialist and you received the hearing aids. Is that a fair characterization of the general time period and topic of your Complaint?
A. Well, again, those questions you have to refer to my attorneys as far as any legal language or -- you have to refer to them because I'm not an attorney. I wouldn't know how to answer that question.
Q. Okay. Is it your testimony today that you have no knowledge or understanding of the facts and circumstances that you're alleging in your Complaint?
A. That's not my testimony. I have a knowledge of what happened to me. But as far as the question that you're asking, I think that you would have to refer to my attorneys on that one.
Q. Okay. All right. Mr. Moore, I want to speak to you a little bit about your medical history. You indicated in a response to an Interrogatory that we served on you that you had not seen any medical providers prior to your incarceration in Stateville. Is that true?
A. You said -- you say -- ask the question again,





please.
Q. Have you ever seen any medical providers, doctors, nurses, physician's assistants, prior to your incarceration at Stateville prison?
A. Yes, I have.
Q. Okay. Do you know the names of those physicians or nurses?
A. The only one I can remember by name, because she had the same last name that I had, is Mrs. Moore. She was a nurse in the county -- in the county jail. That's the only one I can remember by name. But other than that, no, I can't remember the names, sir.
Q. Okay. Do you remember the name of the hospitals or clinics that you had been to before?
A. Before my incarceration I went to Loyola Hospital. I was born at Cook County Hospital. That's pretty much -- those are the only two that I can remember.
Q. Okay. And the time that you went to Loyola Hospital, can you give me the general subject matter as to why you were there?
A. I can remember Loyola Hospital. I got stitches in my hand one time. I can remember, if I'm





not mistaken, I had surgery on my shoulder maybe one time. Maybe a sprained knee another time. Just a couple of times I have been to Loyola for various things.
Q. Okay. Have you ever sought treatment -- prior to your incarceration at Stateville had you ever sought treatment in relation to either one of your ears?
A. No, sir. Not that I can recall.
Q. I'm going to go ahead and mark my first exhibit here for the record. I'm going to be marking as Moore Deposition No. 1 the Bates stamped range HRVA 446 through HRVA 734. Mr. Moore, I'm going to go ahead and share my screen with you so you can see some documents here. The documents that I just referred to as Exhibit 1 have been exchanged by the attorneys in this case. They are your medical records from Stateville prison. I will go ahead and share my screen with you. I have a couple of questions for you.
Mr. Moore, can you see my screen?
A. Yes. You might have to zoom in a little bit. I can see it.
Q. How is that? Can you read the writing and stuff

on it?
A. Barely. I can read my name, my ID number.
Q. Okay. And I'll zoom in when we get to the page that I want to be at here. So, for the record, we are looking at the Bates stamped page No. HRVA 592. So I'm going to go ahead and zoom in for you here, Mr. Moore.
MR. BEASLEY: Jordan, if I could, I'm sorry to interrupt, before you do zoom in on a particular document, would you allow me to just see the entire document? I want the witness to see the entire document before you zoom in.
MR. EMMERT: Sure. Just for your benefit, Luke, I did send copies of this via e-mail just prior to the dep. If you want to pull them up on your computer as well, feel free to do so. I just wanted to let you know that.
MR. BEASLEY: Yes, I saw that. Thank you very much.

CONTINUED DIRECT EXAMINATION

BY MR. EMMERT:
Q. Okay. So, Mr. Moore, this is a Mental Health





Progress Note. Again, we're on HRVA 592. It looks like it's page 1 of 2. This is the second page. Can you see that?
A. No, sir. I can't see any of the writing, but I can see the actual page.
Q. Okay. So in order for you to read it, you want me to zoom in?
A. Yes, sir.
Q. Okay. I'm going to go ahead and zoom in here. Are you able to read the writing -- can you see my cursor?
A. I'm sorry, sir?
Q. Can you see the cursor on my screen?
A. What is the cursor? Is that the hand that's moving around?
Q. Yes; yes.
A. Okay. Yes, I see that.
Q. Okay. Can you read this writing here in the middle of the page?
A. Yes, sir, I can read it.
Q. So I'm going to scroll up to the top of the page here. This is a progress note from August 28 of 2018, correct?
A. Yes, sir.





Q. Okay. Let's scroll back down here towards the middle of the page. And I'm going to go ahead and read it for the record. I'm going to ask you a few questions about it. It says "MHP met with I/m" -- I'm assuming that means inmate -- "in a confidential setting for his routine follow-up and to discuss his recent mental health referral. Inmate stated 'I'm embarrassed to wear my hearing aid because it messes up my swag.'" Did I read that portion correctly?
A. Based on what I'm reading on this page, yes, you read it correctly.
Q. Okay. This seems to indicate to me that you were wearing a hearing aid again on August 28 of 2018; is that correct?
A. August 28 of 2018? No, that's not correct.
Q. I'm sorry. Go ahead.
A. No, I don't -- no, that's not correct. With my recollection, as I can remember, I didn't have a hearing aid on that date.
Q. Okay. Do you have any recollection of this visit with it looks like Ms. Taylor?
A. Yes, I remember -- I can remember visiting Ms. Taylor.





Q. Okay. Do you remember talking with her about your hearing aid?
A. Yes.
Q. Okay. So do you remember telling Ms. Taylor that you are embarrassed to wear the hearing aid because it messes up your swag?
A. I remember -- I remember the conversation I had with Ms. Taylor about the hearing aid. The specifics, as far as what was stated, I can't recollect. I don't remember the specifics. But I remember having a conversation in general about my hearing aid.
Q. Okay. And just so you're aware, if I stop for a second, I'm just taking down some notes.
A. Okay.
Q. Okay. So you just mentioned that you do remember having a conversation with Ms. Taylor about the hearing aid. Do you remember when that occurred?
A. No, sir.
Q. Okay. The beginning of this note is dated August 28 of 2018. Do you have any reason to believe that that conversation did not occur on August 28 of 2018?
A. No. No, sir. I don't -- I don't -- if that's

what it says -- I remember having the conversation with her. But as far as the dates or whatever, I can't remember.
Q. Okay. So I suppose you would defer to the record here that if the record indicated the conversation occurred on August 28 of 2018, you would agree with me that that's probably when it occurred, correct?
A. Yes, I am -- I agree I had the conversation. I remember the conversation. I just don't remember the dates.
Q. Okay. But I suppose my question to you is do you have any reason to dispute the accuracy of this medical record?
MR. BEASLEY: Objection. Asked and answered.
MR. EMMERT: You can go ahead and answer, Mr. Moore.
A. I just don't remember any specific dates. I do remember the conversation.
Q. So do you -- strike that. All right. Mr. Moore, you testified earlier that you do not have any medical training or experience, correct?
A. Yes, sir.





Q. Okay. So is it fair to say that you have no knowledge as to what the scope of practice for a nurse is?
A. I'm sorry, sir? Can you repeat that?
Q. Sure. So is it fair to say you do not have any knowledge as to what the scope of practice for a nurse is?
MR. BEASLEY: Objection. Form. You can answer, Tim.
A. Yes, I just -- I'm not a nurse, a doctor, physician; so, no, I don't know -- I'm not -- I'm not neither of those. I don't have the education of a nurse or doctor or physician, sir.
Q. Okay. So then it's fair to say then that you have no idea what nurses are allowed to do in comparison to doctors, for example?
MR. BEASLEY: Objection. Form. Just stating a form objection. Tim, after I state my objection, you can go ahead and answer the question unless for some reason I instruct you not to answer the question. Okay?
THE WITNESS: Okay.





A. The question was? Can you ask the question again, sir?
Q. Sure. So given that you don't have any medical knowledge or training, you have no idea what a nurse is allowed to do within the scope of her medical license versus what a doctor would be able to do within the scope of the doctor's medical license; is that correct?
MR. BEASLEY: Objection to form.
A. Well, me dealing with nurses and doctors during my lifetime, I know a nurse can't perform surgery, you know, things of that nature, serious things. But, no, I really -- I'm really not -- I'm really not educated in the medical field to give you -- no, I don't know anything about being a nurse or a doctor, sir.
Q. Okay. That's fair enough. I want to talk to you a little bit about each of the individual medical defendants that you've named in this case. And I want to start off with Nurse Cetta. Do you have any independent recollection of Nurse Cetta?
A. I'm sorry. Can you help me understand the question? You say independent recollection as





far as what, sir?
Q. Would you recognize her if you saw her?
A. Yes. Yes, sir.
Q. Do you remember receiving any medical treatment from Nurse Cetta?
A. No, sir. Not treatment.
Q. Okay. I guess what do you mean by that, not treatment?
A. I mean when you say treatment, can you -- can you explain to me what you mean by treatment?
Q. Sure. So do you remember Nurse Cetta ever providing you with medical care or assistance in any way?
A. No. I remember -- no, I don't.
Q. Okay. Do you ever remember seeing Nurse Cetta as a patient?
A. Yes.
Q. Okay. What do you remember about that?
A. I just remember me stating the thing that I was dealing with at that time, and that was pretty much it. If I remember right, she would write something in her notes or her book or whatever, and that was it. That's what I can remember of that particular interaction with Nurse Cetta.

Q. Okay. Do you remember approximately when that interaction occurred?
A. No, sir. Maybe 2018. The end of 2018. If I can remember right.
Q. Okay.
A. It was a while back.
Q. All right. So you've made the allegation in your Complaint that a cockroach crawled into your ear on or about July 18 of 2018. What do you remember about that?
MR. BEASLEY: Objection. Form.
A. The actual incident? Or what are you -- can you be more specific, sir?
Q. Sure. Yeah. The actual incident when it occurred, what can you tell me about, you know, everything that you remember about when that happened?
A. What I remember? I remember being woken by a feeling of a tingling feeling in my ear, and I started to kind of like tap the side of my face, and I realized that it was something -- that it was some sort of living object or creature in my ear. At that point I called for a correctional officer to call for a nurse, and





I signed up for sick call. And that was pretty much it as far as the incident.
Q. Okay.
A. That I can remember.
Q. Okay. So the way I understand your testimony, you were able to physically feel the cockroach crawling into your ear when it happened. It woke you up out of your sleep? Is that correct?
A. Correct.
Q. Okay. And I suppose you knew that something was crawling into your ear because it woke you up and you could feel it; is that right?
A. Correct.
Q. And then you say you called for a corrections officer to then call for the nurse. Do you remember the name of the corrections officer you reached out to?
A. No, sir.
Q. Now, I'm going to go ahead and share my screen with you again here and talk a little bit about Nurse Cetta. All right. Can you see my screen again, Mr. Moore?
A. Yes, I can see your screen.
Q. Okay. Mr. Moore, I'm showing you HRVA page 484.





Can you see the entire page there?
A. Yes, sir. But I just can't see the writing.
Q. Okay.
A. It's too small.
Q. I'll go ahead and zoom in for you on the writing. Okay. Can you see your name up there at the top, Timothy Moore?
A. Yes, sir.
Q. Okay. And, you know, you may or may not be able to read the handwriting on the page. Just let me know if you can or you can't. So under this first portion here up at the top where it says S, it says "There is something in my ear since w-e-d-s." Is that a fair reading?
A. Yes, sir.
Q. Okay. And then it goes on to say "Which ear? Left or right?" And the handwriting indicates "RT," meaning right ear; is that correct?
A. Yes, sir.
MR. BEASLEY: Jordan, sorry to interrupt. I'm just going to object -- just a general objection for the record -- that as we read these medical records that at times counsel or the witness is





reading typed words and other times handwritten words, and some of it is illegible. I'm not saying I'm not accepting your representation as to what it says, but I do want that objection on the record.
MR. EMMERT: Sure. Yes, I understand.
Q. And again, Mr. Moore, if you can't read the handwriting or I suppose the typed words either, just let me know. Okay?
A. Yes, sir.
Q. Okay. All right. So kind of moving down here towards the middle of the page on the right-hand side, there is a big circle around a box that says "Earwax: Debrox 4 to 6 drops b.i.d. x 5 days. Refer to clinic for F/U" -- I'm representing to you that that means follow-up -- "after 5 days." Did I read that correctly?
A. Yes, you've read that correctly. Yes, sir.
Q. And I'm going to go ahead and move on to HRVA page No. 485. I'm going to show you the full page first. Can you see that, Mr. Moore?
A. Yes, sir.
Q. I'll go ahead and zoom in for you. Okay. Can

you see the handwriting on the page?
A. You say can I read the handwriting on the page?
Q. Can you see it?
A. Yes, I can see it, sir.
Q. Okay. We'll start here on the left. There is an S and then a colon. "I need my ear washed out." Is that correct?
A. Yes. I can read it. It says "I need my ear washed out."
Q. Okay. And then also on the left-hand column there is an O with a colon. There is an R with a circle around it meaning "Right ear noted with foreign object in canal. Ear lavage performed and foreign object flushed out. No further complaints verbalized." Did I read that correctly?
A. You say did you read that correctly? Yes, you have read that correctly.
Q. Okay. Over here on the right side there is a P with a colon. Says "Removal of foreign object from right ear. Inmate to obtain earplugs. RT NSC PRN." Did I read that correctly?
A. Yes. It's not really legible, that part. But, yes, for the most part from what I can see.





Q. Okay. And then here at the bottom there appears to be a signature. Looks to me like D-C-e-t-t-a. D Cetta. Do you agree with that?
A. I can't really read the name.
Q. Okay. Do you have any idea if Nurse Cetta was the individual who removed the cockroach from your ear on July 20 of 2018?
A. She may have been.
Q. Do you have any recollection of what happened during that visit?
A. What I can remember on the visit where I had the roach removed from my ear, it was -- I can remember me being faint because when they pushed -- the object that they use to remove -- to rinse the ear out, to clean the ear out, it kind of made me nauseous. It almost made me faint. So that's what I can remember. And when they flushed out the roach, I asked to see it, and I can remember seeing the roach. It was dead by that time. It was -- the roach had died. And that was pretty much it, that I can remember, as far as to the actual time when they flushed the roach out of my ear.
Q. Okay. Now, you mentioned being faint based





upon the tool that they were using to remove it from your ear. Can you describe what type of tool it was, if you can?
A. Well, it looked like -- sort of like a squeegee. It looked like some sort of like a syringe or something like that. They was using some sort of tool to push fluids within my ear canal.
Q. Okay. Now, you say that when the cockroach came out, you looked at it. How did you know it was a cockroach?
A. I asked to see it, and I know what a cockroach look like. It was a roach.
Q. You said it was dead; is that correct?
A. Yes, sir. From what I could tell, it wasn't moving anymore.
Q. Was the cockroach still intact or was it kind of, you know, broken apart or, you know, squashed? Anything like that?
A. No. It was a full cockroach. Intact. It was just wet and not moving.
Q. Okay. Okay. So we have established then that the cockroach was, in fact, removed from your right ear, correct?
A. I'm sorry, sir? Say it again.





Q. I said the cockroach was, in fact, removed from your right ear, correct?
A. Yes, sir.
Q. Okay. Were you experiencing any hearing loss in your right ear at that time?
A. No, I can't say there was any hearing loss at that particular time. I think it was more muffled, if anything. Ringing in my ear at that particular time. But, no, I can't say in fact that it was loss.
Q. Okay. So, you know, there is going to be some discussion today about the, you know, muffling that you experienced in your right ear, as well as this ringing sound as it relates to your right ear immediately after the cockroach was removed. So what I'm going to ask you to do today -- are you familiar, you know, when you go to the doctor, sometimes they'll ask you to describe pain on a 1 to 10 scale with, you know, a 1 being virtually no pain at all and a 10 out of 10 being extreme pain, the worst pain you have ever felt in your life? Are you aware of that type of scale?
A. Yes, sir.

Q. So I'm going to ask you to do the same thing with respect to the muffling and the ringing today. Okay? So let's go ahead and say that a 1 is, you know, there is no muffling sensation in your ear and there's no ringing in your ear. Does that make sense?
A. Yes, sir.
Q. Okay. And then we'll say a 10 would mean you either can't hear out of your ear because it's muffled and you aren't able to hear anything or the ringing is so bad that you can't really hear anything. Does that make sense?
A. On your scale, okay. I get it.
Q. You understand what I'm saying at least?
A. Yes, I understand what you're saying. You're trying to gauge -- I get it.
Q. Okay. So immediately after the cockroach was removed from your ear on July 20 of 2018, on a scale of 1 to 10 how muffled was your hearing?
MR. BEASLEY: Objection. Form.
Sorry, Tim. Go ahead.
A. Immediately as to what? One hour? Two hours? One day? Two days? A week? How would you classify immediate?





Q. That's a fair question. Let's say in the first hour after it was removed how muffled was your hearing in your right ear?
A. It was pretty muffled an hour after. It was muffled. I would say a 10 as far as it being muffled.
Q. Okay. So you couldn't hear out of your ear at all at that point?
A. It was just muffled. You know, I heard -- I could hear sounds. It was just muffled.
Q. Okay. In your right ear how bad was the ringing on a scale of 1 to 10?
MR. BEASLEY: Objection to form.
A. The ringing didn't immediately start an hour after the roach was removed. The ringing started later.
Q. About when did the ringing start?
A. Approximately maybe a week, four, five days, somewhere in that range.
Q. Okay. So, you know, within an hour to two hours after the cockroach was removed were you having any pain in your right ear?
A. I can't remember if the pain was that immediate. The roach had been in my ear, so I don't -- I





don't -- I can't remember if the pain was bad -- I can't remember, sir.
Q. Okay. Approximately when did the pain in your right ear start?
A. I can't -- I can't remember.
Q. All right. Let's talk a little bit about your left ear. Were you having any issue with your left ear on July 20 of 2018?
A. No, sir. Not that I can remember, no, sir.
Q. Now, during this visit with Nurse Cetta on July 20 of 2018 did anybody ever tell you that you had an infection in your right ear?
A. Not that I can remember, sir. No one ever told me. No one ever speak of those words that I can remember during my time with Nurse Cetta.
Q. Okay. And Nurse Cetta recommended that you utilize earplugs; is that correct?
A. Not that I can remember.
Q. I suppose is it possible it could have happened and you just don't recall?
A. I just don't recall it. I'm not saying that it didn't. I just don't recall whether she said it or not.
Q. Okay. If the medical records here, HRVA 484





and 485, indicate that she recommended earplugs to you, would you have any reason to disagree with the medical record?
A. I just don't recall whether she said it or not, sir.
Q. Okay. And do you remember her instructing you to return to sick call as needed?
A. I don't recall. I don't recall her instructing me to return to sick call, sir.
Q. Understood. Okay. So as it relates to Nurse Cetta and the visit you had with her on July 20 of 2018, what are you claiming that Nurse Cetta did wrong that day?
A. The only thing that I asked of Nurse -- of the nurse or whoever I talked to around the time that the incident took place is, you know, once I realized that the roach had been taken from my ear and I realized that that's what it was, I did request some sort of medication, some sort of antibiotics for fear that this insect or this roach might leave some sort of bacteria. So if I talked to Nurse Cetta or whatever nurse or doctor or physician I talked to, that's all that my request was, was just the proper medical

care. And I requested some antibiotics. That's all I can recall as to if she did or if she didn't give me what I requested. That would be it.
Q. Okay. So your only allegation against Nurse Cetta is that she did not provide you with antibiotics on July 20 of 2018?
MR. BEASLEY: Objection. Misstates the prior testimony.
A. Yes, my testimony is that whichever nurse -- if I talked to Nurse Cetta or if I dealt with Nurse Cetta around the time of the incident, that these are my requests. I requested these things of every person that I have talked to -- every medical person that I have talked to. So if she did or she didn't give me what I requested, that is all I can recall is that's what I asked. If I talked to her, I asked her and any other medical person there that I have spoken with around that time, I asked for these particular things. So that's really all I can recall as far as that's concerned.
Q. Okay. When you say those particular things, are you referring specifically to antibiotics?





A. Just the proper medical -- proper medical care. At that particular time that's all that I can -- with my education, that's all I could think of to ask was something to eliminate any bacteria that the roach might have left. So just the proper medical care, sir.
Q. Understood. So do you remember asking Nurse Cetta on July 20, 2018 for antibiotics?
A. Well, I just asked -- any nurse that I have talked to I have asked the same thing. Just proper medical care, sir. That is what I can recall.
Q. But my question to you is do you remember asking Nurse Cetta specifically on July 20 of 2018 for an antibiotic?
A. I can't recall, sir.
Q. Do you have any idea if you received any antibiotics after your visit with Nurse Cetta on July 20, 2018?
MR. BEASLEY: Jordan, I'm sorry. I didn't catch parts of that question. Your audio was coming in and out. Could you ask it one more time, please?
MR. EMMERT: Absolutely.





Q. So, Mr. Moore, do you recall receiving any antibiotics after your visit with Nurse Cetta on July 20, 2018?
A. No. I don't recall, sir.
Q. Okay. Now, do you have any idea if you ever saw and received medical treatment from Nurse Cetta at any other point during your incarceration?
A. I can't recall, sir.
Q. So is it fair to say that your allegations against Nurse Cetta are limited to the time you saw her on July 20 of 2018?
MR. BEASLEY: Objection to form.
THE WITNESS: I didn't hear the objection.
MR. BEASLEY: I objected to the form of the question, Tim. You can answer.
A. Can you ask the question one more time, sir?
Q. Sure. So are your allegations against Nurse Cetta limited to this time that you saw her on July 20 of 2018?
A. My allegations against Nurse Cetta is specific for this incident, this particular incident with the roach crawling in my ear. So if I have seen





her dealing with this specific incident, that's pretty much, that I can recall, the only thing that -- yeah, that's pretty much it, as I can recall.
Q. Okay. So, for example, if you saw her for an unrelated reason later on, say like a skin condition or some sort of test related to your skin, that's not the subject of this lawsuit, correct?
A. Well, the subject of the lawsuit is just inadequate medical care. So whatever is stated in the lawsuit. Again, you would have to refer to my attorneys on that question.
Q. Mr. Moore, I am asking you about what your allegations are. I guess let me ask you this: You originally filed a handwritten complaint in this case. Do you remember doing that?
A. Yes, sir.
Q. Okay. And then you were appointed counsel, and an Amended Complaint was filed that was typed up on -- a formal Complaint that I would expect to see from an attorney was typed up. Have you seen your First Amended Complaint at all?

A. Have I seen my First Amended Complaint?
Q. Right.
A. Yes, sir. I have seen all of the Complaints.
Q. Okay. And the allegations that are made in that First Amended Complaint, are those your allegations?
A. Yes. Yes, sir.
Q. Okay. Because I just wanted to make sure. I was a little bit confused as to why you were referring me to your attorney. So the way I understand your Complaint and testimony here just now about Nurse Cetta, the allegations you're making against her for improper medical care are related to the cockroach and not some unrelated matter; is that correct?
A. Yes, sir.
Q. All right. So after the cockroach was removed, how did your ear feel, your right ear?
A. How long, sir?
MR. BEASLEY: Let me just note my objection, Tim. Objection to the form of the question. Go ahead.
Q. Let's say within the first couple of days.
A. Well, I can't recall as far as pain. It was





just a lot of pressure in my -- in my ear in the first couple of days. It was just uncomfortable-feeling. That's pretty much all I can recall as to the first couple of days. I knew I was just uncomfortable.
Q. And then, you know, within that same time period, the first couple of days, I suppose just for the sake of ease let's say within one week after it was removed, were you experiencing any unusual symptoms in your left ear?
A. No, not in my left ear at that particular time. Not that I can -- not noticeable. It may have been -- I may have been -- it may have been a little muffled maybe in my left ear. I don't know. I can't remember. But my focus -- my main focus at that particular time was on my right ear, and it was just uncomfortable. It was not a good feeling.
Q. And going back to the date it was removed, July 20 of 2018, did you have any other complaints that day?
A. I'm sorry. Say it again, sir.
Q. So going back to this July 20, 2018 date that the cockroach was removed from your right ear,





did you have any other complaints unrelated to the cockroach in your ear that day?
A. Not that I can recall. I can't recall, sir.
Q. I want to talk to you a little bit about Nurse Lewandoska. Do you have any independent recollection of Nurse Lewandoska? Do you remember seeing her? Would you recognize her if you saw her?
A. Yes, sir.
Q. Okay. So what do you remember about Nurse Lewandoska?
A. As far as how she looks?
Q. Well, I guess do you remember ever receiving medical treatment from her?
A. Not that I can recall. Are you going to give me -- give me a specific time frame? Or, I mean, are you talking in general or what?
Q. Yeah. Right now I'm just talking in general if you remember any medical visits you had with her.
A. Yes, I remember -- I remember a medical visit that I had with her.
Q. Okay. Approximately when did that occur?
A. I can't recall. It was -- it was -- I can't





recall, sir. I would have to go back to the medical records.
Q. Okay. Can you give me an approximate time frame? Was it, you know, ten years ago? Five years ago? Last week?
A. No. It was within the last two years. Within the last two years I've had -- yeah, I've had, you know, interactions with her.
Q. Okay. So in your Complaint you're making the allegations that Nurse Lewandoska struck your name from the D house sick call list on August 2 of 2018; is that correct?
A. Yes, sir.
Q. Now, what makes you believe that Nurse Lewandoska took your name off the sick call list on August 2, 2018?
A. Well, the correctional officer that worked our cellhouse that particular day, when I asked why wasn't I being called for sick call -- because I knew I put my name on the list -- this particular officer informed me that she had removed my name from the list. And that's what made me -- that's what made me know that she's the one that took my name off the list.

Q. Did the corrections officer use her name specifically?
A. Yes, sir. What he said was he said the nurse, and then I asked him which nurse, what's her name? And that's when he gave me her name, sir.
Q. Okay. So you do remember the corrections officer saying that it was Nurse Lewandoska who removed your name from the list?
A. Yes, sir.
Q. Who is the corrections officer that said this?
A. His name was Chaldez, if I'm pronouncing it right. Chaldez, sir.
Q. Do you have any idea how that's spelled?
A. No, sir.
Q. Okay. I suppose let me ask you this: Do you know if the beginning of his name starts with an S-h or C-h?
A. It starts with a C-h, sir.
Q. Got you. Okay. All right. So with respect to your allegation of Nurse Lewandoska removing you from the sick call list, your conversation with Corrections Officer Chaldez, is that the only way that you knew your name had been removed from the list by Nurse Lewandoska?





A. Yes. On that particular morning he was working our unit, this particular officer, and I knew that I should -- we should have been called that morning. And when I wasn't called, I asked why I wasn't called. My name was on the list. And he informed me that the nurse had took my name off the list. I asked him which nurse, and he informed me that it was Nurse Lewandoska, if I'm pronouncing her name right, sir. That was my only recollection of me knowing that she had took my name from the list.
Q. Okay. So nobody else told you that?
A. No, sir. It was just the correction officer who had said. It was that particular incident.
Q. Okay. I suppose this will be somewhat redundant. So is it accurate to say that Nurse Lewandoska has never told you that she removed your name from the sick call list?
A. Not that I can recall, no, sir.
Q. Okay. Other than this conversation you've had with Corrections Officer Chaldez wherein he informed you that it was Nurse Lewandoska who removed your name from the sick call list, do you have any knowledge as to whether or not





Nurse Lewandoska was even working in the D block that day?
A. Well, I saw -- I saw -- what's her name? How do you pronounce her name? Lewandoska?
Q. Correct.
A. If I can recall, yes, I saw she was one of the nurses who worked that particular day in this particular cellhouse. So as far as her working, I saw her. But as far as me knowing who took my name -- which nurse took my name off the list, that information came from the officer.
Q. Understood. Okay. I'm going to go ahead and mark my second exhibit here. So we'll mark it as Moore Deposition Exhibit No. 2. So I realized I'm still sharing that. Okay. So Moore Deposition Exhibit No. 2, for the record, is going to be a document you have provided in discovery. It's Bates stamped Wexford 268 through 272.

MR. BEASLEY: Jordan, can I ask a clarifying question?

MR. EMMERT: Sure.

MR. BEASLEY: Are you just going to number -- so for the first document





that you showed today, which I think was a medical record document, is that just going to be a single exhibit even though there is a couple hundred pages?

MR. EMMERT: Yes.

MR. BEASLEY: I just wanted to clarify.

MR. EMMERT: Yes. And then that's why I was referring to it by Bates stamped numbers so it's clear on the record. But at some point if I don't refer to the Bates stamped number, just let me know and we'll make sure it's in there.

MR. BEASLEY: Great. Thank you. I'm just going to -- before you get back to your line of questioning, we're a little over an hour. So maybe a good time for a break in the next ten minutes or so?

MR. EMMERT: We can take it right now if you want. That would be fine.

MR. BEASLEY: Great. And how long would you like? Five, ten minutes?

MR. EMMERT: Five is fine with me. Mr. Moore, how long would you like?

THE WITNESS: Five is fine with me.

MR. EMMERT: Okay. So we'll meet back say 11:45 -- or 10:45. Sorry.

MR. BEASLEY: 10:45. That works. Thank you.

MR. EMMERT: All right.

(At this time a short recess was taken.)

MR. EMMERT: All right. Let's go back on the record.

CONTINUED DIRECT EXAMINATION

BY MR. EMMERT:

Q. Okay. Mr. Moore, we were just speaking some about Ms. Lewandoska and your allegation that she struck your name from the sick call list on August 2 of 2018. I'm going to go ahead and show you a grouping of documents. Again, this will be Moore Deposition Exhibit No. 2. And the documents are Bates stamped Wexford 268 through Wexford 272.

A. Okay.

Q. I'll go ahead and share my screen with you here. Mr. Moore, can you see my screen?

A. Yes, I can see it.

Q. Okay. We're looking here at Wexford 269. Document says Sick Call List Sign-Up at the top;





is that correct?

A. Yes.

Q. Okay. And then here under the portion where it says Name, it says Moore. Do you see that?

A. Yes, I can see it. It's a little small, but I can see it.

Q. Let me zoom in for you here. Is that better?

A. It's better. Yes, sir.

Q. And then after that it says under Number, M39367; is that correct?

A. Yes, sir.

Q. Okay. And that is your inmate number, correct?

A. Yes, sir.

Q. Okay. So do you believe this entry here refers to you?

A. Yes, sir. That's my name. That's my ID number. That's my cell number at the time. Yes, sir.

Q. Okay. And then do you see up at the top here it says Date To Be Seen, the 3rd?

A. Yes, sir.

Q. Okay. And then over here by Complaint it says Refusal. Do you see that?

A. Yes. I see that, sir.

Q. Okay. You are on a sick call sheet from August,





2018. Do you recall refusing to be seen this sick call on August 3, 2018?

A. Do I recall refusing to be seen? No, I have never refused to be seen from a sick call.

MR. BEASLEY: Jordan, I need to note my objection for the record. The date says the 3rd on here. Can you zoom out? Or does the document otherwise have the complete date is really just my question.

MR. EMMERT: If we look at Wexford 268 at the top left-hand corner, the date posted 8-2-18, date to be seen the 3rd, indicating the day after August 2, 2018.

MR. BEASLEY: Great. Thank you.

A. Yes, I have never -- I never refused that day.

Q. You never refused the sick call?

A. I never refused that sick call date. It was very urgent to me. I never -- no, I never refused to be seen on that day, sir.

Q. Have you ever refused sick call in the past?

A. No. I have never -- I don't recall. I wouldn't recall ever refusing sick call. Maybe if -- I may have had a visit scheduled or something on





the same date I might have had a sick call; but, other than that, I have never verbally refused to go to my sick call.

Q. Okay. Now, other than Nurse Lewandoska -- or your allegation of Nurse Lewandoska taking your name off the sick call list, do you have any other allegations against Nurse Lewandoska?

A. The only allegations that I have against Nurse Lewandoska is the allegation that is stated in the Complaint.

Q. Okay. What are those?

A. I would have to refer back to the Complaint specifically if you want to get to specifics. But -- I can't recall all of them as of right now.

Q. Okay. Is striking your name from the sick call list one of your allegations?

A. If it's in the Complaint, yes, sir.

Q. Okay. So is it your testimony that without looking at the Complaint, you don't remember what your allegations against Nurse Lewandoska are?

MR. BEASLEY: Objection. Misstates the witness's prior testimony.

A. No. What I'm saying is to be specific as far as what allegations specifically for Ms. Lewandoska, I would actually refer to the Complaint.
Q. Okay. Let's go ahead then and take a look at the Complaint. I'll pull it up here.
(At this time Mr. Swanson left the virtual deposition.)
Q. Let me ask you this: Is it your testimony that all of your allegations against Nurse Lewandoska are specifically stated in the Complaint?
A. Yes, sir, that would be fair to say.
Q. So is it also fair to say then that anything not included in your Complaint as it relates to Ms. Lewandoska would not be an allegation you're making against Nurse Lewandoska? Is that correct?
MR. BEASLEY: Objection. Form.
A. It's still open, you know. So, no, I wouldn't say that. I wouldn't say that anything -- no, I wouldn't say that.
Q. Okay. But it is your testimony that you included all of the allegations you wanted to bring against Nurse Lewandoska in your Complaint?





A. As of to date, yes. I will say that as of this -- as of this date, yes. Yes, sir.
Q. Okay. I want to talk to you briefly about Dr. Okezie and Dr. Henze. Do you have any independent recollection of -- I'll start with Dr. Okezie. Do you have any independent recollection of Dr. Okezie?
A. No independent recollection, no. I can't -- I can't recall, to be honest with you, no.
Q. Would you recognize Dr. Okezie if you saw him?
A. I can't recall. I can't say I will. I can't say I will recognize him or her if I saw them.
Q. Okay. Do you have an independent recollection of Dr. Henze?
A. Yes.
Q. Okay. What's that recollection?
A. I just -- I know what she looks like.
Q. Do you remember if you have ever seen her for a medical visit?
A. Yes, I remember speaking with Dr. Henze.
Q. Okay. What do you remember about that?
A. I can't -- I can't really recall the specifics.
Q. Do you remember generally what you spoke about?
A. No. I have talked to her on a number of





occasions dealing with different things, but I can't recall any specifics.
Q. Okay. I'm going to go ahead and share my screen with you again. All right. Mr. Moore, can you see my screen again?
A. Yes, I can see it.
Q. Okay. I would like to direct your attention to Bates stamped page No. HRVA 499. Okay. Do you see this page HRVA 499?
A. Yes. I think you have to zoom in a little bit for me to -- for me to really see it. Okay. That's good.
Q. Okay. Up here at the top it has your name, correct?
A. Yes, sir.
Q. And then it has the date December 19, 2018; is that correct?
A. Yes, sir.
Q. Okay. Do you have any recollection of this medical visit from December 19, 2018?
A. I mean, I don't recall the specifics of that particular visit.
Q. Okay. What do you remember from the visit?
A. I'm sorry, sir?





Q. What do you remember from the visit?
A. From this visit?
Q. You said you don't remember any specifics from the visit. Do you remember anything about the visit?
A. No. To be honest with you, I don't remember -- I don't remember -- I don't remember any specifics, anything in general. I remember having the visit. I just don't remember, you know, what was -- what was spoken about.
Q. Okay. Do you remember if you were seen by Dr. Okezie or Dr. Henze on that day?
A. I think it may have been Dr. Henze, if I'm not mistaken. I want to say Dr. Henze -- I saw Dr. Henze on this particular day.
Q. Okay.
A. I think this was -- I think this was the day -- I think this may have been the day that she was -- was -- I think she may have been telling me that I was going to be going or being scheduled to go out or something maybe, if I remember right.
Q. Okay.
A. I don't know. I can't remember.

Q. On this particular day I'll go ahead and represent to you that this is the visit that you were, in fact, referred to the audiologist. Now, at this visit do you remember if the doctor that saw you was a man or a woman?

MR. BEASLEY: Object to the misstatement of evidence there and to the form of the question.

A. On the visit with the specialist or the visit with -- which visit are you referring to, sir?

Q. The visit from December 19 of 2018.

A. I can't recall. It may -- I want to say a woman. I want to say it was Dr. Henze.

Q. Okay. And I'm just trying to kind of jog your memory to see if this helps you remember at all. Do you remember if the doctor that saw you could speak English very well, or was the doctor kind of hard to understand?

A. I can't -- I mean, Dr. Henze, she speaks very -- she speaks pretty good English. But, yeah, I don't remember -- I wouldn't be able to remember. I wouldn't be able to remember which -- if the doctor spoke -- I think it was Dr. Henze, though. She speaks pretty good English.





Q. Okay. I guess let me ask you this: Have you ever seen a doctor at Stateville that you had difficulty understanding what they were saying because of their foreign accent?

A. Ever? Yes. I mean, I never had difficulty understanding what they -- you have doctors here with foreign accents, yes.

Q. Okay. And during this visit on December 19, 2018 do you remember being told that you were going to have an audioscope done?

A. I don't recall the specifics. I just -- I remember the visit. But any specifics, no, I don't recall.

Q. Okay. And then I will go ahead and ask you the same question I've asked before. You indicated earlier that you believed Dr. Henze was the doctor who saw you during this visit. What allegations are you making about Dr. Henze as it relates to this particular visit?

A. Well, all of my allegations are stated within the Complaint, so I would have to refer back to the Complaint to answer that question, sir.

Q. Okay. So you can't remember specifically anything that Dr. Henze did wrong during this





visit?

A. Well, again, I just -- throughout the whole duration of this process I just asked for proper medical attention, proper medical care. So anything that's alleged would be in the Complaint against Dr. Henze, sir.

Q. So all your allegations against Dr. Henze are -- strike that. All of your specific allegations of wrongdoing as it relates to Dr. Henze are included in your Amended Complaint, correct?

A. Yes. That would be fair. That would be fair to say, sir, as of today.

Q. Okay. Now, as it relates to Dr. Okezie during this visit, I suppose -- I don't remember your -- I think you said before -- did you say that you'd recognize Dr. Okezie if you saw him?

A. No, I wouldn't -- I wouldn't recall. I couldn't recall.

Q. Okay. So you testified earlier that you believed Dr. Henze is the doctor who saw you during this visit from December 19 of 2018. So you would agree with me that you did not see Dr. Okezie on this day; is that correct?

A. No. What I will say is I don't recall whether





it was him or Okezie or Henze. I'm just -- I'm pretty much -- I'm pretty much just guessing as to which particular person I saw on this particular day, but I can't really recall. I would let the record reflect which doctor I saw that day.

Q. Okay. And, again, all of the specific allegations you have of wrongdoing as it relates to Dr. Okezie are contained in your First Amended Complaint; is that correct?

A. In my First Amended Complaint, yes, as of now. Thus far, yes, sir.

Q. And then I asked you about Dr. Henze earlier, as to whether or not you remember seeing her at other times for treatment. Do you remember seeing Dr. Okezie at any point for treatment?

A. No, I can't recall.

Q. All right. So I want to move on now to Latanya Williams. Do you have an independent recollection of Latanya Williams?

A. Yes, sir. I know her.

Q. Do you remember --

A. (Interrupting) I would know her if I seen her. I know what she looks like.

Q. Okay. Do you remember having medical visits with Ms. Williams?
A. Yes, sir.
Q. Okay. How many times do you remember seeing Ms. Williams?
A. I can't recall. It was a number of times.
Q. And what can you tell me just from memory about those medical visits where you saw Ms. Williams?
A. I can't tell you too much of anything. I can't tell you too much of anything, sir.
Q. You don't remember anything from those medical visits?
A. Specifics, no. I have seen her a couple of times. As related to this particular incident, I saw her and I -- she didn't -- she wouldn't -- I told her what I was dealing with. I explained to her what happened to me and what my condition was at the time and what I think it may -- I think it came from. And she insisted that it may be something else. So that's really all I can remember as far as this particular situation is concerned with Dr. Williams.
Q. I'm going to go ahead and show you a couple other documents here. First one I'm going to





show you is this document here, HRVA 487. Can you see the document, Mr. Moore?
A. Yes, I can see the document. You might have to zoom in for me to read it, though.
Q. Sure. I'll go ahead and zoom in here. Up at the top it says your name and your inmate ID number at the top there. Do you see that?
A. Yes, sir.
Q. Okay. And it looks like this is a note from August 15 of 2018; is that correct?
A. Yes, sir.
Q. Okay. I'm going to go ahead and represent to you that this is a visit that you had with Ms. Williams and was the first one after the incident where the cockroach crawled into your ear. Do you have any independent recollection of this particular medical visit, Mr. Moore?
A. Yes, sir.
Q. What do you remember about it?
A. I just -- I remember seeing her, and I remember telling her about what happened, my incident. That's pretty much it.
Q. Now, I'm not going to ask you to try to decipher the whole note here, but do you remember making





complaints of your eyes watering and itching during this visit?
A. I can't recall.
Q. Okay. Now, with respect to your hearing in your right ear, how muffled on a scale of 1 to 10, again with 10 being no hearing at all, on a scale of 1 to 10 how muffled was the hearing in your right ear at this visit, if you can recall?
A. I can't recall.
MR. BEASLEY: Objection. Form. And can I just ask, are you asking him to answer after reading the record or just based off of his memory?
MR. EMMERT: Based off of his memory.
MR. BEASLEY: Okay. So these questions are not tethered to the record because the witness hasn't been given an opportunity to read the record; is that correct?
MR. EMMERT: If I ask questions about the record, I'll have him read it.
MR. BEASLEY: Understood. Thanks.





A. Yeah, I can't recall as to how muffled my ear was at that particular time, but it was pretty muffled. I could tell you that by this time it was pretty -- it was bad.
Q. Okay. Was it worse than a couple of days after the cockroach came out, or was it about the same as it was after the cockroach came out?
A. I can't really recall. I can't really recall. Probably worse. But, you know, that's something that's hard to gauge is how muffled your ear is. But it was pretty bad. I can say that it was pretty bad. It was enough for me to -- you know, to stress to her that I might -- that I might be dealing with something pretty serious. And so it was bad. It was alarming to me, you know. At the time I was -- I was in kind of a panic, to be honest with you, but it was bad.
Q. All right. Were your ears ringing at all at this point?
A. Yes, sir.
Q. Which ear was ringing?
A. My right ear, sir.
Q. How bad was that on a scale of 1 to 10?
MR. BEASLEY: Objection. Form.

A. I can't recall, sir. As far as I can't gauge. It was too long ago for me to gauge how loud or quiet the ringing was. I just noticed the ringing in my ear at that particular time enough for me to let her know what I was experiencing.
Q. Okay. And were you having any pain in your right ear at this point?
A. Yes, sir.
Q. And how bad was the pain in your right ear?
A. It was pretty bad.
Q. On a scale of 1 to 10, with 10 being the worst, how bad would you say it was?
MR. BEASLEY: Objection --
A. (Interrupting) It was a 10. It was a 10. I can remember the pain -- the pain was bad.
MR. BEASLEY: I'm sorry. Just remember to pause for a minute so I can interpose my objections. Okay?
THE WITNESS: Okay.
MR. BEASLEY: Thank you.
Q. Okay. So the pain that you were experiencing in your right ear at this time on August 15, 2018, had you ever experienced any pain worse than that?





A. I can't recall.
Q. You mentioned earlier that you had surgery on your right shoulder before you were incarcerated in Stateville. Do you remember that?
A. No. It was -- it was my left shoulder. I'm sorry if I said it was my right. It was my left shoulder.
Q. Your left shoulder. Okay. Was that pretty painful?
A. Yeah. Not the surgery within itself because they put me to sleep for the surgery; but the hairline fracture, yes, it was painful.
Q. Okay. On a scale of 1 to 10 how would you rate the pain from the fracture in your left shoulder?
MR. BEASLEY: Objection. Form.
A. I would -- it was a 10. A different type of pain, but it hurt.
Q. Now, at this point on August 15, 2018 were you having any issues with your left ear at that point?
A. I'm sorry?
Q. On this day, August 15, 2018, were you having any issues with your left ear at this point?





A. Not that I can recall. I wouldn't say -- I had no complaints about my left ear.
Q. And, Mr. Moore, I'm going to have you go ahead and look at the document here on the screen. And, again, this is HRVA 487. Do you see the column entitled Plans?
A. I'm sorry. Yeah, I see it. I see it, sir.
Q. Okay. And then do you see here we have a couple of different boxes labeled 1, 2, 3 and 4?
A. Yes, sir.
Q. Okay. Box 3 indicates that you were prescribed Claritin at this visit. Do you recall that?
A. Yes, I can recall that.
Q. Okay. Did you take the Claritin after the visit?
A. Yes, sir. After I was given -- after they gave me -- because I think it took a couple of days for them to bring me the actual medication when they ordered it. So, yes, whatever medication she gave me, I took it.
Q. Okay. Did you take it every time it was brought to you during medication pass?
A. Yes. I take my medication whatever -- however I'm instructed to take it, that's how I take it.





Q. Okay. And then kind of moving down here to No. 5, do you see where it says Tylenol?
A. Yes, sir.
Q. Okay. So you were prescribed Tylenol during this visit, correct?
A. If I could -- yeah. I can't recall, but if that's what the record says.
Q. Okay. Do you remember taking the Tylenol that you were prescribed?
A. Whatever they prescribed to me, I took.
Q. Okay. And then moving down here to No. 6, do you see where it says "RTC 1m/o"?
A. No, I don't see it.
Q. I'll zoom in a little bit here. Maybe that's too close. Okay. Do you see the No. 6 here where my cursor is?
A. Yes, I see that.
Q. Okay. And then after that it says "RTC 1m/o"?
A. Okay. I see that, sir.
Q. Okay. And then the box below it says "F/U" to indicate follow-up?
A. It looks like FM, but it could be a U.
Q. Okay. Do you remember being told that you were supposed to return to the clinic in one month

for a follow-up?
A. I can't recall. They usually don't tell you what date -- what date that you're going to follow up. They don't -- they don't give us that type of information. This is just something she may have written in her notes to herself. But they don't tell me -- they don't tell -- they don't tell us the dates when we come back.
Q. Okay. I'll go ahead and zoom back out here. I'm going to scroll down to HRVA page No. 488. Do you see that document, Mr. Moore?
A. Yes, I can see it, but I can't -- I can't make out what it says.
Q. Okay. I'll zoom in here. Up at the top -- do you see your name up at the top and your inmate number?
A. Yes, sir.
Q. Okay. Then we have the date 9-13-18. Do you see that?
A. Yes, sir.
Q. All right. And then I suppose I don't know if you can read the writing. I'm going to go ahead and read it to you. It says "I/M," inmate, "not seen today for sick call due to hard lockdown."





Do you remember a hard lockdown on September 13 of 2018?
A. I can't recall, sir.
Q. Okay. And then under that it says "Inmate rescheduled to September 19, 2018." Can you read that or no?
A. September 19, 2018. Yeah, it says 9-19-18. Yeah, I can read it. Yes, sir.
Q. Now we're going to scroll down again. I'm going to show you the next page, HRVA 489. Do you see that?
A. Yes, I can see it, but I can't read it.
Q. Okay. We'll go ahead and zoom in. Here at the top do you see your name and inmate number?
A. Yes, sir.
Q. And the date 9-19-18?
A. Yes, sir.
Q. Do you see that?
A. Yes, sir.
Q. Okay. And I'll go ahead and read it to you. "RNSC," indicating nurse sick call note, "I/M," inmate, "refused sick call at this time." Do you recall refusing a nurse visit on September 19 of 2018?





A. No, sir. Again, this was very urgent to me, so I wouldn't -- I wouldn't refuse, no. I didn't refuse this visit.
Q. Okay. All right. I'm going to skip ahead to HRVA page No. 491. Do you see this page, Mr. Moore?
A. I'm sorry?
Q. I said do you see this page, HRVA 491?
A. Yes, sir.
Q. I'm going to go ahead and zoom in again. Do you see your name and inmate number up at the top there?
A. Yes, sir.
Q. And the date September 24, 2018; is that correct?
A. Yes, sir.
Q. Okay. Do you have any independent recollection of this visit? I'll represent to you that it was a visit with Ms. Latanya Williams.
A. Yeah, I don't -- I can't recall.
Q. Okay. So you don't recall any specifics from the visit?
A. No, not any specifics, but I remember the visit in general, me seeing her around that time.
Q. Okay. Other than your memory that you saw her





around this time, is there anything else you remember?
A. No -- remember about what?
Q. Just about the visit in general.
A. No.
Q. Okay. And at this point were you still having the muffled sensation in your right ear?
A. Yes, sir.
MR. BEASLEY: I'm sorry. Same objection as earlier. Are you offering the witness an opportunity to read the record, or are we asking him questions that aren't about the record?
MR. EMMERT: I'm just asking him what he remembers right now.
MR. BEASLEY: Okay.

CONTINUED DIRECT EXAMINATION

BY MR. EMMERT:
Q. So, Mr. Moore, you remember that your right ear was muffled at this visit; is that correct?
A. Yes, sir.
Q. Okay. I'm going to ask you again like I have before, on a scale of 1 to 10 how bad was it with 10 being no hearing at all?

MR. BEASLEY: Objection. Form.
A. I can't gauge. I just know -- I just knew it was bad. It wasn't normal. It wasn't normal.
Q. Okay. Was it more or less muffled than your previous visit from August of 2018?
A. I couldn't gauge. It was probably about -- it was probably around the same. It was -- it was muffled. I mean, it was just muffled. That's pretty much all I can remember.
Q. Okay. Were you still experiencing a ringing sensation in your right ear at this point?
A. Yes. I want to say that I can recall, yeah, the ringing, it was still there.
Q. And was the ringing better or worse as compared to your visit in August of 2018?
A. I can't recall. I couldn't tell you.
MR. BEASLEY: Again, just let me note my form objection, and then you can answer. Go ahead, Tim.
A. Yeah, I couldn't gauge, sir, if it was worse.
Q. Okay. Were you having any pain in your right ear at this point?
A. Yes, sir. There was still pain.
Q. How bad was the pain in your right ear?





A. It was pretty bad.
Q. Okay. In comparison to your visit from August of 2018 was the pain better or worse?
A. It was about -- it was about the same.
Q. I'm going to go ahead and refer to this document here again. Again, we're on HRVA 491. I'll zoom in a little bit as well. Mr. Moore, do you see up at the top right-hand corner the column that says Plans?
A. Yes, sir.
Q. Okay. And, again, do you see the boxes labeled 1, 2, 3, 4 and 5?
A. Yes, sir.
Q. Okay. And in Box 1 here it says "Amoxicillin 500mg 1 po." Did I read that correctly?
A. Yes, sir.
Q. Okay. And then the box right under it says "TID X 10 days." Did I read that correctly?
A. Yes, sir.
Q. Do you know what amoxicillin is?
A. I have a general idea of what it is.
Q. What is your understanding of what amoxicillin is?
A. Amoxicillin -- my understanding of amoxicillin





is it's a sort of an antibiotic.
Q. Okay. So do you agree with me that you were prescribed amoxicillin on September 24, 2018?
A. Yes, sir.
Q. Okay. Did you take the amoxicillin?
A. Everything that they prescribe to me, yeah, I have taken. So if she prescribed it to me, yes, I took it, sir.
Q. Okay. Then the box here with the No. 2, do you see that?
A. Yes, sir.
Q. And it reads "Zyrtec 10mg 1 po QD x 1m/o." Did I read that correctly?
A. Yes, that's pretty -- it's pretty sloppy. But, yeah, for the most part I can see Zyrtec 10mg 1 po. The last part I can't really make out.
Q. Okay. That's fine. So you agree with me you were prescribed Zyrtec during this visit from September 24, 2018?
A. Yes, sir.
Q. Okay. And I'll ask you the same question again. Did you take the Zyrtec as instructed?
A. Yes, sir.
Q. Okay. All right. And then moving down to No. 6,





do you see the box with a 6?
A. Yes, sir.
Q. Okay. And that reads "Tylenol 500mg 1 po qd bid x 1m/o." If you can read -- I mean, let me know what you think that says. Did I read it correctly, or is there something you can't read?
A. No, the No. 6 is -- I can't read. It's unlegible (sic). It's not legible.
Q. Do you remember being prescribed Tylenol during this visit from September 24, 2018?
A. I can't recall.
Q. Okay. Do you remember being prescribed any eardrops during this visit?
A. I can't recall, sir.
Q. If you were prescribed eardrops, did you take the eardrops?
A. Yes. If they were prescribed to me, I took them. I was prescribed some eardrops, but I don't know which visit it was, to be honest.
Q. Okay. And then looking at No. 5, it says "RTC f/u 1m/o." Do you see that?
A. Where you at? No. 5? Yes, sir.
Q. Do you agree that you were -- were you instructed

to follow up with the clinic in one month?
A. No. Again, they don't tell us when they are going to call us back. When they -- when we -- they don't tell us. Those were her personal notes.
Q. Okay. So we'll go ahead and scroll down here to page HRVA 497. Do you see this page that's on the screen here, HRVA 497?
A. Yes, I can see it.
Q. Okay. I'm going to go ahead and zoom in for you again. See your name up there at the top with your inmate number?
A. Yes, sir.
Q. And then we have a date of October 31, 2018; is that correct?
A. Yes, sir.
Q. Now, I'm going to go ahead and represent to you that this is another visit you had with Latanya Williams. Do you have any independent recollection of this visit?
A. I can't recall.
Q. Do you remember if you were still having any muffling sensation in your right ear at this time?





A. Yes. Yes, I can say that I was.
Q. Okay. Now, in comparison to the last couple of visits from August and September of 2018, how bad was the muffling at this visit in October in comparison to the last one?
MR. BEASLEY: Objection. Form.
A. If I can recall, it had got worse. It started to feel more clogged as opposed to being muffled. It started to feel -- it was worse.
Q. Okay. Could you hear at all out of your right ear at this point?
A. Barely.
Q. Were you experiencing the ringing sensation in your right ear at this point?
A. I can't recall.
Q. Okay. Now, what about your left ear? Were you having any issues with your left ear at this time period, October 31 of 2018?
A. Well, I noticed that my left ear started to become a little more -- yeah, I noticed a difference.
Q. In what way?
A. I want to say it was -- it was starting to become like muffled.





Q. Okay. And I'll ask you again, if you had to describe how muffled your ear was, your left ear, at this visit, October 31, 2018, on a scale of 1 to 10, with 10 being the worst, how muffled was it?
MR. BEASLEY: Objection. Form.
A. I can't really gauge it. Probably about -- probably about a 5. But I was dealing with a lot. It was -- it was bad.
Q. Okay.
A. It was probably about a 5.
Q. Okay. Were you experiencing any ringing in your left ear at this point?
A. I can't recall.
Q. Okay. Okay. So at this visit in October of 2018 were you experiencing any pain in your right ear?
MR. BEASLEY: I'll object again to the extent you're asking him to review the record and talk about the record versus testifying from his memory. Can we have some clarification on that, Jordan?
MR. EMMERT: I'm asking about his memory.





CONTINUED DIRECT EXAMINATION
BY MR. EMMERT:
Q. Do you have remember having any pain in your right ear at this time?
A. I can't recall.
Q. Do you remember if you were having any pain in your left ear at this point?
A. No, I can't recall.
Q. Mr. Moore, I'm going to direct your attention to the document now HRVA 497. I'm going to ask you the same type of thing again. Do you see the column on the right that says Plans?
A. Yes, sir.
Q. Okay. And, again, we have boxes labeled 1, 2, 3, 4, 5, 6 and 7. Do you see that?
A. Yes, sir.
Q. Okay. So looking at the box labeled No. 3, I'll go ahead and read it to you. It says "Motrin 600mg." Do you agree that that's what it says?
A. Yes, sir.
Q. And then below it says "1 po BID x 14 days." Is that correct?
A. Yes, sir.

Q. Okay. Would you agree that you were prescribed Motrin during this visit?
A. Yes, sir. If the record reflects that, yes, sir.
Q. Okay. I'll ask you again, did you take the Motrin?
A. Yes, sir.
Q. Okay. And then below that, No. 4, I'll read it to you. It says "Augmentin 875mg." Do you agree that's what it says?
A. Yes, sir.
Q. Do you have any idea what Augmentin is?
A. No, sir.
Q. If I were to tell you it is similar to amoxicillin and an antibiotic, would you have any reason to disagree with me?
A. I wouldn't -- I wouldn't know. I wouldn't know what it is to agree or disagree with you, sir.
MR. BEASLEY: Tim, if you can just remember to pause so I can interpose an objection. I'm going to object to the question to the extent it's calling for any medical or other expert knowledge.
Q. Now, would you agree with me that you were prescribed Augmentin during this visit?





A. Yes, sir. If that's what the record reflects, yes, sir.
Q. Okay. And I'll ask again. Did you take the Augmentin?
A. Yes. Whatever they prescribed me, I took, sir.
Q. Okay. And then down here No. 6, do you see that?
A. Yes, sir.
Q. Okay. It says "RTC f/u 3 weeks." Is that correct?
A. Yes, sir.
Q. Again, they don't tell you when your next visit will be; is that correct?
A. No, they don't -- they don't give us -- they don't let us know when we're going to be coming back for a follow-up.
Q. Okay. Now, I'm going to go ahead and move along again to HRVA page No. 498. Mr. Moore, do you see this document here?
A. Yes, sir.
MR. BEASLEY: Jordan, before we get into this document, I want to check. We're coming up on an hour. And, Tim, I wanted to check with you whether they





have a set time for you to take a lunch.
THE WITNESS: Well, yes, she just came in about 30 minutes ago and told me that she had lunch ready for me.
MR. BEASLEY: Okay. Maybe when you get to a good stopping point we can break 30 minutes for lunch?
MR. EMMERT: Okay. Sure. That will work.
MR. BEASLEY: Okay.

CONTINUED DIRECT EXAMINATION

BY MR. EMMERT:
Q. All right. Mr. Moore, going back to this document, HRVA 498, I'm going to go ahead and zoom in for you again. Do you see your name and inmate number up at the top there?
A. Yes, sir.
Q. And then the column with the date is from November 26, 2018; is that correct?
A. Yes, sir.
Q. Okay. I will go ahead and represent to you again that this is a visit that you had with Ms. Latanya Williams. Do you have any recollection of this visit with Ms. Williams?





A. Yes. Yes, sir. I can remember this visit.
Q. What do you remember about it?
A. I remember still having -- I was still having those -- the same issues with my ear at this particular time.
Q. Is there anything else you remember?
A. I mean, yeah, just me explaining to her that I think that I was in bad shape, that my ear was pretty bad.
Q. Okay. And are you referring to your right ear?
A. Yes, sir.
Q. Okay. Now, you just indicated that your right ear was still muffled at this point; is that correct?
A. Yes, sir.
Q. Okay. I'll ask you the same question again. In comparison to your prior visit was the muffling better, worse or the same in your right ear?
THE WITNESS: You're breaking up. You're breaking up, Mr. Beasley.
MR. BEASLEY: Stating a form objection. You can answer, Tim. Thank you.
A. Okay. Yeah, it was bad. Again, I can't gauge.

It was just pretty much -- it was muffled. It was bad. Like it was a 10. It was a 10.
Q. Okay. But you don't know if it was better or worse or the same as compared to your prior visit?
A. I couldn't gauge it.
Q. Okay.
A. But I would lean towards it being worse.
Q. Okay. Well, what about ringing in your right ear? Were you still experiencing a ringing sensation in your right ear at this point?
A. I can't -- I can't recall.
Q. Okay. What about pain in your right ear? Were you experiencing pain in your right ear at this point?
A. I couldn't recall.
Q. Now switching to your left ear, were you experiencing any muffling in your left ear on November 26, 2018?
A. Yep.
Q. Okay. Was the muffling in your left ear better or worse or the same than in the prior visits?
A. It was about the same.
Q. Did you have any ringing in your left ear at





this time on November 26, 2018?
A. No, I couldn't recall.
Q. What about pain in your left ear? Did you have any pain during this visit?
A. No, I couldn't recall.
Q. And, again, directing your attention to the document we are on, HRVA 498, I'll ask you again, do you see the column that says Plans?
A. Yes, sir.
Q. Okay. Again, we have boxes labeled 1, 2 and 3. Do you see that?
A. Yes, sir.
Q. Okay. Directing your attention to Box No. 2, I'll read it to you. It says "Refer to med DIR. Discuss hearing loss." Did I read that correctly?
A. Yes, sir.
Q. Okay. So would you agree with me that after this visit you were referred to the medical director to discuss your hearing loss?
A. Yes, if that's -- if that's what the record reflects. Again, they don't tell me -- they don't tell us anything. It just -- they don't -- they don't give us a heads-up when they follow





up saying anything of that nature.
Q. Understood. Okay. Just have a couple more questions for you before we break for lunch. I'll direct your attention to a couple of different pages here. We will start with HRVA 489. This is something we discussed before, but I just want to touch on it again. Okay. I'm going to zoom out for you. Do you see page
HRVA 489, Mr. Moore?
A. Yes, sir.
Q. Okay. I'll go ahead and zoom in here. And this is a note from September 19, 2018, correct?
A. Yes, sir.
Q. Okay. And in the column titled Subjective, Objective, Assessment, it reads "Inmate refused nurse sick call at this time." Did I read that correctly?
A. Yes, sir.
Q. Okay. And is it your testimony that you did not refuse a nurse sick call visit on this day?
A. Yes. I never -- I never refused a sick call on this day.
Q. Do you have any idea why this particular nurse





would have put that in your medical chart?
A. No, sir. I have no idea why she would state that I refused to be seen when that didn't happen.
Q. I'll go ahead and take you to HRVA 492. Do you see this page HRVA 492?
A. Yes, sir.
Q. I'll zoom in. And it looks like we have a note from September 29, 2018. Do you see that?
A. Yes, sir.
Q. Okay. And under the column Subjective, Objective, Assessment, it says "Inmate refused RNSC at this time." Did I read that correctly?
A. Yes, sir.
Q. Okay. Is it your testimony that you -- well, I guess let me ask it this way: Did you refuse a nurse visit on September 29 of 2018?
A. No, sir. I have never -- during this time I don't recall refusing any visit concerning this incident with my ear.
Q. You mentioned that you don't recall refusing any nurse visits as it relates to this incident with your ear. Do you recall refusing nurse visits for issues unrelated to your ear?

A. I can't recall, sir.
Q. You also mentioned in that statement that you don't recall refusing any nurse visits as it relates to your ear. Is it possible that you did, in fact, refuse nurse visits as it relates to your ear and you just simply don't remember?
A. No, I don't -- I didn't refuse any visit as it relates to my ear.
Q. Okay. And I'll take you to one more page here. We're going to go to HRVA 494, Mr. Moore. Can you see this page? Can you see this page 494, Mr. Moore?
A. Yes, sir.
Q. Okay. I'll go ahead and zoom in. It looks like this is a flu vaccination record from October 15 of 2018; is that correct?
A. Yes, sir.
Q. I'll go down to the bottom here. There is a box that is checked "I refuse a flu vaccination at this time." Did I read that correctly?
A. Yes, sir.
Q. Okay. And then under it it says Signature with some handwriting that says "I/M," inmate, "did not sign." Did I read that correctly?





A. Yes, sir.
Q. Okay. Do you remember refusing a flu vaccination at this time?
A. Yes, sir.
Q. Why did you refuse the flu vaccination?
A. Because I didn't want to take it.
Q. Do you remember why you refused to sign the document?
A. Because I didn't want to sign it.
Q. Okay. Now, in your Complaint you make some allegations -- you made some allegations wherein you state that you were not seen by a medical provider because the provider was unavailable due to time constraints or some other reason. Do you remember those allegations?
A. I don't. You have to refer to the Complaint itself in regards to those allegations.
Q. Okay. I guess let me ask it this way: Do you have any knowledge of the work schedules, meaning the dates and times any medical providers are in the clinic providing medical care -- do you have any knowledge of the work schedules of any of the medical professionals at Stateville?
MR. BEASLEY: Objection. Form.





A. No, sir. I don't have any -- I don't have any knowledge of any of the staffs' particular work schedule. No, sir.
Q. Okay. Do you have any knowledge of the number of patients any one medical provider at Stateville sees on a normal day?
MR. BEASLEY: Objection. Form.
A. No, sir. I have no knowledge of the number of inmates or clients that they see a day, sir.
Q. Okay. Is it also fair to say -- I'm sorry.
A. Patients, not clients. Patients. I'm sorry.
Q. Okay. Is it also fair to say that on any given day at Stateville you do not have any knowledge as to the medical conditions of patients other than yourself that present to these medical professionals at Stateville?
MR. BEASLEY: Objection. Form.
A. Can you repeat the question, sir?
Q. Sure. Would you agree with me that you do not have any knowledge as to the medical conditions of other inmates at Stateville?
A. I mean, I have knowledge of some inmates here. We live in close proximity. So sometimes when things happen to certain people, you know, and





I'm around them -- we live pretty much together. I'm aware of it. So, yeah, I would say that I am aware of some of the medical conditions of some of the people around me, yeah.
Q. Okay. I asked you earlier about if you had any knowledge of the number of patients that any one medical provider may see in a day, and you said you didn't have any knowledge of that. I'm going to ask you a similar question. Do you have any knowledge of the various types of medical conditions that the medical providers at Stateville are addressing for inmates unrelated to yourself on a day-to-day basis?
MR. BEASLEY: Objection. Form.
A. Repeat the question for me one more time, sir.
Q. So do you have any knowledge of the specific medical conditions that the medical providers at Stateville address for patients other than yourself on a day-to-day basis?
MR. BEASLEY: Objection. Form.
A. Again, the only knowledge of conditions that I may have with any individual in Stateville may be of people in my close proximity, but it's not detailed. It's just something like maybe from

outside looking in. Maybe -- nothing -- nothing detailed.
Q. Okay. So based upon that lack of knowledge is it fair to say that if a provider, a medical provider, couldn't see you on some specific day, you don't have any knowledge of the reason they could not see you that day; is that correct?
MR. BEASLEY: Objection. Form.
A. Yeah, I don't have any knowledge as to a reason why I may have not been seen on a specific day, no. They don't tell me.
MR. EMMERT: Okay. Okay. I think that's probably a good place to break for lunch.
MR. BEASLEY: How long are we going to take here?
MR. EMMERT: How much time do you need, Mr. Moore?
THE WITNESS: Maybe 30 minutes maybe. Is that cool? Is that fine?
(At this time a short recess was taken.)

CONTINUED DIRECT EXAMINATION

BY MR. EMMERT:
Q. Mr. Moore, are you ready?





A. Yes, sir.
Q. All right. So going back on the record then, Mr. Moore, as I have asked you about the other defendants, as it relates to Nurse Lewandoska, have you included all of the allegations you have as it relates to Nurse Lewandoska in your Complaint?
A. As of now, yes.
Q. Okay. So, Mr. Moore, I want to ask you a couple of questions about the injuries you're claiming in this case. So in your Complaint you complain of pain in your right ear, pain in your left ear, a ringing in your ears, hearing loss in both of your ears, vision problems, headaches and dizziness. Are those all of the injuries you are claiming you suffered in this case?
A. If that's what the -- if it's in the Complaint, yes. Yes, sir.
Q. Okay. So with respect to the pain in your right ear, when did the pain start?
A. I want to say 2018, if I can recall.
Q. Okay. How long after the cockroach was removed did it start?
A. I want to say it was before -- I can't recall.





But I want to say it was before they even removed the roach, if I can recall.
Q. Okay. Did the pain start before the cockroach crawled into your ear?
A. No, sir.
Q. And do you still have pain in your right ear today?
A. Off and on I get discomfort. Every now and again.
Q. Is the discomfort more intense or less intense than it used to be?
A. I would say it's a little less intense than what it was; yeah.
Q. Okay. After the cockroach crawled into your ear, throughout 2018 and 2019 was the pain in your right ear constant?
A. I couldn't -- I couldn't gauge it. It was -- it would be worse -- it would be worse at times. I mean, it would be worse at some times than others. It would be more worse sometimes.
Q. So the pain would kind of fluctuate up and down in levels of intensity?
A. Yes, sir.
MR. EMMERT: Can we go off the





record for a second?
(At this time a short discussion was had off the record.)
MR. EMMERT: Go back on the record then. Okay.

CONTINUED DIRECT EXAMINATION

BY MR. EMMERT:
Q. Mr. Moore, with respect to your left ear, did you ever experience pain in your left ear?
A. During the times -- yeah. Yeah. Yeah, I did.
Q. Okay. When did the pain in your left ear start?
A. I can't recall.
Q. Okay. Can you give me -- was it after the cockroach was removed from your ear?
A. After the roach was -- yeah; yeah. It was after that.
Q. Okay. Approximately how long? A couple of weeks? A couple of months that you started experiencing pain in your left ear?
A. I want to -- I want to -- probably want to say months. It was months after that I started experiencing pain in my left ear.
Q. Okay. And how intense was the pain in your left ear compared to your right ear?

A. It wasn't -- it wasn't as intense, if I can remember right. It wasn't as intense as the pain in my right ear.
Q. Okay. Would that pain fluctuate as well? It would get better sometimes and then get worse, better and worse, as it relates to your left ear?
MR. BEASLEY: Object to the form.
A. I can't really recall with the left -- with my left ear.
Q. All right. Now let's talk about the ringing in your ears. With respect to your right ear, when did the ringing start?
A. After the roach was flushed from my ear.
Q. Okay. Within hours? Within days? Approximately how long did it take for the ringing to start?
A. I can't recall.
Q. Okay. Was the ringing in your right ear constant after it began?
A. I want to say no, it wasn't constant. It wasn't a constant ring. It would -- it would come and go.
Q. How often would it come on?
A. I can't recall.





Q. Do you still have any ringing in your right ear?
A. Yeah.
Q. How often does it ring now?
A. I can't recall. I couldn't gauge it.
Q. Does it happen a lot?
A. I would say -- yeah. Yeah, it happens periodically.
Q. Once a day? Once a week?
A. No, I couldn't recall. I couldn't gauge throughout the day. I couldn't recall.
Q. Now, going back to your left ear, do you have any pain in your left ear as of today?
A. Yeah.
Q. Okay. How bad is the pain today?
A. It's manageable. I mean, I have learned to live with it. It's just a constant thing.
Q. Okay. So is the pain in your left ear constant, or does it come and go?
A. I would say that it -- when I say constant, I mean it comes and goes from time to time. But it's a constant thing that I deal with.
Q. Okay. Do you have pain in your left ear every day?





A. You could say that. You could say that.
Q. Okay. Do you have pain in your right ear every day?
A. I wouldn't say -- no. I wouldn't say that.
Q. All right. Let's talk about your hearing loss. Can you hear anything out of your right ear?
A. No.
Q. You do have a hearing aid for your left ear, correct?
A. Yes, sir.
Q. Okay. With the hearing aid in, how much can you hear?
A. It's pretty good.
Q. And then if the hearing aid isn't in, how much can you hear?
MR. BEASLEY: Object to the form.
A. I couldn't -- I mean, it's worse than having it in.
Q. You can still hear some things with your hearing aid out in your left ear?
A. Yes.
MR. EMMERT: Okay. Let's go off the record real quick.





(At this time a short discussion was had off the record.)
MR. EMMERT: Back on the record then.
CONTINUED DIRECT EXAMINATION
BY MR. EMMERT:
Q. So, Mr. Moore, I was just asking you about your ability to hear out of your left ear without the hearing aid. I'm sorry. I just don't recall your answer. Did you testify that you could still hear some things out of your left ear without your hearing aid in?
A. Yes, sir.
Q. Okay. All right. So with respect to the issues you're having in your left ear, are you attributing those issues to the cockroach in your right ear?
A. I wouldn't -- that's not my -- whatever my claim is. I mean, whatever is in the Complaint, that is what I'm claiming.
MR. BEASLEY: Object to the extent it calls for medical or other expert testimony.
Q. Yeah, and I'm not -- I'm not looking for an expert opinion here. I just want to know if

that is what your thought is. Are you claiming that you can't hear out of your left ear because of the cockroach that crawled into your right ear, or don't you know?

A. I don't know if -- I don't know. I don't know if that -- if that's what's caused the problems in my left ear.

Q. Has any medical professional ever told you that the cockroach being in your right ear caused your hearing loss in your left ear?

MR. BEASLEY: Objection. Form.

A. Yes, sir.

Q. Who said that?

A. When I -- the doctor. The specialist. I think his name is -- I forget his name. I forget his name. But the specialist that I was seen by, he told me.

Q. Are you referring to Matt Walk?

A. That may be. Yeah, I think that's what his name is. Whatever specialist that I saw, that's who.

Q. Are you referring to the specialist at Ortiz Hearing?

A. Yes, sir.





Q. Okay. Do you have any idea what type of medical professional Matt Walk from Ortiz Hearing is?

A. No, sir.

Q. Okay. So it's your testimony that Mr. Walk told you the hearing loss you were experiencing in your left ear was caused by the cockroach in your right ear?

A. No, sir. The specialist told me that the damages done to my right ear were caused by the cockroach being in my right ear. He never stated anything about my left ear, as to what caused those damages.

Q. Okay. So my question to you then is with respect to your left ear, has any medical professional told you that the damage in your left ear was caused by the cockroach in your right ear?

A. No, sir. No medical professional has ever said anything with respect to my left ear as to what caused the hearing loss in my left ear. Not to me. They never told me.

Q. Okay. And other than this Mr. Walk from Ortiz Hearing, has any other medical professional told you the damage to your right ear is due to the cockroach?





A. No, sir. No other medical professional has told me that that's what caused the damage to my right ear.

Q. Understood. Okay. You also made some complaints of vision problems in your Complaint. Are you claiming that your vision problems are related to the cockroach that crawled into your right ear?

A. If it's in the Complaint. If it's in the Complaint, yes.

Q. Well, that's what I'm asking you. Is that what you're claiming?

A. If that's what is in the Complaint.

Q. Okay. So it's your contention that the cockroach that crawled into your right ear caused your vision problems?

MR. BEASLEY: Objection. Asked and answered.

A. If that's what's in the Complaint, yes, sir.

Q. Okay. Throughout the time period described in your Complaint were you experiencing any pain in your eye?

A. A little -- a little stress, yes. A little stress.





Q. Okay. Which eye were you experiencing pain in?

A. Both.

Q. When did the pain start?

A. I can't recall the specific dates or the specific time, whether it was after -- it was after the incident.

Q. Was it weeks? Days? Months after?

A. I can't recall.

Q. Okay. How bad was the pain on a scale of 1 to 10?

A. It was just I would say 6 or a 7. It was just a lot of stress, strain. It feels like a strain to the point where it made me blurry and dizzy, headaches.

Q. Okay. Was it a constant pain?

A. I would say. Yes, sir.

Q. Okay. So throughout the entire time period from when the cockroach crawled into your ear until now, you have had constant eye pain? Is that your testimony?

A. Yes, sir.

Q. Do your eyes hurt right now?

A. Yes, sir.

Q. Did you have any other vision problem besides

pain?
A. Just blurry. Blurry vision.
Q. Anything else?
A. Dealing with my eyes?
Q. Yes.
A. With my eyes it's just, like I said, the pain and the pressure, the blurry vision with the eyes. Anything other than that, dizziness, vertigo, nausea. A whole host of things. Headaches.
Q. And when did all of these problems begin; the vision, headaches, dizziness, vertigo, nausea? Was that all after the cockroach crawled into your ear?
A. Yes; yes. It was all after the incident.
Q. Okay. Did all of those issues start at the same time?
A. I would say the dizziness and the headaches, those started first before I started having the pain in my eyes and the blurriness in my vision. But, yeah, it was, you know, pretty much around the same time, yes.
Q. Okay. And how long did the headaches and dizziness, vertigo and nausea, how long did that





last?
A. It's an ongoing thing. I still deal with it right now.
Q. And you mentioned in your Complaint that you believe you had an infection in your right ear. Is that true? Do you think you had an infection in your right ear?
A. If it's in the Complaint, yeah.
Q. Did anybody ever tell you that you had an infection in your right ear?
A. No one -- no one stated as a matter of fact that that is what it was. But when she prescribed the -- when she finally did prescribe the -- no. No one ever stated that.
Q. Okay. What makes you think you had an infection in your right ear?
A. Because of the medicine that she -- that she prescribed, that Dr. Williams prescribed.
Q. So do you believe you had an infection in your right ear because she provided you or prescribed you antibiotics?
A. Yes, sir.
Q. Is there any other reasons?
A. Well, because I just would guess that a roach





would carry bacteria, and the bacteria causes infection.
Q. Any other reasons?
A. Not that I can recall at this moment.
Q. Okay. Did you keep any handwritten notes of this whole cockroach incident? Anything in your cell? Anything you sent to family members? Anything like that?
A. Just grievances. Copies of my grievances. Copies of letters that I wrote to the various people here at Stateville administration.
Q. Did you ever write any letters to family members about the issues that you were having?
A. I may have. I may have. I can't recall.
Q. Did you keep any of your own notes that you wrote down in your cell?
A. What about them? I'm sorry?
Q. Did you keep any of your own notes in your cell? Like, you know, did you ever write anything down on a piece of paper, notes to yourself about this incident that you kept in your cell?
A. No. Just grievances. Anything that I wrote about this incident was on the grievance.





Q. Okay. We spoke about the allegations you have against each of the medical defendants in this case, being Nurse Cetta, Nurse Lewandoska, Physician's Assistant Latanya Williams, Dr. Okezie, Dr. Henze, as well as Wexford itself. You indicated that all of your allegations against each of those defendants are stated in your Complaint, correct?
A. Yes, sir. As of now.
Q. Do you have any allegations to add that you would like to tell me about?
A. Not at this time. No, sir.
Q. Do you have any specific circumstances that would describe those allegations that you would like to add at this time?
A. I'm sorry?
Q. Do you have any specific circumstances or other facts that you didn't put in your Complaint that you would like to add at this time? Any allegations? Any circumstances that you have?
A. Not that I can --
MR. BEASLEY: (Interrupting) Objection. Form and foundation.
Q. Okay. So in your Complaint you included each

and every circumstance that you claim each individual defendant -- well, strike that. You included in your Complaint each allegation of wrongdoing that you want to bring against each individual defendant; is that correct?
A. Yes, you could say that.
Q. Okay. I have also asked you a number of questions about whether or not you have an independent recollection of various medical visits and various interactions with medical professionals. I have also asked you about your recollection of pain and the muffling sensation and the ringing in your ears. Do you recall those questions generally?
A. Yes, sir.
Q. And you indicated a number of times that you didn't remember or you didn't recall some information at this time. Do you remember testifying to that?
A. Yes, sir.
Q. Okay. Is there anything that you can think of that would refresh your recollection as to any of those topics?
MR. BEASLEY: Objection. Form.





A. No, sir. Not at this time.
Q. Okay. Just a couple more questions. And we ask everybody these questions. You are currently incarcerated in Stateville; is that correct?
A. Yes, sir.
Q. You have been convicted of felony charges; is that correct?
A. Yes, sir.
Q. Okay. What felony charges were you convicted of?
A. Armed robbery, aggravated criminal sexual assault. And that's pretty much it that I can recall at this moment.
Q. Okay. And then the last question I have for you. Mr. Moore, did you put the cockroach in your ear?
A. No, sir.
MR. EMMERT: Okay. That's all the questions I have at this time.
MR. BEASLEY: Elizabeth, could we take at least a 15-minute break so people can get a little food and something to drink? And you haven't had a chance yet, right?
THE WITNESS: I mean, I could use a





break.
MR. BEASLEY: Yeah. Would a 15-minute break be okay for everybody?
MS. ANDONOVA: Sure. We'll be back at 1.
(At this time a short recess was taken.)

CROSS-EXAMINATION

BY MS. MALLORY:
Q. Mr. Moore, my name is Elizabeth Mallory and I represent the IDOC defendants in this case. I have some follow-up questions on mostly things that Mr. Emmert asked about.
First I just want to start out with how you got to Stateville. How long is your sentence for?
A. 120 years.
Q. So you don't have a parole date?
A. No, ma'am.
Q. When did you get to Stateville?
A. I want to say 2012, 2013, if I'm not mistaken. If I do recall.
Q. Is that the first time you've ever been to Stateville?
A. Yes, ma'am.





Q. Was that when you were convicted? Or were you at another prison beforehand?
A. No. I was -- once I was convicted they brought me straight here.
Q. So you've been at Stateville your entire time after your conviction?
A. Yes, ma'am.
Q. Where were you housed when you first got to Stateville?
A. In F house. F house, the round house.
Q. Do you remember when you left F house?
A. No, I can't recall the date that I left F house.
Q. Do you know the year?
A. I can't recall the year either.
Q. Where were you housed after F house?
A. Delta house.
Q. And do you know when you started living in Delta house?
A. I can't recall.
THE WITNESS: Is he back?
MS. MALLORY: Yes.
MR. BEASLEY: Tim, I'm here. Can you not -- I see you now. Sorry about that.
THE WITNESS: That's okay.

MR. BEASLEY: Thanks for checking on me.

CONTINUED CROSS-EXAMINATION

BY MS. MALLORY:

Q. So where are you currently housed?
A. I'm currently in Edward house right now.
Q. When did you get moved there?
A. I want to say December the 1st, if I'm not mistaken, of 2020.
Q. So before that you were in Delta house, right?
A. Yes, ma'am.
Q. Do you remember for how many years?
A. I can't recall, no.
Q. Was it more than one year?
A. Yeah, it was more than one year. I spent the majority of my time here in Stateville in Delta house.
Q. What kind of cell were you in? Well, strike that. Were you in a cell by yourself -- strike that, too. When you got to Stateville and you were in F house, were you in a cell alone, or did you have a cell mate?
A. I had a cell mate.
Q. Did you have a cell mate the entire time you





were in F house?
A. Yes, ma'am.
Q. And how about when you got to Delta house?
A. Yes. I had a cell mate when I was in Delta house as well.
Q. The entire time?
A. Yes, ma'am.
Q. And what is your cell mate's name? What was your cell mate's name from Delta house?
A. It was a number. I had a different -- when I first arrived at Delta house are you speaking about?
Q. I would like to know everyone that you've celled with at Delta house.
A. I can remember the first guy was -- his name was Mr. Parham. His last name was Parham. I forget his first name. I got a Devon Daniels. I forget this last guy that I was just in a cell with, I forget his name, but he was a Latino guy. I forgot his name. I'm sorry.
Q. So you had three cell mates while in Delta house?
A. Yeah. As far as I can recall, yes, ma'am.
Q. And then you got moved to Edward house and





that's where you are now; is that correct?
A. Yes, ma'am.
Q. Do you have a cell mate in Edward house?
A. No, ma'am.
Q. No?
A. No, ma'am.
Q. Have you ever had a cell mate in Edward house?
A. No, ma'am.
Q. Is there a reason?
A. They haven't given me one if there is. I don't know about it.
Q. When you got to F house, were there any issues with bugs or vermin when you got to F house?
A. Yes, ma'am.
Q. And did you report these issues?
A. When you say report it --
Q. Did you complain to anyone, did you say anything to anyone?
A. Yes, ma'am. I complained to the officer at that particular time that there was roaches in my cell.
Q. Who was the officer?
A. I can't recall.
Q. Did the officer do anything?





A. He said he did but -- he said that he did. He told the exterm- -- they called it a work order. He said they put a work order in.
Q. Did they call and exterminate your cell?
A. No.
Q. Did you complain again after it had been a while since your initial complaint?
A. No. I don't think I spent that much time in there. I think I was moved maybe like -- I may have only been there for a month or two maybe, if I recall. But I think I was moved before I got a follow-up as far as my complaints was concerned.
Q. Let's go to Delta house.

MR. BEASLEY: Is anyone else getting background noise?

THE WITNESS: Yeah, I hear it, too.

MR. BEASLEY: I don't think it's from one of us on my top row, but maybe Victoria or Dan, if you could mute.

(At this time a short discussion was had off the record.)

CONTINUED CROSS-EXAMINATION

BY MS. MALLORY:

Q. I'm going to share my screen with you and I'm going to put up the Complaint, the First Amended Complaint that was filed in this case. Are you seeing the First Amended Complaint or are you seeing both of my screens?

A. I see the First Amended Complaint. It's pretty small.

Q. I wish this would show you what -- so all you see is the First Amended Complaint?

A. Yes, ma'am.

Q. I will make it bigger. I just want to get to the portion that I want to talk to you about which is on page 6. Can you see it better now?

A. Yes, ma'am.

Q. So paragraph 20 says "Ever since Mr. Moore moved to Cell 538 in Stateville's Delta Unit on May 18, 2017 he identified (sic) cockroaches in his cell. Mr. Moore would always find cockroaches crawling in his cell underneath, alongside and in his bed." So in 2017 is that when you started seeing the roaches?

A. In that particular cell house.





Q. That's when you started seeing them in Delta house?

A. Yes, ma'am, when I got there.

Q. So you got to Delta house in 2017?

A. (Indicates affirmatively.)

Q. So you were incarcerated in 2013?

A. I can't recall which dates or what date I was moved to Delta house and I can't recall the specific date that I was in F house or when I came to Stateville.

Q. In May of 2017 you started seeing roaches in your cell; is that correct?

A. Yes. Yes, ma'am.

Q. Did you report that to anyone?

A. I don't think I did.

Q. Why did you not report it?

A. I can't recall. I can't tell you why.

Q. Well, it says you were disgusted by them. So why didn't you report it?

A. Again, I can't tell you why I didn't report it back then.

Q. Did you report it in June of 2017?

A. I don't know. I can't recall.

Q. How about July of 2017?





A. I can't recall.

Q. How about August of 2017?

A. I don't recall.

Q. September of 2017?

A. I don't recall.

Q. October of 2017?

A. I may have. I just don't recall.

Q. November of 2017?

A. I don't recall.

Q. How about December of 2017?

A. I don't recall.

Q. How about in 2018? Did you report it in January?

A. I don't recall.

Q. How about in February of 2018?

A. I don't recall.

Q. How about in March of 2018?

A. I don't recall.

Q. April of 2018?

A. I don't recall.

Q. May of 2018?

A. Don't recall.

Q. June of 2018?

A. I may have.





Q. July of 2018?

A. I may have.

Q. August of 2018?

A. I may have.

Q. But you're not sure?

A. I mean I might have records, grievances that state that I did, but it was a while back.

Q. Well, it sounds like, based on paragraph 21 of this Complaint, that you were highly distressed by all of the cockroaches in your cell, it seems like. I mean, we could read it. Paragraph 21 says "The infestation was so pervasive that Mr. Moore always felt as if something was crawling on him. He struggled to fall asleep at night, kept awake by the fear that cockroaches would crawl over him in his sleep, disgusted by the pests and hearing reports from fellow inmates of cockroaches crawling inside mouths, nostrils and ears. Mr. Moore asked CO Shepherd to request extermination services for Mr. Moore's cell. CO Shepherd told Mr. Moore that he would put in a work order to have Mr. Moore's cell exterminated."

A. Okay.

Q. So you struggled to fall asleep because of the roaches?
A. Sometimes.
Q. And you were kept awake due to fear of them crawling on you while you slept?
A. Yep, sometimes.
Q. And you had heard reports that they had entered orifices of other inmates?
A. Yep.
Q. But you don't recall if you ever said anything to an authority about this?
A. I may have.
Q. It seems like something you would recall, Mr. Moore, if it was that distressing to you.
MR. BEASLEY: Objection. Argumentative.
Q. Okay. So on July 4th of 2018 -- in paragraph 22 it says that on July 4th of 2018 you wrote Warden Nickolson to reiterate your plea for an exterminator. What do you mean when you say that you wrote to him?
A. I wrote him a letter.
Q. Just a letter? Not a grievance, right?
A. No. I put to him specifically I wrote a letter. I addressed it to him.





Q. What made you so inclined to write him a letter on July 4th of 2018?
A. Because he was the warden, so I felt like that I would have to seek some sort of help from him.
Q. Did any particular event cause you to write this letter on July 4th of 2018 as opposed to any other date?
A. Well, I can vaguely remember it being notices posted to contact certain individuals if you wanted to request -- to make requests to have your cell exterminated. So that might have been what made me write him.
Q. So Stateville posted notices? Is that what you're saying?
A. I don't know who posted them, but I vaguely remember that that's what I had to do to write.
Q. Where were the notices posted?
A. I can't recall.
Q. What did the notices say?
A. Specifically I can't recall what they specifically said. I knew that it was telling us in order to request an exterminator, that we would have to follow certain steps or something to that nature. So that's what I did.





Q. What were the steps that you had to follow?
A. I can't recall.
Q. So did you follow the steps?
A. At that time I thought I was.
Q. Is there anything right now that would be impairing your memory?
A. Such as? I don't know.
Q. Are you on any medications? Are you under the influence of anything?
A. No, I'm not under the influence of anything. It's just it was a while back, so a lot of this stuff I can't recall.
Q. So you wrote the letter to the warden in July of 2018, the beginning of July. What steps did you take before July 4th of 2018 to rid yourself of the cockroach problem in your cell?
A. If I can remember right, I just basically requested -- made a request known to the CO that had our gallery that was working on our cell house.
Q. And was that one of the steps that you were required to take?
A. I think so.
Q. So you wrote this letter to the warden on





July 4th. Did you receive a reply?
A. No. No, ma'am.
Q. Did you do anything, following this letter and not receiving a reply, to complain about the cockroaches?
A. I probably wrote a grievance. I probably wrote a grievance on it.
Q. And did you get a reply to your grievance?
A. I want to say yeah. Yeah, I got a response to it.
Q. So then on July 20th -- well, you can tell me. On what date did you discover a roach in your ear?
A. The date, I want to say July -- I know it was approximately around maybe the 18th, I think. I can't remember the specific date.
Q. And on the 18th what occurred?
A. I'm sorry?
Q. What occurred on the 18th?
MR. BEASLEY: Objection. Vague.
A. Are you referring to the date that the roach crawled in my ear?
Q. Correct.
A. The roach crawled in my ear.

Q. How do you know that it crawled in your ear?
A. Because I felt it crawling around.
Q. Did you feel it crawl in?
A. No. I didn't feel it until I woke up. It woke me up out of my sleep.
Q. So you were sleeping?
A. Yes.
Q. And you felt it crawling around?
A. Yes, ma'am.
Q. What did you do when you woke up?
A. I tried to get help.
Q. How did you do that?
A. Called out for help.
Q. Did anybody come?
A. Yes. CO came.
Q. Which CO?
A. I can't remember.
Q. What did that CO do?
A. He instructed me to sign up for sick call.
Q. And did you do that?
A. Yes, ma'am.
Q. Was your immediate reaction to call the CO? Or did you do something before that?
A. No. I was in panic, so my immediate reaction





was to call for help.
Q. So you woke up feeling that there was something in your ear, and you immediately got out of bed and yelled for a CO; is that correct?
MR. BEASLEY: Objection. Mischaracterizes the witness's prior testimony. You can answer.
Q. Feel free to let me know step by step how it went.
A. I mean, you got it right.
Q. So did you touch your ear? Did you try to figure out what was going on in your ear?
A. No. I just placed my hand over my ear. Like the palm of my hand, I just placed it over my ear. And after the CO told me what he told me, I just sat down and pretty much had to grind it out until I was able to be saved.
Q. When were you seen?
MR. BEASLEY: Objection. Form.
A. I want to say -- I can't recall, but I want to say maybe a day or two after -- I don't know. I would have to go back to the records.
Q. Once you were awake could you still feel the roach crawling in your ear?





A. Yes, ma'am.
Q. You could feel it crawling around in your ear?
A. Yeah, moving -- I just felt it moving.
Q. Was it moving around the entire time until it was flushed out?
A. On and off. On and off. It would be on and off.
Q. So the moving ceased only after it was flushed out; is that correct?
A. I mean, once it was out of my ear, I didn't feel it anymore. That would be -- yeah.
Q. And you said earlier that when the roach was flushed out of your ear you were able to see it. Is that correct?
A. Yes, ma'am.
Q. And it was a fully intact roach; is that correct?
A. Yes, ma'am.
Q. Going back to when you were first awoken due to the sensation of the roach crawling around in your ear, you said you put your palm up to your ear, right?
A. Yes, ma'am.
Q. Did you do anything else?
A. No, ma'am.





Q. Did you try to get it out in any way?
A. No, ma'am.
Q. Did you put anything inside of your ear to try to clear it out?
A. No, ma'am.
Q. I'm going to share my screen with you again and I am going to show you Grievance No. 5368 which is IDOC Bates No. IDOC22. Can you see this grievance?
A. Yes, ma'am.
Q. Is that your handwriting?
A. Yes, ma'am. It's kind of small. Can you zoom in for me?
Q. Yes. Do you recall writing that grievance?
A. Yes, ma'am.
Q. And that was on 7/21/18, so a few days after the roach crawled into your ear?
A. Uh-huh.
Q. I'm going to read what the grievance says. It says "During the late night of 7/18/18 or early morning of 7/19/18 I felt something crawl inside my right ear while I was sleeping. I was awakened by a strange feeling of a bug crawling around inside my ear. I believed it was a roach

because I knew my cell and the cell house has roaches in it. I used a Q-tip trying to kill whatever that was inside my ear and then dig it out to no avail." Do you recall writing that?
A. Yes, ma'am.
Q. So you did in fact try to take it out of your ear; is that correct?
A. No. I never -- when it happened I never tried to take it out. I just put my hand over my ear.
Q. Why did you wrote this in the grievance then?
A. I can't recall.
Q. But you did just tell me this is your handwriting, right?
A. Yes, ma'am.
Q. And you do recall filing this grievance?
A. Yes, ma'am.
Q. But you're saying this sentence that you wrote, "I used a Q-tip trying to kill whatever that was inside of my ear and dig it out to no avail" is inaccurate?
A. No. I just put my hand over my ear.
Q. Help me understand. Why did you wrote this in the grievance if it didn't occur?
A. Well, again, it happened so long ago. As to





the specifics of what I can remember at this particular time what happened, when it happened I just put my hand over my ear. I was in a panic, put my hand over my ear, I called Dr. Hill, and that's what I remember happening at this time.
Q. Did you let anybody know, once you were seen by a medical professional, that you had inserted a Q-tip into your ear?
A. Not that I can recall.
Q. Have you ever inserted a Q-tip into your ear before July 18th of 2018?
A. No, not that I can recall.
Q. Do you own Q-tips?
A. No. I'm pretty sensitive to anything being put in my ears, so I don't -- to clean my ears I use a towel. But to answer your question flat out, no, I don't own any Q-tips.
Q. Did you ever own Q-tips while at Stateville?
A. No, ma'am.
Q. Did any of your cell mates ever complain of roaches in the cell?
A. Yeah.
Q. Did they ever ask a CO in your presence to have





the cell exterminated?
A. Yeah, I can say -- I can remember Mr. Parham asking.
Q. Have you ever been bitten or injured by a bug in the past?
A. No, not that I can recall.
Q. Has a bug ever crawled into any of your orifices in the past?
A. No, ma'am.
Q. I want to talk about your left ear now. So my understanding is that you are completely deaf in in your right ear; is that correct?
A. Yes, ma'am.
Q. And you have some hearing in your left ear but you require a hearing aid?
A. Yes, ma'am.
Q. When did your hearing in your left ear begin to deteriorate?
A. I can't recall. I was diagnosed -- I can't recall.
Q. In your Complaint it says that you experienced depression and anxiety as a result of your hearing loss; is that correct?
A. Yes, ma'am.





Q. Do you remember when the depression and anxiety started setting in?
A. It was after the incident.
Q. How long afterwards?
A. I can't put a specific time on it, but I just knew I started to feel -- I started to feel different.
Q. Was there a death in your family around that same time period?
A. No. No, not that I can recall.
Q. Do you recall when your grandparents passed away?
A. I think it was the beginning of -- I want to say the beginning of 2018, February, March. I think it was in March of 2018 if I'm not mistaken.
Q. Were you close to your grandparents?
A. Yes, ma'am.
Q. Did that cause you to have emotional distress that they passed?
A. Yeah. I was pretty hurt. I was pretty hurt behind it.
Q. So your right ear, which is the one that the roach crawled into, once the roach was flushed

out of it, were you experiencing any sensations in the ear?
A. Yes, ma'am.
Q. What did you feel in it?
A. Just the ringing. Yeah, the ringing.
Q. Do you remember how long that lasted?
A. No, I don't remember.
Q. And did you have any ringing in your left ear?
A. No, not at that time.
Q. Did you start experiencing pain in your right ear at some point?
A. Yes, ma'am.
Q. When did that start occurring?
A. I want to say maybe a few -- maybe a week, five, six days after the incident.
Q. And did you report that?
A. I want to say I did.
Q. Were you seen by a medical professional?
A. I can't recall.
Q. Why don't you tell me what you can recall about your experience following the roach crawling in your ear.
MR. BEASLEY: Objection. Form.
A. Well, what I can recall is me putting in to see





the nurse or putting in to see the doctor. It taken them a couple days before I get called over to actually get the roach flushed out of my ear. I can recall after the roach was flushed out of my ear I started to experience certain things; ringing, pain, muffled. And I put in -- I continued to put in to see the nurse about these issues, and it was just a prolonged situation. I was very panicked, I was very -- it was very urgent for me to get the medical treatment that I needed. So that was pretty much all I can recall. I put in to see the nurse or see the doctor.
Q. Would it be correct to assume that the muffled hearing never improved after the roach incident? Or strike that. Let me rephrase. Did your hearing ever stop being muffled after the initial onset of that symptom?
MR. BEASLEY: Objection. Form.
A. Did it ever stop being muffled after the incident?
Q. Yes.
A. No, it never stopped being muffled.
Q. Were you in July of 2018, maybe in August of





2018 as well, were you experiencing any hearing issues in your left ear?
A. No, not that was -- not that I can notice at that particular time, no.
Q. When did you start noticing hearing issues in your left ear?
A. Well, to be honest, once I was given the evaluation, that's when I was informed that it was a problem. But as far as my hearing is concerned, as far as anything else, that's when I was informed about the hearing part of my left ear evaluation.
Q. So prior to the evaluation you did not know that you had hearing issues in your left ear?
A. I just felt, like I said, it was just a muffled sound. It wasn't nothing that was quite noticeable to me at that particular time. You know, dealing with what was going on in my right ear, that's really where my focus was at at that particular time. But after I had the evaluation, I was informed otherwise.
Q. I understand. I guess what I'm trying to ask is before the evaluation, regardless of when the roach incident happened, did you at any time





notice that the hearing in your left ear was not what it should be?
A. It was just a muffled sound, if you can -- yeah, it was just muffled.
MR. BEASLEY: For the court reporter there, Tim and I were talking over one another, but I just had a form objection. Thank you.
Q. Maybe I'm just not asking this in a manner that makes sense. I'm trying to understand when -- because what you're telling me is that you did notice that there was muffled hearing in your left ear at some point, right? Is that correct? Or am I misunderstanding?
A. No, that's correct. You're correct on that.
Q. At what point did you independently notice the muffled sound?
A. Oh, it was after -- it was maybe a couple of months after the incident, give or take.
Q. So prior to the incident there was no muffled sound in your left ear; is that correct?
A. Correct.
Q. Prior to the incident did you ever experience a muffled sound in your right ear?

A. No, not that I can recall.
Q. Have you ever had an ear infection in either one of your ears?
A. No. Not that I can recall, no. What I've been -- no, not that I can recall. Whatever I've been diagnosed with, I leave that up to the doctors. I don't know what they diagnosed me with. But I can't recalling having an ear infection.
Q. Have you ever seen exterminators at Stateville?
A. Yes, ma'am.
Q. On the occasions when you have seen exterminators there, did you ever stop a CO and ask to have the exterminator stop in your cell while they were there?
A. Yes, ma'am. I can say I did, yes, ma'am.
Q. Which CO did you ask?
A. CO Shepherd.
Q. And you asked him that while an exterminator was present?
A. Once, yeah.
Q. And what happened?
A. He told me that I had to put a work order in, or he had to put a work order in for me. He





couldn't just stop them when they come to the cell house. They come for specific cells, and they can't just come to my cell when I call. I guess they got to put a work order in for me.
Q. Have you ever heard if any other inmate ever had their individual cell exterminated?
A. Yeah. I've seen them exterminate, yes.
Q. You've seen other people's cells being individually exterminated?
A. Yes, ma'am.
Q. Have you ever spoken to any of those people about their cells getting exterminated?
A. No, ma'am.
Q. Is there any reason that you can think of that your cell wouldn't be exterminated but other people's would be?
MR. BEASLEY: Objection. Form.
A. No, there's no reason that I can think of why that would happen.
Q. I'm just checking my notes. Is CO Shepherd the only correctional officer you recall complaining to about the roaches in your cell?
A. Yeah. That I can recall, yes, ma'am.
Q. So you've never asked another CO to have your





cell individually exterminated?
A. Not while in Delta house.
Q. And do you recall how many times you requested this of CO Shepherd?
A. More than three or four times.
Q. Is he the only CO that supervises Delta house?
A. He doesn't -- no, he's not the only one that supervises Delta house.
Q. What other COs were also present at Delta house during this time?
MR. BEASLEY: Objection. Form, foundation.
A. I can't recall.
Q. You don't remember seeing any other COs at Delta house at this time in July of 2018?
A. Yes, I saw a lot of them, but I can't recall which ones.
Q. But you do recall CO Shepherd?
A. Yes, ma'am.
Q. Is there a particular reason you remember him?
A. Because he was the CO that was assigned to my particular gallery and my housing unit.
Q. Were there no other COs assigned to that gallery?





A. Not at that time, no, ma'am.
Q. What about when CO Shepherd was at home or sleeping?
A. Yeah, a lot of COs assigned -- when he's not there, when he wasn't there at that time, around that time there was other COs assigned to the gallery. I just can't recall which ones it was.
Q. And you never said anything to any of them about the roaches in your cell; is that correct?
A. That's correct.
MS. MALLORY: I don't have any other questions.
MR. BEASLEY: Okay. I have some questions that I would like to cover. Are you guys good to go ahead with those now or would you like to take a short break?
MS. MALLORY: You can go ahead with them.
MR. EMMERT: I'm good.

CROSS-EXAMINATION

BY MR. BEASLEY:
Q. This is my first time sharing documents on the Webex platform, so you guys will have to bear with me if I hit a few bumps along the way.

Mr. Moore, I already introduced myself for the record, but just to be on the safe side, I'm Luke Beasley. We obviously met before. I just have a few questions about some of the subjects that you were asked to testify about earlier today. Okay?
A. Okay.
Q. First of all, do you remember when Mr. Emmert asked you about the date on a document -- well, my screen share is already not working it seems, so let's try again. Now it should pop up. I'm clicking the pdf file. Let's see if this works. Is HRVA000952 showing on your screen, Mr. Moore?
A. Yes, sir.
MR. BEASLEY: And Elizabeth, if I can ask, is this the only document that's showing on the screen, I hope?
MS. MALLORY: Yes, it is. It's the only one.
MR. BEASLEY: Thank you very much.
MS. MALLORY: I've got the same concern with mine.
MR. BEASLEY: Yeah. It was three





clicks before it actually started showing what I wanted, so we have to take a leap of faith.

CONTINUED CROSS-EXAMINATION

BY MR. BEASLEY:
Q. Mr. Moore, do you remember when Mr. Emmert asked you about the date on this document earlier this morning?
A. Yes, sir. Can you bring it up for me, make it a little bit bigger for me?
Q. Yes, I can. Is that okay?
A. Yes, sir.
Q. The session date on this document reads August 28th, 2018. Can you see that?
A. Yes, sir.
Q. Now, when Ms. Mallory asked you just a bit ago about the date the cockroach was removed from your ear, you testified that that was in July of 2018. Do you remember that?
A. Yes, sir.
Q. Does that make the date on this document that I'm showing you about one month after the cockroach was removed from your ear?
A. Yes, sir.





Q. By this point, August 28th, 2018, had you completely lost your hearing in either your right or your left ear?
A. I can't recall.
Q. So this is one month after the cockroach was removed from your ear?
A. No, no. No, it wasn't.
Q. By this point in August of 2018 had you received a hearing aid from anyone?
A. No.
Q. I'm scrolling down to Part 3 which is called the SOAP note. Can you read the text in Part 3, Mr. Moore? Are you able to read that?
A. A little bit. It's still small.
Q. I'll make it a little bit bigger. How about now?
A. Yeah, I can get it now.
Q. So starting at the far right side of the first line, it reads "Inmate stated 'I'm embarrassed to wear my hearing aid because it messes up my swag.'" Do you see that?
A. Yes, sir.
Q. I just ask the question again for clarity. By August of 2018 you had not received -- well,





strike that. By August 2018 had you received a hearing aid from anyone?
A. No, sir.
Q. So to return to the question that Mr. Emmert was asking you earlier today, does what we have just talked about help refresh your recollection as to whether you think this date is accurate on the document?
A. Yes, sir. It's not accurate at all.
Q. Let me stop sharing this if I can. Mr. Moore, you remember -- moving to a different topic, you remember this morning when you were asked some questions by Mr. Emmert about refusing medical services at Stateville?
A. Yes, sir.
Q. If you refuse medical services at Stateville, is there any procedure that you're asked to follow?
A. Yes, sir.
Q. What is that procedure?
A. You have to sign. You have to sign a refusal saying -- stating that you refused treatment.
Q. In the few examples that Mr. Emmert showed you earlier today where the records suggested that

you had refused medical treatment, did you see your signature on any of those forms?
A. No, sir.
Q. Can you recall other instances, Mr. Moore, where you did sign a form indicating that you refused medical services?
A. Yes, sir. It was maybe one year, because I never take the flu vaccine, so I may have signed one of those particular sheets refusing to take it. And the COVID, I just refused to take a COVID test a couple of months back and I signed that. I had to sign that as well.
Q. Mr. Moore, just a little bit ago Ms. Mallory asked you some questions about a grievance that indicated -- one of your grievances that indicated you attempted to use a Q-tip to remove a cockroach from your ear. Do you remember that questioning?
A. Yes, sir.
Q. You testified, Mr. Moore, that the cockroach crawled into your ear sometime in July of 2018. Do I have that correct?
A. Yes, sir.
Q. Is that about two and a half years ago?





A. Yes, sir.
Q. Do you remember every single detail about events that happened two and a half years ago?
A. No, sir.
Q. Mr. Moore, is it possible that you did use a Q-tip to try to remove the cockroach from your ear in July of 2018 but that sitting here today you don't remember doing so?
A. Yes, sir. That's possible.
Q. In general, Mr. Moore, do you believe that your grievances are an accurate reflection of what you recalled about --
A. (Interrupting) You have broke up for a second there.
Q. I sometimes lean away from my computer. In general, Mr. Moore, do you believe that your grievances are an accurate reflection of what you recalled about a particular incident when you filled out that grievance?
A. Yes, sir.
Q. Is there any reason you would not represent as accurately as possible what happened in one of your grievances?
A. Just maybe me just not remembering specifically





the details.
MR. BEASLEY: Thank you, Mr. Moore. That's all the follow-up that I have. Anything else from anyone?
MR. EMMERT: Yeah, I have a couple briefly.

REDIRECT EXAMINATION

BY MR. EMMERT:
Q. Mr. Moore, I'm going to go ahead and share my screen with you again. Mr. Moore, can you see my screen?
A. Yeah, I can see it.
Q. And you can see the document Bates stamped HRVA486?
A. Yes, sir.
Q. Is that correct?
A. Yes, sir.
Q. I'll zoom in, and it looks like this is a visit -- you see your name up at the top here with your inmate ID number?
A. Yes, sir. Whom I speaking with, sir?
Q. This is Jordan Emmert.
A. Okay.
MR. BEASLEY: Are you able to see him





on your screen, Tim?
THE WITNESS: No, sir. I see Mrs. Mallory's name keep coming up when he speaks.
MS. MALLORY: I'll mute myself so that doesn't happen.
MR. BEASLEY: Sorry to interrupt.
MR. EMMERT: No, you're good.

CONTINUED REDIRECT EXAMINATION

BY MR. EMMERT:
Q. Going back to this document, Mr. Moore, it looks like it's dated August 11th, 2018; is that correct?
A. Yes, sir.
Q. Would you agree with me that you had a nurse visit on August 11th of 2018 if that's what this record shows?
A. Yeah. If that's what the record shows, yes, sir.
Q. Now, your counsel just asked you a couple of questions about the process by which you refuse treatment at Stateville. Do you remember that?
A. Yes, sir.
Q. And you indicated that they ask you to sign a

refusal form if you are refusing treatment. Is that correct?

A. Yes, sir.

Q. Do you also remember testifying earlier today about the flu vaccine; that you refused to sign a refusal form as it related to refusing a flu vaccine?

A. Yes, sir.

Q. So you started to say that you don't always sign a refusal form when you refuse medical treatment. Is that correct?

A. It's fair to say that that's the requirement. If you want to refuse, they would like for you to sign to refuse. If you don't sign it, they will state that you refuse to sign the refusal.

Q. Going back to a question that I asked earlier, I just want to make sure that we're clear. So, you included every instance of wrongdoing you are claiming the medical defendants engaged in with respect to your medical treatment in your First Amended Complaint, correct?

MR. BEASLEY: Objection. Asked and answered. Mischaracterizes the witness's prior testimony.





A. Um, as of now.

MR. EMMERT: That's all I have.

MR. BEASLEY: Anything further from you, Elizabeth?

MS. MALLORY: I don't have anything else.

MR. BEASLEY: I think that's all the questions for today then.

MR. EMMERT: Are you going to waive or reserve?

MR. BEASLEY: Yeah, we'll reserve. We'll read and sign.

(The deposition of this witness came to a close at 2:05 p.m.)





ERRATA SHEET

I, the undersigned, Timothy Moore, do hereby certify that I have read the foregoing deposition taken on the 20th day of January, 2021, and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below.)

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| 10 | 17 | Change Antibiotics to EarWax solution. | |
| 123 | 17 | Change the word "saved" to "seen". | |

Signature



CORRECTIONS TO DEPOSITION

The witness, Timothy Moore, states he/she wishes to make the following changes in testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Signature Date 2-3-21

CERTIFICATE OF SHORTHAND REPORTERS

We, Angela Oldenburg and Deb Fisher, Certified Shorthand Reporters in and for the State of Illinois, do certify that, pursuant to the agreement hereto annexed, there came before us via Webex videoconference on the 20th day of January, 2021 at 9:30a.m., the following-named person, to wit: Timothy Moore, who was by us duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that he was thereupon examined on his oath and his examination reduced to writing under our supervision; that the deposition is a true record of the testimony given by the witness and that the reading and signing of the deposition by the said witness were expressly waived.

We further certify that we are neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that we are not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

We further certify that our certificate annexed hereto applies only to the signed and certified transcripts. We assume no responsibility for the accuracy of any reproduced copies not made under our control or direction.

Dated this 23rd day of January, 2021.

______________________________
Certified Shorthand Reporters
922 North Lyford Road
Rockford, Illinois
(815)226-9755
License No. 084-3196
License No. 084-1054