# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Timothy C. Moore,

    *Plaintiff,*

v.

Wexford Health Services, Inc., *et. al*,

    *Defendants.*

No. 19 CV 3892

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

In this suit regarding his medical care while incarcerated in Stateville Correctional Center, Plaintiff Timothy Moore alleges Eighth Amendment deliberate indifference due to serious medical need and state medical malpractice claims against the medical provider at Stateville, Defendant Wexford Health Sources, Inc. ("Wexford"), as well as the medical professionals who treated him: nurse Dawn Cetta ("Cetta"), physician assistant La Tanya Williams ("Williams"), and Dr. Marlene Henze ("Henze") (collectively, "Defendants"). [Dkt. No. 56.] Before the Court is Defendants' motion for summary judgment. [Dkt. No. 156.] For the reasons below, the motion is granted in part and denied in part.

Summary judgment is granted in favor of Defendants on Count Three for deliberate indifference and Count Five for medical malpractice as to Cetta only; on Count Four for *Monell* liability based on Wexford's "collegial review" policy; and on Count Seven for institutional negligence against Wexford. Summary judgment is otherwise denied. The claims that remain to be tried are Counts Three and Five as to Williams and Henze for deliberate indifference and medical malpractice; and Count Six against Wexford through *respondeat superior*.

1

## I.    Factual Background

### A.    The Parties

Plaintiff Timothy Moore is a prisoner currently incarcerated at the Illinois Department of Corrections, Menard Correctional Center. [Dkt. No. 160 at ¶ 1.] During the events of this case, Moore was incarcerated at Stateville Correctional Center ("Stateville"). [*Id.* ¶ 2.] Wexford is the medical care provider that employs medical professionals who treat Stateville inmates. [*Id.* ¶¶ 17, 20.] Cetta is a registered nurse who used to work at Stateville and treated Moore on July 20, 2018. [*Id.* ¶ 3.] Williams is a board-certified primary care physician assistant working at Stateville who treated Moore on August 15, 2018, September 24, 2018, October 31, 2018, November 26, 2018, and November 18, 2019. [*Id.* ¶¶ 20, 39, 48, 53, 93.] Henze is a board-certified family medicine physician who has served as the Medical Director at Stateville since October 8, 2018. [*Id.* ¶ 64.]

### B.    Timothy Moore's Medical Condition and Initial Medical Care

On July 18, 2018, while incarcerated at Stateville, Moore was awakened by a tingling feeling in his ear. [*Id.* ¶ 2.] When he felt something moving in his ear, Moore tapped the side of his face, put his palm up to his ear, and called for a correctional officer to call for a nurse. [*Id.*] The correctional officer told Moore to sign up for sick call and Moore did so. [*Id.*]

Moore was seen two days later by Cetta. [*Id.* at ¶¶ 2, 6.] According to Cetta's note dated July 20, 2018, Moore told Cetta that he needed his ear washed out. [*Id.* ¶ 6.] Cetta noted "R ear noted with foreign object in canal," meaning she physically

2

examined his ear and saw an object inside it. [*Id.*] Cetta noted "[e]ar lavage performed and foreign object flushed out," indicating that she performed an ear flush and removed an object she could not identify. [*Id.*] The parties agree that the "foreign object" was a cockroach. [*Id.* ¶ 2.] Cetta asked Moore if he had any other issues. [*Id.* ¶ 10.] Moore indicated that he did not, leading Cetta to write "[n]o further complaints verbalized." [*Id.*]

Approximately one hour later, Moore testified that his hearing out of his right ear became muffled at a scale of ten out of ten. [*Id.* ¶ 15.] Four to seven days later, Moore testified that he started to hear a ringing in his right ear. [*Id.*] To report his new symptoms, Moore filed a formal grievance on August 3, 2018. [Dkt. No. 161-1 at 2.] Moore complained that he was experiencing "an irritating pain and hearing loss" in his "right ear" for "about a week" and requested to "see a doctor as possible."[1] [*Id.*] This was Moore's first complaint of hearing loss and pain in his ears at Stateville.

On August 11, 2018, Moore reported for a sick call and an unidentified medical provider filled out an "Offender Outpatient Progress Notes" worksheet to document Moore's reported symptoms.[2] [Dkt. No. 160 at ¶ 19; Dkt. No. 160-8 at 41.] Moore complained of a right earache, a headache with throbbing or crushing pain in his

---

[1]     Williams and Henze testified that they did not review any of Moore's grievances and were not involved in the grievance process. [Dkt. No. 160-5 at 20; Dkt. No. 160-6 at 19.]

[2]     While Cetta, Williams, and Henze's names appear on many of Moore's medical notes, other nurses and medical providers also spoke with Moore during various sick-call encounters. The parties have not identified these individuals and the Court is unable to decipher their signatures. When possible, the Court identifies medical professionals by name and otherwise refers to them by title alone.

3

temples, and blurry or double vision with no reported history of similar episodes. [Dkt. No. 160 at ¶ 19.] He was thereafter referred to see a medical provider, per the note indicating "[r]efer to MD 8/15/18." [*Id.*]

### C. Moore's August 15, 2018 Visit with Williams

Moore was seen a total of five times by Williams, including four visits in 2018 and a fifth visit in 2019. [*Id.* ¶¶ 20, 39, 48, 53, 93.] Williams does not independently remember any of the visits with Moore and relied exclusively on the medical records to discuss Moore's condition at her deposition. [*Id.* ¶ 20.]

Williams first saw Moore for a medical appointment on August 15, 2018. [*Id.* ¶ 20.] Moore remembers that at his August visit, his hearing from his right ear was "muffled" and ringing, and his pain was at a ten out of ten scale. [*Id.* ¶ 37.] Per Williams, Moore did not state that he was in pain. [*Id.* ¶¶ 35, 37.] Prior to the visit, Williams reviewed Cetta's July 20th note and the August 11th "Offender Outpatient Progress Notes." [*Id.* ¶ 36.]

At her deposition, Williams discussed her general practices for treating patients. [*Id.* ¶¶ 21–23.] When asked how she conducts ear exams, Williams testified that she begins by examining the heart and lungs, lymph nodes, mouth, nose, and the external portion of the ear. [*Id.* ¶ 22.] Next, she performs an external evaluation of the ear to look for any signs of swelling, redness, or any discharge or obstruction. [*Id.*] After checking for external signs of distress, Williams looks at a patient's internal ear using an otoscope, an instrument used to visually examine the inside of the ear. [*Id.*] When asked how she tests a patient who complains of hearing loss,

Williams testified that she conducts a "gross evaluation" of the patient's hearing. [*Id.*] Williams testified that she would note whether the patient's "gross hearing" is intact by either placing the patient about fifteen to twenty feet away from her, "call" the patient, and noting whether the patient seemed to have any problem hearing her, or by talking to the patient and observing whether he appeared to understand her. [*Id.* ¶¶ 22–23.]

When asked about her medical documentation procedures, Williams testified that when a medical record that she completed includes the acronym "HEENT" (a reference to head, eyes, ears, nose, and throat), that indicates that Williams visually inspected the patient's ears both with and without an otoscope. [*Id.* ¶ 21.] Williams testified that her typical practice would be to document positive findings, including physical findings such as redness, swelling, discharge, or a red or retracted eardrum. [*Id.* ¶ 22.] She also indicated that she can alternatively find "positive negative findings" or "pertinent negative findings," which is "important to note for a particular complaint that a patient may have or have had in the past." [*Id.*] If there are "positive findings" after conducting an ear exam that may be contributing to hearing loss, Williams said she would not perform any other type of hearing assessment and would instead treat whatever "positive finding" she detects in the ear. [*Id.* ¶ 23.]

At her deposition, Williams testified about her August 15, 2018 note concerning her first visit with Moore. [*Id.* ¶ 30.] The note read:

> PA note. 31-year-old African American male referred from RN Sick Call with complaint of headaches and double vision. Patient denies double vision but states they burn at gym, law library, water and itching -- that should be watery, watery and itching . . . States headaches temples,

> sharp one to two times -- one to two times weekly, WKLY, that's weekly, onset times two months. I run four miles on yard, off and on numbness, tingling after. Right ear muffled, rings off and on. No new stresses . . . In general the patient was well developed, well nourished, no acute distress, alert and oriented times three, heart and lungs were within normal limits, HEENT, head, eyes, ears, nose and throat, the nasal turbinates were congested bilaterally. My assessment or diagnosis was allergic rhinitis.

[*Id.*] Williams testified that she must have examined Moore's head, eyes, ears, nose, and throat due to the "HEENT" notation. [*Id.*] Based on the absence of any "positive findings" in her note, Williams testified that she found no sign of infection in either ear, observed both ear drums were intact, and did not perceive Moore to be in any extreme pain. [*Id.* ¶¶ 32, 34.] Williams further testified that she conducted a "gross assessment" of Moore's hearing at the August appointment but did not conduct any further formal testing of Moore's hearing. [*Id.* ¶ 33.]

Based on her note, Williams diagnosed Moore with allergic rhinitis (that is, an allergic reaction that is more commonly known as seasonal allergies), due to Moore's complaints of watery, itchy, and burning eyes, headaches, and congested nasal turbinates (the small structures inside the nose). [*Id.* ¶ 31.] Williams additionally testified that allergic rhinitis may have explained Moore's complaint of muffled hearing and on and off ringing in his right ear. [*Id.* ¶ 34.] Specifically, Williams testified that headache, muffled hearing, and ringing in the ear can be associated with a variety of conditions, including upper respiratory tract infection, such as a cold, sinusitis, allergic rhinitis, eustachian tube dysfunction, or an ear infection. [*Id.* ¶ 29.] Williams noted that dizziness, nausea, and a feeling that the room is spinning are also associated with sinus infections, allergies, and inner ear infections. [*Id.*]

Williams referred Moore to optometry for his complaint of double vision, prescribed Claritin, ophthalmic drops, and Tylenol, and instructed Moore to return to the clinic in one-month for a follow-up visit. [Dkt. No. 160 at ¶ 35.]

### D. Moore's September 24, 2018 Visit with Williams and October 8, 2018 Grievance

On September 24, 2018, Williams saw Moore for a second time to follow up on his August visit. [*Id.* ¶ 39.] Moore recalls that for his September visit, his right ear was muffled, he heard ringing, and that his pain level remained at a ten out of ten. [*Id.* ¶ 45.] In her note documenting Moore's September visit, Williams wrote:

> PA Note. 31-year-old African American male for follow-up. States he's noticed no improvement other than the Tylenol helped with headache. Still muffled sensation. Under my Objective: In general, well developed, well-nourished . . . no acute distress, alert and oriented times three. Heart and lungs were within normal limits. Sinuses were noted within normal limits. There was no tenderness noted for the sinuses. HEENT, once again, the nasal turbinates were noted to be boggy and congested bilaterally. My Assessment was at this time, No. 1: Allergic rhinitis versus sinusitis?

[*Id.* ¶ 39.] Based on her note and notation of "HEENT," Williams testified that she visually inspected Moore's ears with and without an otoscope, did not observe any signs of infection, noted that both ear drums were intact, and observed that Moore did not appear to be in extreme pain. [*Id.* ¶ 40.] Williams testified that she did not conduct any hearing assessment because she believed it would have been inappropriate. [*Id.* ¶ 41.] Specifically, Williams reasoned that because Moore's symptoms stemmed from the "ears, nose, and throat," resolving the allergic rhinitis would resolve "the cause of the muffled sensation" Moore was experiencing. [*Id.* ¶¶ 41–42.] Williams noted that it was "not practice" to simultaneously treat allergic

rhinitis and to test a patient's hearing because allergic rhinitis might impact the hearing test's outcome. [*Id.* ¶ 42.]

Williams testified that by this point, she began to question whether Moore had allergic rhinitis or instead had sinusitis (inflammation of the tissue lining of the sinuses), which is treatable with antibiotics. [*Id.* ¶ 43.] Williams testified that muffling or pain in the ears, headaches, vertigo (or dizziness), ringing, or hearing loss can be symptoms of sinusitis, and blurred vision can be a symptom of allergic rhinitis. [*Id.* ¶ 58.] Accordingly, Williams prescribed both a ten-day course of antibiotics for the sinusitis and Zyrtec and Nasacort for the allergic rhinitis. [*Id.*] She scheduled Moore for a follow-up visit on October 24, 2018. [*Id.*] Williams testified that nothing about the September visit made her believe that Moore was suffering an urgent medical condition. [*Id.* ¶ 44.] On October 8, 2018, Moore filed a second formal grievance, complaining of "dire" pain and hearing loss in his right ear and requesting "proper medical treatment *i.e.*, hearing test and a[n] MRI." [Dkt. No. 161-11 at 2–3.]

### E.   Moore's October 31, 2018 Visit with Williams

On October 31, 2018, Williams saw Moore for a third time. [Dkt. No. 160 at ¶ 48.] Moore remembers that by his October appointment, the muffling in his right ear had worsened so that he could barely hear out of it. [*Id.* ¶ 52.] Moore also started to experience muffling in his left ear at a five of ten level. [Dkt. No. 160-2 at 75–76.] In her note documenting the October visit, Williams wrote, in relevant part:

> PA Note. 31-year-old African American male on MD Sick Call follow-up.
> Sinuses better but right ear still muffled . . . Objective: General, well-developed, well-nourished, no acute distress, alert, and oriented times three . . . H and L, heart, and lungs within normal limits. HEENT, head,

eyes, ears, nose and throat, right frontal sinuses, decreased transillumination.

[Dkt. No. 160 at ¶ 48.] As before, based on her notation of "HEENT," Williams testified that she visually inspected both of Mr. Moore's ears with and without an otoscope, found no signs of infection in either ear, observed that both ear drums were intact, and did not believe that Moore was in extreme pain. [*Id.* ¶ 49.] Williams testified that based on her conversation with Moore, she did not observe "any gross hearing loss." [*Id.*] Williams testified that the notation "frontal sinus decreased transillumination" meant she held a light source to Moore's frontal sinus area. [*Id.* ¶ 50.] Because Moore's sinuses did not flare as they should, she concluded that Moore had a sinus infection and she diagnosed sinusitis. [*Id.*] According to her testimony, a symptom of sinusitis may be muffled hearing. [*Id.*] Williams prescribed a stronger antibiotic designed to treat sinusitis and Motrin, and scheduled Moore for a follow-up visit in three weeks. [*Id.* ¶¶ 51–52.] As before, Williams testified that based on Moore's complaints, she did not believe that he was suffering from an urgent medical condition. [*Id.* ¶ 49.]

### F.    Moore's November 26, 2018 Visit with Williams

On November 26, 2018, Williams saw Moore for a fourth time. [*Id.* ¶ 53.] Moore recalls that at his November visit, his right ear had a muffling sensation at a ten of ten level and his left ear at a five of ten. [Dkt. No. 160-2 at 81–83.] In her note documenting the November visit, Williams wrote:

PA Note. 31-year-old African American male on MD Sick Call for follow-up right ankle. "It's getting better, still can't hear out of right ear." Denies trauma. It started after I had my ear flushed in July. I thought

9

> it was my sinuses or infection. "It's muffled." No pain . . . General assessment of the patient. Patient well developed, well-nourished, no acute distress, alert and oriented times three. Heart and lungs as well as lymph nodes within normal limits. HEENT decreased auditory acuity noted right ear, bilateral canals were clear . . . Assessment One is: "Decreased auditory acuity." Rule out hearing loss.

[Dkt. No. 160 at ¶ 53.] Much as before, based on her notation of "HEENT," Williams testified that she performed a visual exam of Moore's ears both with and without an otoscope, found no sign of infection, noted that his eardrums were intact, and did not believe that Moore was in extreme pain. [*Id.* ¶ 54.]

Unlike her prior three notes, this time Williams wrote that Moore's bilateral ear canals were clear. [*Id.*] Asked to explain why she noted a "positive negative finding" following this visit but failed to do so in prior notes, Williams testified that the fact that Moore's ear canals were clear was important because it meant that no foreign body was blocking them; to Williams, this indicated that Moore's complaints of hearing loss were due to some other cause, which is why she wrote it down. [*Id.*] Williams explained that her reference to "decreased auditory acuity," or difficulty hearing, prompted her to perform a "finger rub test" to determine whether Moore could hear noise. [*Id.* at ¶ 55.] Williams wrote "rule out hearing loss," to indicate that Moore needed further assessment, including off-site specialty care, to determine if he had hearing loss. [*Id.* ¶ 56.] Williams explained that she referred Moore to the medical director, Henze, to evaluate the hearing loss.[3] [*Id.* ¶ 56.]

---

[3]       Williams testified that, except in the case of an emergency, she cannot directly refer a patient to a specialist and must first refer the patient to a physician at the prison. [Dkt. No. 160 at ¶ 24.]

### G.     Moore's Visits with Henze and Subsequent Treatment

On December 19, 2018, per Williams' referral, Henze saw Moore. [*Id.* ¶ 72.] Henze noted Moore had complained of "hearing loss . . . in the right ear over time, many months." [*Id.*] On performing an ear exam, Henze observed that Moore's ear canals were clear and showed no signs of infection, but his eardrums were "bulging." [*Id.*] Henze believed that Moore "probably" had "some fluid in [his] middle ear," which was likely "due to eustachian tube dysfunction," which can "definitely affect hearing." [*Id.* ¶¶ 72–73.] Henze testified that eustachian tube disfunction "correlates with the allergic rhinitis." [*Id.*] Henze increased Moore's prescribed dose of Nasacort to reduce inflammation and ordered an audioscope hearing test "once available" to assess Moore's hearing dysfunction. [*Id.*]

On January 11, 2019, an unidentified medical provider attempted to conduct an on-site audioscope hearing test but Moore's left ear canal was not visible so the test could not be completed; Moore's ear was flushed the following day. [*Id.* ¶¶ 75, 77.] On February 8, 2019, with his ears now free from obstructions, an unidentified medical provider assessed Moore's hearing by conducting on-site audioscope hearing test. [*Id.* ¶ 77.] Moore was able to hear at all three tone levels tested in his left ear but only at the lowest tone level in his right ear. [*Id.*] Henze testified that these results indicated that Moore needed an audiogram to further assess his hearing. [*Id.* ¶¶ 78–79.] Henze described an audiogram as an off-site "more thorough hearing test" performed by a hearing aid specialist or audiologist where a patient is tested in a soundproof room. [Dkt. No. 160-6 at 50.]

11

For Moore to receive an audiogram, Henze was required to participate in Wexford's "collegial review" process. [Dkt. No. 160 at ¶ 79.] This process requires that the patient be seen by the Stateville Medical Director, who then recommends that the patient receive offsite care by consulting with another Wexford employee for final approval. [*Id.* ¶¶ 24, 64–65.] Henze testified that during her initial training regarding the collegial review process, she learned that inmates do not always tell the truth about their symptoms to receive off-site care. [*Id.* ¶ 65.]

Stateville approved Henze's request for an audiogram on February 26, 2019, but Moore was not seen for the procedure until June 10, 2019. [*Id.* ¶¶ 79–83.] Henze testified that the wait between the approval for the audiogram and the test itself did not contribute to any further deterioration of Moore's hearing because hearing loss is untreatable and patently not an emergency. [*Id.* ¶ 80.] Henze also noted that she had no control over outside providers' schedules. [*Id.* ¶ 82.]

In the interim, on April 3, 2019, Henze saw Moore for a second time. [*Id.* ¶ 81.] Henze assessed Moore as having "persistent effusion bilaterally(?)" and was "grossly hard of hearing." [*Id.*] Henze testified that effusion—or fluid—in the ears is consistent with eustachian tube dysfunction and that her observations did not correlate with the amount of hearing loss Moore complained of. [*Id.*] At that point, Henze held off referring Moore for treatment by an ears, nose, and throat ("ENT") specialist until she received the results of the audiogram. [*Id.*]

On June 10, 2019, hearing aid specialist performed an audiogram on Moore. [*Id.* ¶ 83.] The audiogram indicated that Moore suffered severe hearing loss in his left

12

ear that was treatable with a hearing aid. [*Id.*] Moore's right ear was "dead and unaidable," meaning a hearing aid would not assist with that ear. [*Id.* ¶¶ 83, 87.] After collegial review, Moore received a hearing aid for his left ear. [*Id.* ¶ 87.]

On June 20, 2019, Henze saw Moore for the third time. [*Id.* ¶ 89.] Henze assessed Moore's "[r]ight ear" as "very sore and red" and observed it "draining." [*Id.*] Henze examined the "right ear canal," which she noted was "red, edematous, [and] consistent with otitis external." [*Id.*] By contrast, Henze noted that Moore's left ear was "normal." [*Id.*] Henze noted that it "was painful to get impression made of [Moore's] right ear." [*Id.*] From these symptoms, Henze concluded that the fluid coming from Moore's right ear was unrelated to the fluid she observed in April of 2019. [*Id.* ¶ 90.] Henze diagnosed Moore with otitis externa, or an infection of the outer ear canal, and prescribed antibiotic ear drops. [*Id.* ¶¶ 89–90.] Henze testified that an outer ear infection does not cause permanent hearing loss but can cause temporary hearing loss when it causes the ear canal to close, though Moore's ear canal was not closed. [*Id.* ¶ 90.]

When testifying about Moore's condition, Henze expressed doubts that Moore's hearing was as bad as he described. [*Id.* ¶¶ 73–74, 88, 96–97.] For instance, in describing Williams's note from November 2018, Henze testified that people can pretend that they are not hearing things and that it does not seem possible that a 32-year-old would have the sudden hearing loss. [*Id.* ¶ 97.] When asked whether a prompt hearing test was important to determine the proper course of treatment, Henze noted that when she treated Moore the day before her deposition, he was not

13

wearing his hearing aid but appeared able to hear Henze when she spoke at a low pitch. [*Id.* ¶¶ 73–74.] Henze also pointed out that twenty percent of Stateville inmates had a hearing aid, which is a much higher incidence than the general population. [*Id.* ¶¶ 88, 96.] Finally, Henze testified that she does not believe that Mr. Moore was suffering from sudden hearing loss syndrome because of the very rapid progression of his reported symptoms. [*Id.* ¶ 98.]

On October 9, 2019, an unidentified nurse saw Moore for reports of dizziness, light-headedness, and ear pain. [*Id.* ¶ 91.] Moore was given acetaminophen for pain and instructed to return to see a provider if the symptoms worsened or interfered with daily functioning. [*Id.*] On November 8, 2019, an unidentified nurse saw Moore due to his reports that he was experiencing the sensation of the room spinning, vomiting when he felt dizzy, and ringing in his ears—symptoms (with the exception of ringing in the ear) consistent with vertigo. [*Id.* ¶ 92; Dkt. No. 160-6 at 59.]

On November 18, 2019, Williams saw Moore for the fifth and final time. [Dkt. No. 160 at ¶ 93.] In her note for the September visit, Williams wrote, in relevant part:

> 32-year-old African American male on MD Sick Call complained of puking and dizziness times two months. Left hearing aid, they were unable to make a mold of the right, it was too painful . . . Objective: In general well developed, well-nourished, no acute distress. Alert and oriented times two. Heart and lungs within normal limits. EXT, lumbar spine or L spine with tenderness left side, radiating to the buttocks and posterior thigh. HEENT, right canal red, swelling, colored crust. Neuro exam was within normal limits . . . Assessment: No. 1, ROE, which stands for right otitis external . . . No. 3, hearing loss.

[*Id.*] From these symptoms, Williams diagnosed Mr. Moore with an external ear infection and prescribed a series of medications. [*Id.* ¶¶ 93–94.] On February 11,

2020, an unidentified nurse saw Moore for headaches, nausea, vomiting, dizziness, blurry vision, and diplopia (or double vision). [*Id.* ¶ 95.] The unidentified nurse prescribed Moore acetaminophen and directed Moore to return to sick call if his symptoms did not improve. [*Id.*] Henze said that vertigo (or dizziness) and ringing are symptoms of and associated with ear infections and Meniere's disease, and that she would rely on an ENT to diagnose Meniere's disease. [*Id.* at ¶¶ 97, 99.] Henze testified that she was unaware if Moore was ever referred to see an ENT, but such a referral was not medically necessary. [*Id.* ¶¶ 96–97.] Rather, in her opinion, Moore was not suffering from Meniere's disease. This was because Moore's exams "were more consistent with sinus issues and eustachian tube dysfunction and when he complained of vomiting there was no evidence in the chart that he was suffering from vertigo, and he did not appear as ill as he complained of being." [*Id.* ¶ 99.]

Since 2018 to the time of his deposition in 2021, Moore has suffered intermittent pain and periodic ringing in his right ear and constant pain in his left. [*Id.* ¶¶ 101–102, 106.] At present, Moore cannot hear out of his right ear. [*Id.* ¶ 104.] The pain from his ears causes blurriness in his vision, dizziness, vertigo, nausea, and headaches. [*Id.* ¶ 106.] Moore further testified to feeling embarrassed at being forced to wear a hearing aid in his early thirties. [Dkt. No. 161-8 at 2; Dkt. No. 161-9 at 2.]

## II.    Procedural Background

On June 11, 2019, Moore filed a *pro se* complaint. [Dkt. No. 1, 5.] With the assistance of appointed counsel, Moore later amended the complaint, alleging deliberate indifference due to unsanitary living conditions against certain Illinois

Department of Corrections ("IDOC") defendants (Count One); deliberate indifference due to serious medical need against certain IDOC defendants (Count Two); deliberate indifference due to serious medical need against Defendants Christian Okezie, Lydia Lewandowska, Williams, Cetta, and Henze (Count Three); deliberate indifference due to serious medical need against Defendant Wexford (Count Four); medical malpractice under Illinois law against Defendants Okezie, Lewandowska, Williams, Cetta, and Henze (Count Five) and against Defendant Wexford via *respondeat superior* (Count Six); and medical malpractice under Illinois law for institutional negligence against Defendant Wexford (Count Seven).[4] [Dkt. No. 56, ¶¶ 67–114.]

As part of discovery in this case, the parties hired experts to opine on the medical cause of Moore's hearing loss. Dr. Charles Weingarten ("Weingarten"), a board-certified expert otolaryngologist, testified on Moore's behalf to opine about Moore's treatment. [Dkt. No. 160 at ¶ 107.] While Weingarten explained that there are other potential conditions that may cause hearing loss, like retrocochlear lesion, he concluded that Moore has sudden hearing loss syndrome to a reasonable degree of medical certainty, with the most effective treatment being steroid therapy.[5] [*Id.* ¶¶ 108, 114.] Because Moore first complained of hearing loss in his August 15, 2018 visit

---

[4]    Moore settled with the IDOC defendants as to Counts One and Two. [Dkt. No. 115.] Dr. Christian Okezie and Lydia Lewandowska have since been dismissed with prejudice. [Dkt. No. 135.]

[5]    Weingarten could not conclude whether Moore had a retrocochlear lesion, as Moore has not received a magnetic resonance imaging (MRI) scan, which would show such a lesion. [Dkt. No. 160 at ¶ 108.] Such a lesion which could be treated by surgery, therapy, medication, or nothing at all. [*Id.*] Moore had a computerized tomography (CT) scan, which could have shown a large retrocochlear lesion, but no such lesion was detected. [*Id.* ¶ 111.]

with Williams, Weingarten concluded that it would have been appropriate for Williams to then diagnose Moore with sudden hearing loss, given Moore's lack of history with hearing loss. [*Id.*] Weingarten testified that the standard procedure would be for Moore to be treated within four to six weeks of first complaining of hearing loss. [*Id.* ¶ 112.] Beyond that time period, "the likely benefit [or treatment] is miniscule but possible." [*Id.*] Weingarten explained that, although a patient with sudden hearing loss is most likely to benefit from treatment if delivered within four to six weeks, he would still recommend offering treatment to a patient whose hearing loss dates farther back but "would advise them that the likelihood" of improvement is "miniscule but possible." [*Id.*]

Weingarten opined that the lack of a timely diagnosis and a referral, first for an audiogram and then to an ENT, within four to six weeks after August 15, 2018, precluded appropriate treatment that might have alleviated some or all of Moore's hearing loss, which is now likely permanent. [*Id.* ¶¶ 110, 112.] Weingarten opined that Williams and Henze violated the applicable standard of care for failing to refer Moore to an ENT for evaluation and treatment following their 2018 visits. [*Id.* ¶¶ 110, 115–16.]

Defendants hired Dr. Robert Craig Kern ("Kern"), a professor with a subspeciality in rhinology, or diseases of the nose. [*Id.* ¶ 122.] Kern explained that on April 30, 2021, Henze referred Moore to Dr. Heather Weinreich ("Weinreich") at University of Illinois, Chicago ("UIC"). [*Id.* ¶¶ 121–22.] Henze wrote that the reason for the referral was "'profound R hearing loss' per local audiologist," noting that

17

Moore's "'[h]earing loss' was sudden," and advising Weinreich to check for malingering.[6] [*Id.*] From this, Kern concluded that Moore did not have hearing loss and that it is more likely he is malingering. [*Id.* ¶¶ 124–25.] In Kern's opinion, Henze and Williams did not deviate from the standard of care by failing to order an MRI because there was no documented hearing loss. [*Id.* ¶ 128.] Kern agreed that he could not conclude what level of hearing loss Moore experienced from August of 2018 to February of 2019 or whether his hearing loss was caused by allergic rhinitis or sinusitis because Moore's hearing was not tested. [*Id.*] Kern agreed that sinusitis or allergic rhinitis are consistent with only "mild" hearing loss, whereas Moore's audiogram reveal severe hearing loss. [*Id.*]

## III.  Legal Standard

The Court should grant summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment."

---

[6]     Weinreich's July 1, 2021 note reports that Moore suffered a gradual change in his hearing since the cockroach was flushed from his right ear and "possible malingering but [it was] unclear." [Dkt. No. 160 at ¶ 122.]

*Skiba*, 884 F.3d at 717. In doing so, the Court may not weigh conflicting evidence or make credibility determinations. *See Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Further, the Court must give the nonmovant "the benefit of reasonable inferences from the evidence, but not speculative inferences in [her] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## IV.  Analysis

The parties agree that the claims against Cetta—Counts Three and Five—and the institutional negligence claim against Wexford—Count Seven—should be dismissed. [Dkt. No. 161 at 42 n.13, 46 n.15.] That leaves the following claims for the Court's analysis: (1) whether Williams and Henze were deliberately indifferent to Moore's serious medical condition, thus violating the Eighth Amendment (Count Three), (2) whether Wexford, as a private entity acting as a state actor under color of law, is liable for their constitutionally deficient actions due to its express policy of "collegial review" (Count Four); and (3) whether Williams and Henze were negligent under Illinois medical malpractice law (Count Five)—thereby rendering Wexford liable through *respondeat superior* (Count Six). Each claim is discussed below.

### A.  Standard of Review

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment, and the Supreme Court has interpreted this protection to

require that prison inmates receive adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103–104 (1976) ("[D]eliberate indifference to the serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." (citation omitted)). To determine if the Eighth Amendment has been violated in the prison medical context, the Court performs a two-step analysis. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020). First, the Court determines whether the plaintiff has suffered a serious medical condition—the objective prong. *Farmer*, 511 U.S. at 834; *Goodloe*, 947 F.3d at 1030. Next, the Court considers whether the individual defendant was deliberately indifferent to that condition—the subjective prong. *Farmer*, 511 U.S. at 834; *Goodloe*, 947 F.3d at 1030–31. A plaintiff must also demonstrate that "the violation *caused* the plaintiff injury or damages." *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011) (emphasis in original).

To act with deliberate indifference, the prison medical provider must have a "sufficiently culpable state of mind," meaning the provider knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health. *Goodloe*, 947 F.3d at 1030–31 (citing *Farmer*, 511 U.S. at 834); *see also Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (noting that the provider "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw that inference"). "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886,

894–95 (7th Cir. 2008) (quoting *Collingnon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). "The difficulty is that except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). As such, "[m]ost cases turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." *Id.* While "a risk from a particular course of medical treatment (or lack thereof) is obvious enough" that "a factfinder can infer that a prison official knew about it and disregarded it . . . it can be challenging to draw a line between an acceptable difference of opinion . . . and an action that reflects sub-minimal competence and crosses the threshold into deliberate indifference." *Id.* at 729; *see also King v. Kramer*, 680 F.3d 1013, 1018–19 (7th Cir. 2012) (noting that courts must remain "sensitive to the line between malpractice and treatment that is so far out of bounds that it was blatantly inappropriate or not even based on medical judgment").

In those cases where a lay person may be unable to properly gauge a medical risk, a medical provider's treatment decision must be "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties*, 836 F.3d at 729. State-of-mind evidence sufficient to create a jury question on deliberate indifference includes when a medical provider "persists in a course of treatment known to be ineffective," chooses an "easier and less efficacious treatment without exercising professional judgment," or contributes to "an inexplicable delay in

treatment that serves no penological interest." *Id.* at 729–31 (summarizing caselaw describing circumstantial evidence rising to deliberate indifference).

**B.      Deliberate Indifference as to Williams**

Defendants argue that Count Three should fail as a matter of law as to Williams. [Dkt. No. 159 at 8–32.] Defendants do not challenge that Moore's hearing loss is a serious medical condition (the objective prong), but they argue that there is no genuine issue of fact as to whether Williams acted with deliberate indifference (the subjective prong) and whether Moore's hearing loss was caused by her actions (the causation requirement). *Farmer*, 511 U.S. at 834; *Roe*, 631 F.3d at 864.

1.      *Subjective Prong*

Defendants argue that there is insufficient evidence that Williams knew of, and thereafter failed to treat, a serious medical condition; rather, Defendants urge that Williams exercised proper professional judgment in her treatment of Moore. [Dkt. No. 159 at 8–25.]

On review of the record, a reasonable jury could find that Williams was aware of Moore's hearing loss symptoms but failed to meaningfully treat it. *See Greeno*, 414 F.3d at 654. First, it is safe to say that Williams knew that Moore presented with symptoms of hearing loss as of the first visit. Prior to Moore's first appointment in August 2018, Williams had reviewed Moore's medical records, including Cetta's July 20th note and the August 11th "Offender Outpatient Progress Notes." [Dkt. No. 160 at ¶¶ 19, 36.]  In particular, Williams knew that Moore had been complaining of ear pain, headaches, and blurry or double vision for at least a month. [*Id.* at ¶¶ 2, 6, 10,

19, 36.] Moore had also filed a grievance to that effect in early August and included persistent symptoms of "hearing loss." [Dkt. No. 161-1 at 2]; *see also Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 521 (7th Cir. 2019) (noting that the jury need not credit a prison doctor's testimony that the inmate failed to report his pain when the inmate testified that he was in pain and "filed grievances to this effect").

According to Williams' note regarding the first visit on August 15, 2018, Moore continued to report headaches, double vision, and "[r]ight ear muffled," that "rings off and on." [Dkt. No. 160 at ¶ 30.] Rather than treat his specific symptom of hearing loss, Williams connected Moore's complaints of watery, itchy, and burning eyes, headaches, and congested nasal turbinates to allergic rhinitis and she prescribed him allergy medication. [*Id.* at ¶ 31].

Williams's apparent failure to connect Moore's hearing loss to her diagnosis or prescribed course of treatment continued for several months. In September, Moore reported "no improvement" in his condition, noting "muffling" in his ear and continued pain. [*Id.* ¶ 39, 45.] Despite this, Williams continued to treat Moore with allergy medications and added antibiotics. [*Id.* ¶¶ 53, 58.] She concluded that a hearing assessment "would have been inappropriate," and that "resolving the congestion could address the cause of the muffled sensation" Moore was experiencing, while noting allergic rhinitis "may impact the outcome of a hearing test." [*Id.* ¶¶ 41–42.] Asked whether "allergic rhinitis *typically* cause[d] hearing loss *in just one side of the ear*," Williams would only say that "it absolutely *can* happen." [Dkt. No. 160-5 at 56 (emphasis added).]

23

By October, Moore's hearing remained muffled, but Williams declined to pursue a hearing assessment. [Dkt. No. 160 at ¶ 48.] Instead, she continued with the same course of treatment—antibiotics—even though this plan had not proven effective to treat Moore's hearing complaints. [*Id.* ¶ 51–52.] Williams testified that based on her conversation with Moore, she did not observe "any gross hearing loss," and diagnosed sinusitis, which may include muffled hearing as a symptom. [*Id.* ¶ 49.] It was not until November that Williams documented the need for further assessment and referred Moore to Henze for an evaluation. [*Id.* ¶ 56.]

Defendants ask that the Court credit their explanation that Williams reasonably treated Moore's condition, but on this record, a reasonable jury could question whether Williams actually intended to treat Moore's hearing loss. A reasonable jury might find that Williams "persist[ed] in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 730. More specifically, a reasonable jury could conclude that Williams inexplicably delayed in formally testing Moore's hearing or referring him to an ENT, thereby exacerbating his hearing loss. *Id.* at 731. "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011); *see, e.g., Goodloe*, 947 F.3d at 1031–32 (holding that a three-month delay in referring an inmate to an outside specialist could establish deliberate indifference where the inmate was in substantial pain). Whether delay rises to the level of deliberate indifference depends on how serious the condition is and the ease of treatment. *See Petties*, 836 F.3d at

730; *compare Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (noting that because giving an inmate with gastro-esophageal reflux disease over-the-counter pills was relatively easy, failing to do so for two months created fact question over deliberate indifference); *and Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (concluding that prison provider's refusal to refer patient to a dentist actionable because "a basic dental examination is not an expensive or unconventional treatment, nor is it esoteric or experimental" (internal quotation marks omitted)); *with Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (concluding that inmate did not have a delay claim for a six-day delay in treating his mild cyst infection).

Defendants argue that Williams gave a reasonable explanation for failing to formally test Moore's hearing: despite his reports of muffling and ringing in his ear, Williams found no physical symptoms explaining Moore's apparent hearing loss and testing would be useless while Moore was still congested. [Dkt. No. 159 at 12; Dkt. No. 160 at ¶ 41–42.] While a reasonable factfinder might accept this explanation, it need not do so if the evidence also demonstrates that Williams's reasoning was "internally inconsistent or otherwise implausible on its face." *Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016); *see also Sain*, 512 F.3d at 895 (granting summary judgment to a prison provider because the plaintiff provided "no evidence to show that [the doctor's medical explanation] was a sham or otherwise impermissible").

The Court agrees with Moore that a reasonable jury might find Williams's explanation internally inconsistent, otherwise implausible, or a sham. Williams testified that she failed to formally test Moore's ears in August or September because

she thought that treating his allergic rhinitis would resolve "the cause of the muffled sensation" and therefore, waiting was more prudent. [Dkt. No. 160 at ¶ 41.] Yet, once Moore's allergic rhinitis resolved in October 2018, Williams still did not order any formal hearing test, refer Moore to an ENT, or even refer Moore to Henze for a second opinion. [*Id.* ¶ 48.]

As Moore points out, providers cannot "shut[] [their] eyes for fear of what [they] will learn," which can rise to "a level of knowledge sufficient for conviction of crimes requiring specific intent" and therefore "liability under the eighth amendment's subjective standard." *McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991). While Defendants proffer new reasons for why Williams failed to order formal testing in October, a reasonable jury could conclude that her proffered reasoning for failing to formally test Moore's hearing for four months was, at the very least, internally inconsistent, and at most a "sham." *Sain*, 512 F.3d at 895; *see also Klein v. Wexford Health Sources, Inc.*, 2019 WL 2435850 (N.D. Ill. June 11, 2019) (rejecting defendant doctor's reasoning for declining more aggressive treatment—that he still observed plaintiff's ear bleeding—as post hoc rationalization when there is no record evidence that plaintiff's ear was still bleeding at that point).

This apparent conflict is further supported by Moore's expert. Weingarten testified that Williams's failure to test or refer Moore to an ENT within four to six weeks of his first signs of hearing loss in August of 2018 was a violation of the applicable standard of care. [Dkt. No. 160 at ¶¶ 110, 115–16]; *compare Zaya*, 836 F.3d at 807 (concluding that plaintiff presented sufficient evidence to show that a

reasonable jury could reject the prison doctor's proposed explanation as a sham by, in part, offering expert testimony that the prison doctor violated the applicable standard of standard); *with Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016) (noting that a prison doctor's decision to try two more antibiotics after the first two were ineffective was not deliberate indifference because no expert testified that this chosen course of treatment was a substantial departure from accepted medical judgment); *and Cook v. Wexford Healthcare Servs.*, 2023 WL 1862987 (N.D. Ill. Feb. 9, 2023) (noting in a factually similar case that had the plaintiff had "an expert . . . testify that earlier referral to an ENT could have prevented his hearing loss," perhaps his claim of delay could survive summary judgment).

Simply put, a jury should be allowed to determine whether Williams failed to effectively treat Moore's hearing loss, thereby contributing to an "inexplicable delay" for a testing referral, and ultimately to effective treatment, all of which exacerbated Moore's condition. *See Petties*, 836 F.3d at 729–31; *see also Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000) (treating a serious risk of appendicitis with aspirin created material fact issue of deliberate indifference). Genuine issues of fact exist as to whether Williams acted with deliberate indifference under the subjective prong.

### 2. *Causation*

Defendants also argue that Moore's deliberate indifference claim against Williams fails because Moore has not sufficiently proven causation. [Dkt. No. 159 at 8–25.] Defendants maintain that Moore's hearing loss would not have been prevented

27

if he was referred for an audioscope or audiogram, as they are diagnostic tools, such that any failure to order them was not the cause of any injury. [*Id.*]

To make out a claim for deliberate indifference, Moore must show that the constitutional violation alleged caused him injury or damages. *See Roe*, 631 F.3d at 864. Causation is "typically a question reserved for the jury." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022). When a plaintiff, like Moore, has offered sufficient evidence to infer that delayed treatment harmed an inmate, "summary judgment on the issue of causation is rarely appropriate." *Id.* The Court should grant summary on causation where "a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury." *Id.* (citing *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010)). But "expert testimony that the plaintiff suffered because of a delay in treatment" generally satisfies the causation requirement and qualifies as verifying medical evidence. *Gayton*, 593 F.3d at 624 (citing *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008)).

With these standards in mind, Moore has offered sufficient evidence from which a reasonable jury might infer that delayed treatment caused him harm. *Stockton*, 44 F.4th at 615; *Gayton*, 593 F.3d at 624. Weingarten concluded to a reasonable degree of medical certainty that Moore has sudden hearing loss syndrome, with the most effective treatment being steroid therapy within four to six weeks of the first signs of hearing loss. [Dkt. No. 160 at ¶¶ 108, 114.] Weingarten opined that because Moore complained of hearing loss at his August 15, 2018 visit with Williams, it would have been appropriate for her to then diagnose Moore with sudden hearing

28

loss, given his lack of history with hearing loss. [*Id.* ¶ 109.] Weingarten thus concluded that the delay in a timely referral for an audioscope, and later an audiogram, precluded appropriate treatment that could have alleviated some or all of Moore's hearing loss. [*Id.* ¶ 110.]

This evidence is sufficient to infer that the delay itself, specifically the delay in testing and subsequent diagnosis, harmed Moore, namely by precluding appropriate treatment and further progression of his hearing loss. *Stockton*, 44 F.4th at 615. This conclusion is further supported by evidence of Williams's (and Henze's) refusals to test Moore's hearing, further exacerbating Moore's hearing loss. *See Grieveson*, 538 F.3d at 779 (finding that plaintiff offered sufficient evidence, in the form of medical records, that could lead a jury to infer that the delay in treatment unnecessarily exacerbated his injury).

Defendants' argument that a hearing test, either the audioscope or audiogram, would not have stopped Moore's hearing loss misses the mark.[7] Moore does not argue that those tests *alone* would have prevented his hearing loss; rather, he contends that a hearing test would have shown severe hearing impairment. [Dkt. No. 161 at 13–14.] As Moore points out [*id.* at 14], both experts agree that a hearing test is important to quantifying the level of hearing loss and deciding the best course of treatment, [Dkt. No. 160 at ¶¶ 110, 128]. If Moore was never tested, it was unlikely—if not

---

[7]       The Court rejects Defendants reliance on *Henderson v. Sheahan* as requiring Moore to present expert evidence quantifying, or providing an approximate percentage, of how likely steroid therapy is to effectively treat Moore's sudden hearing loss syndrome. 196 F.3d 839, 843 (7th Cir. 1999). First, Defendants make this argument for the first time in their reply brief. Second, the passage Defendants rely on in *Henderson*, 196 F.3d at 851–52, discussed a plaintiff's future injury claim, which Moore does not make, [Dkt. No. 161].

impossible—that he could ever have been properly treated. Kern's opinion that Moore does not have hearing loss and is more than likely malingering only underscores the genuine issue of material fact regarding causation. [*Id.* ¶¶ 124–25.] Because choosing among these experts would require this Court to engage in a credibility assessment, the Court rejects Defendants' argument. *See Johnson*, 892 F.3d at 893.

## C.  Deliberate Indifference as to Henze

Defendants also contend that the deliberate indifference claim should fail as a matter of law as to Henze, arguing that Moore has offered insufficient evidence to establish subjective deliberate indifference or causation. [Dkt. No. 159 at 25–32.]

### 1.  *Subjective Prong*

Defendants argue that during Henze's three appointments with Moore, she exercised professional judgment in diagnosing and treating Moore's symptoms and therefore, did not act with deliberate indifference towards his serious medical condition. [Dkt. No. 159 at 25–32.] Moore disputes this, arguing that Henze refused to refer him for emergency testing, which could have resulted in effective treatment, because she believed that Moore was exaggerating his symptoms, or malingering. [Dkt. No. 161 at 26–30.] The Court agrees that questions surrounding whether Henze believed that Moore was malingering precludes summary judgment on this issue.

"When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *See Zaya*, 836 F.3d at 805 (emphasis in original). The Seventh Circuit has repeatedly emphasized this point. *See Walker v.*

*Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (concluding that defendant medical providers "have based their refusal to treat [plaintiff's] pain on a good-faith belief that he was malingering, that he was not in pain but was merely trying to get high with the narcotic painkiller, is an issue for the jury"); *Greeno*, 414 F.3d at 655 (observing that "[t]he possibility that [defendant medical providers] did not do more for [plaintiff] because they thought he was malingering and did not really have a severe medical need is an issue for the jury"); *Berry*, 604 F.3d at 442 n.2 (noting that defendant medical providers refusal to alter plaintiff's treatment despite reports that it was not working "might support an argument that [defendant medical provider] believed [plaintiff] was exaggerating his pain, but again, that argument presents at most a factual issue that must be addressed to a jury").

As Moore points out, at the time of Henze's December 2018 appointment, there was ample evidence demonstrating that Moore was suffering sustained hearing loss. Even Henze noted that Moore had reported "hearing loss" in his "right ear" over "many months." [Dkt. No. 160 at ¶ 72.] Yet, Henze repeatedly expressed doubts over Moore's symptoms. Henze testified that people can pretend that they are not hearing things; that Stateville inmates have a higher incidence of needing hearing aids; that she did not think it possible that a 32-year-old, like Moore, would have the sudden hearing loss; and that she did not think he had sudden hearing loss syndrome. [Dkt. No. 160 at ¶¶ 73–74, 88, 96–98.] Henze acknowledged her doubts as recently as her deposition in March 2021, noting that during her most recent visit with Moore, he was not wearing his hearing aid but could seemingly hear her, commenting, "I do

31

have a hard time, if he was so deaf, why wasn't he using his hearing aid. If he is so deaf, why didn't he use his hearing aid yesterday?" [*Id.* ¶ 97; Dkt. No. 160-6 at 86.] When Henze finally referred Moore for outside testing, she specifically asked that the outside provider check for malingering. [Dkt. No. 160 at ¶ 121.] Given her apparent doubts about the veracity of Moore's hearing loss, a jury should be allowed to determine whether the failure to promptly order testing amounts to deliberate indifference. *See Zaya*, 836 F.3d at 805; *Petties*, 836 F.3d at 731.

Apart from her doubts, other evidence demonstrates genuine issues of material fact regarding Henze. For instance, Henze did not refer Moore for off-site treatment by an ENT, or promptly secure an on-site audioscope or off-site audiogram. Rather, she ordered such testing "once available." [Dkt. No. 160 ¶ 73.] While the delay between the time of Henze's February 2019 collegial review request for an audiogram and its eventual scheduling in June 2019 appears to be attributable to scheduling delays on the part of outside providers, *see Benjamin*, 293 F.3d at 1038, the initial delay between Henze's request for an audiogram in December 2018 and Moore being tested in February 2019, arguably is not.

When asked whether receiving an audiogram quickly was an emergency, Henze testified that hearing loss was not an emergency and hearing testing would not stop the progress of hearing loss. [Dkt. No. 160 at ¶ 80.] She also testified that testing was necessary "to determine the level of hearing dysfunction so that she could know what steps to take moving forward." [*Id.* ¶ 73.] This apparent disconnect in Henze's testimony presents an issue for the jury to resolve. *See Petties*, 836 F.3d at

732–33 (noting that a doctor's explanation for failing to order off emergency care was contradictory and therefore, "whether the delay was the result of negligence or deliberate indifference is a question for the jury to decide"); *Miller*, 794 F.3d at 880 (concluding that "a jury would not be irrational to conclude" that defendant medical providers "knew that the plaintiff had a very unpleasant, potentially dangerous, yet readily treatable disease" but "d[id] nothing for two months because they were indifferent to the plaintiff's condition," as evidenced by one defendant stating, "you are not bleeding, you are not dead, you are talking to me, so it can't be an emergency").

A reasonable jury could find that Henze's refusal to order off-site testing under the circumstances, despite Moore's repeated and worsening symptoms, supports a deliberate indifference finding, particularly in light of Weingarten's opinion that Moore should have been referred right away. *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) ("[I]f the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the obdurate refusal to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition") (internal quotation omitted). Months of allergy medication had proven ineffective, yet Henze again prescribed Nasacort. [Dkt. No. 160 at ¶¶ 72–73.] A reasonable jury could conclude that the continued pursuit of an ineffective course of treatment evinces deliberate indifference. *See Petties*, 836 F.3d at 730. As was the case with Williams, genuine issues of fact exist as to whether Henze acted with deliberate indifference under the subjective prong.

33

2. *Causation*

For the reasons already discussed, the Court rejects Defendants argument that Moore has not presented sufficient evidence of causation as to Henze. [Dkt. No. 159 at 28–32.] Defendants' only new argument is that because Henze treated Moore after the four-to-six-week period in which treatment would have been most effective, she cannot be the cause of his hearing loss. [*Id.* at 28; Dkt. No. 171 at 32–33.] But this ignores Moore's loss of chance theory. *See Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012) (discussing "probabilistic harm" and "loss of chance" theory in the § 1983 context). Indeed, Defendants concede Moore must only proffer evidence that a chance was lost. [Dkt. No. 171 at 24.] To that end, Weingarten testified that even outside the six-week window, he would still "offer treatment to the patient," while "advis[ing] them that the . . . likely benefit is miniscule but possible." [Dkt. No. 160 at ¶ 112.]

For all these reasons, the Court denies summary judgment on Moore's deliberate indifference claim as to Williams and Henze.

## C. Count Four for *Monell* Liability Against Wexford

Defendants also move for summary judgment for Count Four against Wexford, a *Monell* claim. [Dkt. No. 159 at 38.] Moore "can bring a *Monell*-style claim against a private corporation acting under color of state law." *Gabb v. Wexford*, 945 F.3d 1027, 1035 (7th Cir. 2019). To begin, a plaintiff must always show that he was "deprived of a federal right." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)). A plaintiff must next "trace the deprivation to some

34

municipal action (*i.e.*, a 'policy or custom'), such that the challenged conduct is 'properly attributable to the municipality itself.'" *Id.* (citing *LaPorta*, 988 F.3d at 986); *see also Stockton*, 44 F.4th at 617 (noting that a private entity may be liable for "(1) an express policy, (2) a widespread practice or custom, or (3) action by one with final policymaking authority"). He must then show that "the policy or custom demonstrates municipal fault," *i.e.*, deliberate indifference. *Dean*, 18 F.4th at 235 (citing *LaPorta*, 988 F.3d at 986). Finally, he must show that the municipal action was "the direct cause or 'moving force' behind [a defendant's] constitutional deprivation," or more simply put, causation. *Id.* The Seventh Circuit has noted that causation for § 1983 claims alleging *Monell* liability is "rigorous" and demands a "direct causal link between the challenged municipal action and the violation of [] constitutional rights." *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997)).

Moore challenges only that the express policy of collegial review was the direct cause of Williams and Henze's alleged constitutional violations. [Dkt. No 161 at 35 ("The record contains evidence sufficient to show that Wexford's 'collegial review' policy caused Williams and Henze to deliver constitutionally inadequate medical care to Mr. Moore.").] No party disputes that the collegial review policy is purposed on cost containment by contractually allowing the State to "claw back" any portion of what it pays to Wexford when off-site referrals that Wexford employees recommend exceed a certain monetary limit, thereby discouraging Wexford employees from referring

offsite specialty care. *Compare* [Dkt. No. 161 at 35–36 (outlining the collegial review policy)] *with* [Dkt. No. 171 at 34 n.7].

Because Moore's claims against Williams and Henze survive summary judgment, Moore has demonstrated an underlying constitutional violation. *Dean*, 18 F.4th at 235. The Court focuses on "moving force" causation and concludes that no reasonable jury could find that Wexford's collegial review was the direct cause or "moving force" behind Williams and Henze's decision-making process to refer Moore for offsite specialty care. *Id.*

To begin, Moore argues that the mere existence of a collegial review policy, with limitations on physician assistants like Williams who cannot refer patients for offsite specialty care, means that there must be a causal connection between the policy and Williams's failure to refer Moore for on or offsite hearing tests or to an offsite specialist such as ENT. [Dkt. No. 161 at 37.]

This evidence falls short as to causation. Although Williams testified that she cannot refer patients to off-site care, there is no evidence that her failure to make such a referral in this case was due to the collegial review policy itself. *See Dean*, 18 F.4th at 239 (noting that the plaintiff "must show that collegial review itself—not simply the actions of the employees administering it—directly caused his constitutional deprivation"). Williams testified that she sent Moore to Henze in December 2018 not for collegial review purposes, but because Moore needed "further assessment and evaluation beyond anything that she could do at that time," and so she referred him to Henze. [Dkt. No. 160 at ¶ 56.] Whether this reasoning was a post-

hoc rationalization for constitutionally deficient care remains a genuine issue of material fact, as discussed above. Whether it was motivated by the collegial review policy does not. No reasonable jury could find that Williams's delays in referral for on or offsite evaluation were connected to the collegial review policy.

As to Henze, Moore argues that the delayed referral for offsite care was motivated both by her skepticism about Moore's complaints and by her training that inmates might lie about their symptoms to receive off-site care. [Dkt. No. 161 at 37–39.] This argument fails to connect Henze's decisions regarding Moore's off-site care to the collegial review policy itself. As the Court understands it, Moore argues that Henze failed to refer him because she did not *believe* that he truly had hearing loss, not because she sought cost savings under collegial review policy. [*Id.* at 37–38.] Malingering concerns aside, the evidence suggests that Henze did not refer Moore to an ENT because she did not believe it was necessary. [Dkt. No. 160 at ¶¶ 81–82.] Under either scenario, the evidence does not plausibly connect Henze's allegedly constitutionally deficient conduct to the collegial review policy. *See Dean*, 18 F.4th at 235. As such, the rigorous causation standard for *Monell* claims has not been satisfied and the Court grants Defendants' summary judgment motion as to Count Four.

### D. Counts Five and Six for Illinois State Law Medical Malpractice and *Respondeat Superior* Liability Against Wexford

Defendants also seek summary judgment on Counts Five and Six, raising the same causation argument as discussed with Moore's deliberate indifference claims. [Dkt. No. 159 at 47.] For the same reasons the Court rejected those arguments in the context of deliberate indifference, it rejects them as to the state law negligence claims.

37

If a claim for negligence under state law survives, so too does a *respondeat superior* claim against an employer. *See also Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 427 (Ill. 2013) (explaining that employer cannot be liable under theory of *respondeat superior* under Illinois law without tort of employee). As such, Defendants' motion for summary judgment is denied as to Counts Five and Six.

## XIV. Conclusion

For the reasons discussed above, Defendants' summary judgment motion is granted in part and denied in part. [Dkt. No. 156.] The Court dismisses Counts Three for deliberate indifference and Count Five for medical malpractice as to Cetta only; Count Four as to *Monell* liability against Wexford; and Count Seven for institutional negligence. The Court denies summary judgment on the remaining claims, namely, Counts Three and Five as to Williams and Henze; Count Five for Illinois medical malpractice; and Count Six on the basis of *respondeat superior* liability.

Enter: 19-cv-3892
Date: July 12, 2023

_____
Lindsay C. Jenkins
United States District Judge